IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) |
| | ) |
| ERIE COUNTY, NEW YORK; | ) |
| CHRIS COLLINS, COUNTY EXECUTIVE; | ) Civil No. _____ |
| ANTHONY BILLITTIER, IV, MD, COUNTY | ) |
| HEALTH COMMISSIONER; | ) |
| TIMOTHY B. HOWARD, ERIE COUNTY | ) |
| SHERIFF; RICHARD T. DONOVAN, | ) |
| ERIE COUNTY UNDERSHERIFF; | ) |
| ROBERT KOCH, SUPERINTENDENT, | ) |
| ADMINISTRATIVE SERVICES DIVISION, | ) |
| JAIL MANAGEMENT DIVISION; | ) |
| BARBARA LEARY, FIRST DEPUTY | ) |
| SUPERINTENDENT FOR ERIE COUNTY | ) |
| HOLDING CENTER; DONALD LIVINGSTON, | ) |
| FIRST DEPUTY SUPERINTENDENT FOR | ) |
| ERIE COUNTY CORRECTIONAL FACILITY, | ) |
| | ) |
| DEFENDANTS. | ) |
| | ) |

**COMPLAINT**

PLAINTIFF, THE UNITED STATES OF AMERICA ("Plaintiff"),
by its undersigned attorneys, hereby alleges upon
information and belief:

1. The Attorney General files this Complaint on behalf
of the United States of America pursuant to the Civil Rights
of Institutionalized Persons Act of 1980, 42 U.S.C. § 1997,

- 2 -

to enjoin the named Defendants from depriving persons incarcerated at the Erie County Holding Center ("ECHC") in Buffalo, New York, and the Erie County Correctional Facility ("ECCF") in Alden, New York, of rights, privileges, or immunities secured and protected by the Constitution of the United States.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over this action under 28 U.S.C. § 1345.

3.  The United States is authorized to initiate this action pursuant to 42 U.S.C. § 1997a.

4.  The Attorney General has certified that all pre-filing requirements specified in 42 U.S.C. § 1997b have been met.  The Certificate of the Attorney General is appended to this Complaint as Attachment A and is incorporated herein.

5.  Venue in the United States District Court for the Western District of New York is proper pursuant to 28 U.S.C. § 1391.

## DEFENDANTS

6.  Defendant ERIE COUNTY (the "County") is a governmental subdivision created under the laws of the State of New York.  The Erie County Sheriff's Office is a division

- 3 -

of the Erie County government.  The County owns and operates ECHC and ECCF.  This action concerns the administration of persons confined at ECHC and ECCF, which house pre- and post-trial detainees.

7.  Defendant ERIE COUNTY is the entity charged by the laws of the State of New York with authority to maintain ECHC and ECCF and is responsible for the conditions of confinement and health and safety of persons incarcerated at ECHC and ECCF.

8.  Defendant CHRIS COLLINS is the County Executive and serves as the chief administrator of the County government. County Executive COLLINS is sued in his official capacity.

9.  Defendant ANTHONY BILLITTIER, IV, MD, is the County Health Commissioner and is responsible for the daily oversight of health care employees at ECHC and ECCF.  County Health Commissioner BILLITTIER is sued in his official capacity.

10.  Defendant TIMOTHY B. HOWARD is the Sheriff of Erie County and is responsible for the day-to-day operations of ECHC and ECCF.  In his official capacity as Sheriff, he has the custody, control, and charge of ECHC and ECCF and the inmates confined within.  Sheriff HOWARD is sued in his official capacity.

- 4 -

11.  Defendant RICHARD T. DONOVAN is the Undersheriff of Erie County and is responsible for the day-to-day operations of ECHC and ECCF.  In his official capacity as Undersheriff, he has the custody, control, and charge of ECHC and ECCF and the inmates confined within.  Undersheriff DONOVAN is sued in his official capacity.

12.  Defendant ROBERT KOCH is the Superintendent of ECHC and ECCF and is responsible for the Administration, Security, and Programs of both facilities.  In his official capacity as Superintendent, he has the custody, control, and charge of ECHC and ECCF and the inmates confined within. Superintendent KOCH is sued in his official capacity.

13.  Defendant BARBARA LEARY is the First Deputy Superintendent of the Jail Management Division of Erie County and is responsible for the day-to-day operations of ECHC.  In her official capacity as First Deputy Superintendent, she has the custody, control, and charge of ECHC and the ECHC overflow annex located at ECCF and the inmates confined within.  First Deputy Superintendent LEARY is sued in her official capacity.

14.  Defendant DONALD LIVINGSTON is the First Deputy Superintendent of the Jail Management Division of Erie County and is responsible for the day-to-day operations of ECCF.  In his official capacity as First Deputy

- 5 -

Superintendent, he has the custody, control, and charge of
ECCF and the inmates confined within.  First Deputy
Superintendent LIVINGSTON is sued in his official capacity.

15.  Defendants are legally responsible, in whole or in
part, for the operation and conditions of ECHC and ECCF, and
for the health and safety of persons incarcerated in ECHC
and ECCF.

16.  At all relevant times, the Defendants or their
predecessors in office have acted or failed to act, as
alleged herein, under color of state law.

## FACTUAL ALLEGATIONS

17.  ECHC and ECCF are institutions within the meaning
of 42 U.S.C. § 1997(1).

18.  Persons confined to ECHC are pre-trial detainees.

19.  Persons confined to ECCF are sentenced inmates,
with the exception of pre-trial detainees who are held in
the ECHC overflow annex located at ECCF.

20.  Defendants have repeatedly and consistently
disregarded known or serious risks of harm to inmates at
ECHC and ECCF, as detailed in the letter issued by Acting
Assistant Attorney General Loretta King on July 15, 2009,
detailing the investigative findings of conditions at ECHC
and ECCF ("Findings Letter").  The Findings Letter is

- 6 -

appended to this Complaint as Attachment B and is incorporated by reference herein.

21.  Defendants have repeatedly failed to take reasonable measures to prevent staff from inflicting serious harm on inmates, even in the face of the obvious and substantial risk that staff will inflict such harm and the multiple occasions in which ECHC and ECCF staff in fact have inflicted such harm.   These failures have manifested themselves in the following respects, among others outlined in the Findings Letter:

      a.   inadequate protection from staff abuse, including failing to adequately investigate allegations of excessive use of force, notwithstanding multiple occasions on which staff have used excessive force on inmates; and

      b.   inadequate protection from harm and serious risk of harm caused by sexually abusive behavior between staff and inmates at ECHC and ECCF.

These failures continue.

22.  Defendants have repeatedly failed to take reasonable measures to protect inmates against the serious harm inflicted on them by other inmates, even in the face of

- 7 -

the obvious and substantial risk that inmates will inflict
such harm and the multiple occasions in which ECHC and ECCF
inmates have in fact inflicted such harm. These failures
have manifested themselves in the following respects, among
others outlined in the Findings Letter:

  a.  inadequate protection from inmate-on-inmate
      abuse, including failing to protect
      vulnerable inmates from harm, such as those
      who are at risk of harm from other inmates;

  b.  inadequate protection from harm and serious
      risk of harm caused by a failure to protect
      inmates vulnerable to sexual abuse by other
      inmates at ECHC and ECCF; and

  c.  failure to implement an inmate classification
      system that adequately assesses the risk
      factors for inmate-on-inmate violence.

These failures continue.

  23.  Defendants have, in the following specific
respects, among others outlined in the Findings Letter,
repeatedly failed to provide adequate mental health and
medical treatment and services to inmates with serious
mental health and medical needs that are known or obvious:

  a.  inadequate suicide prevention (including the
      placement of suicidal inmates in cells that

- 8 -

contain multiple means for committing
suicide) and inadequate mental health care
resulting in multiple suicides and attempted
suicides between 2007 and 2008, as well as
multiple episodes of suicidal ideation and
self-injurious behavior;

b.    inadequate management of medical services and
treatment;

c.    inadequate administration of medication,
including controlled substances, resulting
from nursing staff being untrained in
critical areas of security, accountability,
and common side effects of medications; and

d.    inadequate infection control, including
failing to test timely for Tuberculosis
and/or supervise at ECHC and failing to
adequately treat, contain, and manage
infectious diseases such as Methicillin-
resistant Staphylococcus aureus.

These failures continue.

24.   Defendants have pervasively maintained a physical
environment at ECHC that poses an unreasonable risk of
serious harm to inmates' health and safety by failing to
correct facility maintenance problems that pose a risk of

- 9 -

harm to the safety of inmates and staff within the facility and its exterior, including those deficiencies outlined in the Findings Letter.  Defendants have continued to maintain such an environment notwithstanding these known or obvious risks.

25.  The factual allegations set forth in paragraphs 17 through 24 and outlined in the Findings Letter have been obvious and known to Defendants for a substantial period of time, yet Defendants have failed to adequately address the conditions described.

26.  The factual allegations set forth in paragraphs 17 through 24 and outlined in the Findings Letter are supported by the findings made by several other entities tasked with reviewing ECHC and ECCF, including the New York State Commission of Correction and the National Commission on Correctional Health Care.

## VIOLATIONS ALLEGED

27.  The United States incorporates by reference the allegations set forth in paragraphs 1 through 26 as fully set forth herein.

28.  Through the acts and omissions alleged in paragraphs 17 through 24 and outlined in the Findings Letter, Defendants have exhibited deliberate indifference to

- 10 -

the health and safety of ECHC and ECCF inmates, in violation
of the rights, privileges, or immunities of those inmates as
secured or protected by the Constitution of the United
States.  U.S. Const. amend. VIII, XIV.

29.  Unless restrained by this Court, Defendants will
continue to engage in the acts and omissions set forth in
paragraphs 17 through 24 and outlined in the Findings Letter
that deprive persons confined in ECHC and ECCF privileges or
immunities secured or protected by the Constitution of the
United States.

### PRAYER FOR RELIEF

30.  The Attorney General is authorized under
42 U.S.C. § 1997 to seek equitable and declaratory relief.

WHEREFORE, the United States prays that this Court
enter an order:

a.  declaring that the acts, omissions, and
practices of Defendants set forth in paragraphs 17 through
24 above and outlined in the Findings Letter deprive inmates
confined at ECHC and ECCF of rights, privileges, or
immunities secured or protected by the Constitution of the
United States;

b.  permanently enjoining Defendants, their
officers, agents, employees, subordinates, successors in

- 11 -

office, and all those acting in concert or participation with them from continuing the acts, omissions, and practices set forth in paragraphs 17 through 24 above and outlined in the Findings Letter and requiring Defendants to take such actions as will ensure lawful conditions of confinement are afforded to inmates at ECHC and ECCF; and

      c.  granting such other and further equitable relief as it may deem just and proper.

                        Respectfully submitted,

                        S/Eric H. Holder, Jr.
                        ERIC H. HOLDER, JR.
                        Attorney General of the
                        United States

- 12 -

S/Kathleen M. Mehltretter

KATHLEEN M. MEHLTRETTER
United States Attorney
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202

S/Loretta King

LORETTA KING
Acting Assistant Attorney General
Civil Rights Division

SAMUEL R. BAGENSTOS
Deputy Assistant Attorney General
Civil Rights Division


S/Shanetta Y. Cutlar

SHANETTA Y. CUTLAR
Chief
Special Litigation Section


S/Daniel H. Weiss

DANIEL H. WEISS
Deputy Chief
Special Litigation Section


S/Zazy I. Lopez

ZAZY I. LÓPEZ
AARON S. FLEISHER
ALYSSA C. LAREAU
CHARLES W. HART
Attorneys
Civil Rights Division
Special Litigation Section
U.S. Department of Justice
950 Pennsylvania Avenue, NW
SPL, 601 D Street, Rm. 5426
Washington, DC   20530
(202)305-8702

EXHIBIT A



**Office of the Attorney General**
**Washington, D. C. 20530**

CERTIFICATE OF THE ATTORNEY GENERAL

I, Eric H. Holder, Jr., Attorney General of the United States, certify that with regard to the foregoing Complaint, <u>United States v. Erie County</u>, I have complied with all subsections of 42 U.S.C. § 1997b(a)(1). I certify as well that I have complied with all subsections of 42 U.S.C. § 1997b(a)(2). I further certify, pursuant to 42 U.S.C. § 1997b(a)(3), my belief that this action by the United States is of general public importance and will materially further the vindication of rights, privileges, or immunities secured or protected by the Constitution of the United States.

In addition, I certify that I have the "reasonable cause to believe," set forth in 42 U.S.C. § 1997a, to initiate this action. Finally, I certify that all prerequisites to the initiation of this suit under 42 U.S.C. § 1997 have been met.

Pursuant to 42 U.S.C. § 1997a(c), I have personally signed the foregoing Complaint. Pursuant to 42 U.S.C. § 1997b(b), I am personally signing this Certificate.

Signed this ___28th___ day of ___September___, 2009, at Washington, D.C.

S/Eric H. Holder, Jr.
ERIC H. HOLDER, JR.
Attorney General of the United States

42 U.S.C. § 1997

EXHIBIT B



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

JUL 1 5 2009

The Honorable Chris Collins
County Executive
Rath Building - 16th Floor, Rm. 1600
Buffalo, NY  14202

RE:    CRIPA Investigation of the Erie County Holding Center
       and the Erie County Correctional Facility

Dear Mr. Collins:

We write to report the Civil Rights Division's investigative findings of conditions at the Erie County Holding Center ("ECHC") and the Erie County Correctional Facility ("ECCF"). On November 13, 2007, we notified then Erie County Executive Joel Giambra that we had initiated an investigation of these facilities pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, which authorizes the Department of Justice to seek remedies for any pattern or practice of conduct that violates the constitutional rights of incarcerated persons. Initially, we informed Executive Giambra that our investigation would focus on medical care, mental health care, and protection from harm; however, in the course of our investigation, we also became aware of environmental health and sanitation conditions that warranted investigation.

We note that, initially, the County of Erie (the "County") cooperated with our investigation, providing the United States with some of the requested documents from January 1, 2007, through March 1, 2008. Specifically, the County provided ECHC incident reports; some grievances; state and national corrections reports; and ECHC and ECCF policies and procedures. However, the County did not produce corresponding medical reports, which limited our ability to assess the number and severity of injuries that inmates suffered following incidents of self-injurious behavior, attempted suicides, actualized suicides, inmate-on-inmate violence, and excessive use of force by staff.

- 2 -

Initially, we planned to tour ECHC and ECCF in March 2008, but we re-scheduled our tour to August 2008 at the County's request, due to the appointment of a new County Attorney. In the months leading up to the scheduled August tour, the County broke off all communication with us despite our repeated outreach and offers to meet and discuss the County's concerns. On June 16, 2008, the new County Attorney notified us that the County would no longer cooperate with our investigation. The County refused, and continues to refuse, to allow us access to the facilities, staff, or inmates.

The County's unreasonable denial of our request for access is especially troubling, given that inmates committed suicide on the March 31, 2008, and April 30, 2008, well after we placed the County on notice that our investigation would review allegations of deficient suicide prevention measures. If the County had agreed to our proposed investigation procedures, County officials would have had an early opportunity to work directly with our experts and staff, in an effort to improve conditions at the facilities with the hopes of avoiding such incidents. They also would have had an opportunity to address any identified problems on a voluntary, proactive basis at an early stage of this investigation.

Furthermore, while we strongly disagree with the County's decision to deny us access to the facilities, the County's denial of our request for access to Erie County inmates, even during regular visiting hours, is unreasonable and devoid of any legal or penological support. Inmates have a First Amendment right to speak with government representatives about the conditions of their confinement and the County has no legitimate penological basis to deny the inmates access to United States government representatives.

In December 2008, we informed the County of our plans to travel to the County to interview inmates at ECHC and ECCF. The County again denied us access to ECHC and ECCF inmates. Despite the County's refusal to cooperate, during our December 2008 visit to the County of Erie, we were able to communicate with a number of current and recently transferred ECHC inmates through an arrangement with the United States Marshals Service ("USMS") and various state facilities.[1]

---

[1]     We appreciate the assistance provided to us by the New York State Department of Correctional Services and the staff at the Attica, Orleans, and Wende facilities.

- 3 -

We later learned that the County interviewed some of the ECHC inmates with whom we communicated. We were told that these interviews were videotaped, that the inmates were asked what we had spoken to them about, and that they were required to sign a form.[2] We stressed to the County that such interviews could be construed as retaliation, which is unlawful under CRIPA, but we were given no assurances that the County would desist from such behavior. Notably, we repeated our offer to meet with the County, in order to explain our investigative process, instead of having the County attempt to secure this information from inmates in a manner the inmates might find troubling. Again, our offer was rejected.

By law, our investigation must proceed regardless of whether officials choose to cooperate. Indeed, when CRIPA was enacted, lawmakers considered the possibility that state and local officials might not cooperate in our federal investigation. See H.R. CONF. REP. 96-897, at 12 (1980), reprinted in 1980 U.S.C.C.A.N. 832, 836. Such non-cooperation is a factor that may be considered adversely when drawing conclusions about a facility. See id. We now draw such an adverse conclusion.[3]

Consistent with the statutory requirements of CRIPA, we write to advise you of the findings of our investigation, the facts supporting them, and the minimum remedial measures that are necessary to address the deficiencies we have identified. As described more fully below, we conclude that the conditions of confinement violate the constitutional rights of inmates confined at ECHC and ECCF. In particular, we find that, based on constitutionally deficient practices, the Erie County Sheriff's Office ("ECSO"), the Jail Management Division ("JMD"), and the Erie County Department of Mental Health ("ECDMH"), through the Adult Forensic Mental Health Clinic, fail to protect inmates from serious harm or the risk of serious harm.

_____

[2]    We requested copies of any videotapes from these interview sessions and any forms signed by the inmates, but our request was denied by the County.

[3]    The County's non-cooperation constitutes only one factor that we consider in preparing our statutory findings and recommendations. We also have considered the documentation provided by the County, reports issued by the National Commission on Correctional Health Care and the New York State Commission on Corrections, news articles, and interviews with private attorneys, inmates, and local law enforcement officers.

- 4 -

## I. BACKGROUND

### A. Facility Description

ECHC is a pre-trial detention center located in Buffalo, New York; ECCF is a correctional facility located in Alden, New York. Both facilities are under the authority of Erie County Sheriff Timothy B. Howard, and are managed by the Superintendent of the County's JMD.[4] ECHC is the second largest pre-trial detention facility in New York. ECHC was built to house 680 inmates with the combination of "pod," open bay "dorm," and traditional linear-type cells. ECCF was built to house 1,070 convicted prisoners, parole violators, and ECHC overflow inmates. Approximately 23,000 people are processed through the two facilities each year, with a daily population of approximately 1,600. The ECSO provides medical and dental services to both facilities, while the Erie County Department of Mental Health Services, through the Adult Forensic Mental Health Clinic, provides the mental health services for both facilities.[5] ECHC and ECCF inmates may also be admitted to the Erie County Medical Center's secure Psychiatric Service Unit, guarded by in-hospital sheriff's deputies.

### B. Legal Standards

CRIPA authorizes the Attorney General to investigate and take appropriate action to enforce the constitutional rights of jail inmates and detainees subject to a pattern or practice of unconstitutional conduct or conditions. 42 U.S.C. § 1997.

When a jurisdiction takes a person into custody and holds him there against his will, the Constitution imposes upon the jurisdiction a corresponding duty to assume some responsibility for the inmate's safety and general well-being. County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998) (citing DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 199-200 (1989)). Generally, county governments must provide persons confined in a jail with reasonably safe conditions of

---

[4]     The Superintendent of the Holding Center oversees the Administration, Security, and Programs of both facilities and reports directly to the Undersheriff, who reports directly to the Sheriff.

[5]     National Commission on Correctional Health Care, Health Services Study:  Erie County Corrections Facilities ("NCCHC 2008 Erie Report"), at 2 (Jan. 10, 2008, revised, Feb. 11, 2008).

- 5 -

confinement.  See Bell v. Wolfish, 441 U.S. 520 (1979).
Specifically, the Eighth and Fourteenth Amendments require that
inmates, both pre- and post-trial, "receive adequate food,
clothing, shelter, and medical care." Farmer v. Brennan,
511 U.S. 825, 832 (1994); Benjamin v. Fraser, 343 F.3d 35
(2d. Cir. 2003).

The Eighth Amendment protects prisoners from present,
continuing, and future harm.  See Helling v. McKinney,
509 U.S. 25, 33 (1993).  Prison officials have a duty to protect
inmates from harm caused by other inmates and from excessive
physical force by correctional staff.  See Farmer, 511 U.S. at
833; see also, Ayers v. Coughlin, 780 F. 2d 205, 209 (2d Cir.
1986).  The Eighth Amendment further requires that inmates
receive access to adequate medical and mental health care.  See
Farmer, 511 U.S. at 832; Benjamin, 343 F.3d at 50.  Deliberate
indifference to the serious medical needs of inmates, including
pre-trial detainees, constitutes an unnecessary and wanton
infliction of pain contrary to contemporary standards of decency
and violates the Eighth Amendment.  See Estelle v. Gamble, 429
U.S. 97, 104 (1976); Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir.
1996).

The Fourteenth Amendment protects pre-trial detainees from
being punished or exposed to conditions or practices not
reasonably related to the legitimate governmental objectives of
safety, order, and security.  Bell, 441 U.S. at 535-37, 547-48;
Benjamin, 343 F.3d at 50.  Although the Eighth Amendment does not
apply to pre-trial detainees, they "retain at least those
constitutional rights . . . enjoyed by convicted prisoners [under
the Eighth Amendment]." Bell, at 545; Benjamin, 343 F.3d at 50
("under the Due Process Clause, [pre-trial detainees] may not be
punished in any manner - neither cruelly and unusually nor
otherwise"); Weyant v. Okst, 101 F.3d 845 (2d Cir. 1996).

1.  Protection From Harm

The Eighth and Fourteenth Amendments forbid excessive
physical force against inmates and pre-trial detainees.  See
Hudson v. McMillian, 503 U.S. 1 (1992), Farmer, 511 U.S. at 832;
see also, United States v. Walsh, 194 F.3d 37, 48 (2d Cir. 1999)
("the right of pre-trial detainees to be free from excessive
force amounting to punishment is protected by the Due Process
Clause of the Fourteenth Amendment.")(citing Bell, 441 U.S. at
535 [citations omitted]).  This is true even when the use of
force does not result in significant injury.  Id.  A jail or
prison official who inflicts force maliciously and sadistically
to cause an inmate harm violates the Eighth and Fourteenth

- 6 -

Amendments.  See Livingston v. Griffin, 2007 U.S. Dist. Lexis
36941, at *30 (May 21, 2007)(citing Hudson, 503 U.S. at 9);
Walsh, 194 F.3d at 47-48 (applying Fourteenth Amendment
protections to pre-trial detainees in criminal case against
corrections officer accused of violating inmate's constitutional
rights).  Courts have "applied the same Eighth Amendment
standards to the deliberate indifference claims of pre-trial
detainees."  Patrick v. Amicucci, 2007 WL 840124, at *3 (S.D.N.Y.
Mar. 19, 2007).

     In determining whether excessive force was used, courts
examine a variety of factors, including:

        "[T]he need for the application of force, the
        relationship between that need and the amount of force
        used, the threat reasonably perceived by the
        responsible officials, and any efforts made to temper
        the severity of a forceful response."

Hudson, 503 U.S. at 7-8.

     In determining whether conduct rises to the level of a
constitutional violation, the Second Circuit requires that the
"prison official have 'knowledge that an inmate faces substantial
risk of serious harm and disregard[ed] that risk by failing to
take reasonable measures to abate the harm.'"  Patrick,
2007 WL 840124 at *3 (citing Lee v. Artuz, 2000 WL 231083, at *5
(S.D.N.Y. Feb. 29, 2000)), quoting from Hayes v. N.Y. City Dep't
of Corr., 84 F.3d 614, 620 (2d Cir. 1996).  The Second Circuit
also requires that "an injured inmate . . . show not only that he
was exposed to a substantial risk of serious harm but also that
the defendant officials acted with deliberate indifference to his
health or safety."  Patrick, 2007 WL 840124 at *3, (citing
Farmer, 511 U.S. at 837).  Liability arises where an official
knew of and disregarded "an excessive risk to inmate health or
safety [and is both] aware of facts from which the inference
could be drawn that a substantial risk of harm exists, and he
must also draw the inference."  Id.  Prison officials have been
found liable when "they are on notice of a substantial risk of
serious harm to an inmate and fail to take reasonable steps to
protect him [or her]."  Id.

     The right to be protected from harm includes the right to be
reasonably protected from constant threats of violence.  See
Farmer, 511 U.S. at 833.  This includes protecting inmates from
sexual assault from other inmates and correctional officers.  See
Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997) (finding
the "sexual abuse of a prisoner by a corrections officer has no

- 7 -

legitimate penological purpose, and is 'simply not part of the penalty that criminal offenders pay for their offenses against society.'") (citing <u>Farmer</u>, 511 U.S. at 834)); <u>Villante v. Dep't.</u> <u>of Corr.</u>, 786 F.2d 516, 522-23 (2d Cir. 1986)(finding inmate stated a cause of action for deliberate indifference where guards failed to protect inmate from sexual threats and abuse by other inmates); <u>Rodriguez v. McClenning</u>, 399 F. Supp. 2d 228, 236-238. (S.D.N.Y. 2005) (finding officer's sexual assault of prisoner constituted an Eighth Amendment violation); <u>Noguera v. Hasty</u>, 2001 WL 243535, at *2 (S.D.N.Y. Mar. 12, 2001); <u>Colman v.</u> <u>Vasquez</u>, 142 F.Supp. 2d 226, 237 (D.Conn. 2001).

Lastly, "a corrections officer bears an affirmative duty to intercede on behalf of an inmate when the officer witnesses other officers maliciously beating that inmate in violation of the inmate's Eighth [and Fourteenth] Amendment rights." <u>Jones v.</u> <u>Huff</u>, 789 F. Supp. 526, 535 (N.D.N.Y. 1992)(citing <u>O'Neill v.</u> <u>Krzeminski</u>, 839 F.2d 9, 11 (2d Cir. 1988)); <u>see also</u>, <u>Walsh</u>, 194 F.3d at 48 (holding "<u>Hudson</u> analysis is applicable to excessive use of force claims brought under the Fourteenth Amendment."). "The duty arises if the officer has a reasonable opportunity to intercede." <u>Id.</u> (citing <u>O'Neill</u>, 839 F.2d at 11).

## 2.   Medical and Mental Health Care

The Constitution requires that prison officials address inmates' serious medical and mental health needs. <u>Estelle</u>, 429 U.S. at 104. Officials act with deliberate indifference when an inmate needs serious medical or mental health care and the officials fail to, or refuse to, obtain or provide that care. <u>Id.</u>; <u>see also</u>, <u>Hathaway v. Coughlin</u>, 37 F. 3d 63 (2d Cir. 1994); <u>Chance v.</u> <u>Kaminsky v. Rosenblum</u>, 929 F. 2d 922 (2d Cir. 1991); <u>Armstrong</u>, 143 F. 3d 698 (2d Cir. 1988). The "deliberate indifference to a prisoner's serious medical needs constitutes the 'unnecessary and wanton infliction of pain'" in violation of the Eighth Amendment. <u>Estelle</u>, at 104 (citation omitted). This includes protecting prisoners whose health problems are "'sufficiently imminent' and 'sure or very likely to cause serious illness and needless suffering in the next week or month or year.'" <u>Young v. Coughlin</u>, 1998 U.S. Dist. LEXIS 764, at *11 (S.D.N.Y. Jan. 29, 1998)(citing <u>Helling</u>, 509 U.S. at 33).

The constitutional responsibility to provide minimally sufficient medical care includes treatment of psychiatric or mental health illnesses. <u>Langley v. Coughlin</u>, 888 F.2d 252, 254 (2d Cir. 1989). Prison officials have an obligation to protect an inmate from self-inflicted injury where the prison official

- 8 -

knew or had reason to know "of a potential suicide risk to an inmate . . . ." Eze v. Higgins, 1996 WL 861935, at *7 (W.D.N.Y. 1996) (citing Hudson, 468 U.S. at 526-27 (1984)). Prison officials act with a deliberate indifference to the risk of suicide when they fail "to discover an individual's suicidal tendencies . . . [or] could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide . . . ." Kelsey v. City of New York, 2006 U.S. Dist. LEXIS 91977, at *16 (E.D.N.Y. Dec. 18, 2006) (citing Rellergert v. Cape Girardeau County, 924 F.2d 794, 796 (8th Cir. 1991)).

     3.    Sanitation

Inmates are constitutionally entitled to environmental conditions that do not pose serious risks to health and safety, including deficient sanitation, inadequate fire safety, inadequate ventilation, and pest infestation. Benjamin, 343 F.3d at 52 (affirming district court findings that "inadequate ventilation, lighting, and exposure to extremes of temperature violated the detainees' constitutional rights"); Harris v. Westchester County Dep't of Corr., 2008 U.S. Dist. LEXIS 28372, at *18 (S.D.N.Y. Apr. 2, 2008) (finding a leaking ceiling an "unsafe prison condition").

In the Second Circuit, "challenges by pre-trial detainees 'to the environmental conditions of their confinement are properly reviewed under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth.'" Harris, 2008 U.S. Dist. LEXIS at *17, citing Benjamin, 343 F.3d at 49-50. "Where a pre-trial detainee alleges 'a protracted failure to provide safe prison conditions, the deliberate indifference standard does not require the detainees to show anything more than actual or imminent substantial harm.'" Harris, 2008 U.S. Dist. LEXIS at *17, citing Benjamin, 343 F.3d at 51 (emphasis omitted). Challenges by sentenced inmates to environmental conditions of confinement, however, are protected by the Eighth Amendment, and in order for an inmate to prevail on an environmental conditions of confinement claim, an inmate must meet the deliberate indifference standard. See Hathaway, 37 F.3d at 66.

II.  FINDINGS

The ECSO and JMD's administration of ECHC and ECCF is woefully inadequate and has resulted in a pattern of serious harm to inmates, including death. We find that the County, ECSO, JMD,

- 9 -

and ECDMH fail to provide adequate suicide prevention; mental
health care; medical care; protection from harm; and safe and
sanitary environmental conditions.  In making these findings, we
are cognizant that the County has received similar notice
regarding conditions in ECHC and ECCF from the New York State
Commission on Corrections ("NYSCC") and the National Commission
on Correctional Health Care ("NCCHC") on multiple occasions, but
has yet to remedy these issues.[6]

    A.    Inadequate Suicide Prevention

    Constitutional requirements mandate the development of
suicide prevention standards.  These standards require:  (1) an
appropriate policy and procedure; (2) education and training for
all staff members; (3) appropriate screening to assess suicide
risk; (4) appropriate housing for those identified as at risk;
(5) appropriate supervision, observation, and monitoring of those
inmates so identified; (6) appropriate referrals to mental health
providers and facilities; (7) appropriate communication between
correctional health care personnel and correctional personnel;
(8) appropriate intervention addressing procedures of how to
handle a suicide in progress; and (9) appropriate notification,
reporting, and review if a suicide does occur.

    ECHC and ECCF's current suicide prevention practices do not
comport with generally accepted standards of correctional mental
health care.  Although the policies we reviewed appear sound, it
is clear by the number of recent suicides and attempted suicides
that there are serious problems with how the policy is

---

[6]    See, e.g., New York State Commission on Corrections,
Minimum Standards Evaluation - Erie County Jail Management
Division ("NYSCC 2006 Evaluation")(2006); New York State
Commission on Corrections Erie County Holding Center Cycle 2
Evaluation, Apr. 30, 2007 ("NYSCC ECHC Cycle 2 Evaluation Apr.
2007"); New York State Commission on Corrections Erie County
Holding Center Cycle 2 Evaluation, Aug. 6, 2007 ("NYSCC ECHC
Cycle 2 Evaluation Aug. 2007"); New York State Commission on
Corrections ECHC Phase 2 Evaluation, Apr. 2008; National
Commission on Correctional Health Care, Health Services Study:
Erie County Corrections Facilities ("NCCHC 2008 Erie
Report")(Jan. 10, 2008, revised, Feb. 11, 2008); and numerous
letters from the NYSCC to Erie officials, cited throughout.

- 10 -

implemented and followed.[7]  Moreover, despite a 2008 NCCHC warning, the County continues to house suicidal inmates in unsafe cells that allow an inmate multiple ways to facilitate committing suicide, including:  using steel beds, wall plates removed from the wall, accessible grab bars, and bars on windows.[8]  ECHC inmates have exploited cell deficiencies, incorporating them into their suicide attempts.  Since 2003, at least 23 inmates either committed, or attempted to commit, suicide, or took steps that demonstrated suicidal ideation.  Between 2007-2008 there were three suicides and at least ten attempted suicides.  Below, we provide examples of the County's inability to supervise inmates, identify inmates at risk for suicide, correct deficiencies in cells that facilitate suicide attempts, and prevent likely suicide attempts.

- ECHC inmates have committed suicide by hanging themselves from air vents using bed sheets.  In 2008 alone, two inmates died in such a manner, raising the total to over 15 inmates who have committed, or attempted to commit, suicide in a similar fashion since 2002.

- In the past two years, more than five inmates who attempted suicide by hanging or self-strangulation were unsuccessful only because a guard or another inmate discovered the attempt and cut down the self-made noose or otherwise removed the fabric from around the inmate's neck.  In one instance, ECHC deputies discovered a distraught inmate in his cell only after the rope broke during his attempt to hang himself.

---

[7]    For example, the Suicide Prevention Policy requires that inmates housed in Constant Observation receive uninterrupted, personal visual observation.  Yet, inmates held in constant observation are still finding ways to hide contraband, such as a bullet.  Similarly, the policy requires that the dispensation of psychotropic medication be adequately monitored, yet one inmate attempted suicide by ingesting another inmate's medication, while yet another inmate hoarded his medication for weeks without notice.

[8]    NCCHC 2008 Erie Report, supra, n. 5, at 10 ("The cells used to house suicidal inmates were not 'suicide-proof.'  There were multiple ways to facilitate committing suicide, including using the steel beds, wall plates that are lifted from the wall, handicapped bars, bars on windows, etc.").

- 11 -

- In December 2008, an ECHC inmate attempted suicide by hanging. This was the inmate's third suicide attempt.

- In March 2008, an ECHC inmate committed suicide by hanging, despite a warning from the inmate's family that the inmate could be suicidal.

- In February 2008, a 17-year-old ECHC inmate attempted suicide by hanging. Two other inmates grabbed his legs and successfully untied the sheets from the bars.

- In November 2007, an ECHC inmate attempted suicide while under constant observation. Despite the suicide attempt, ECHC officials released the inmate into general population, where he again attempted suicide six days after his earlier attempt.

- In May 2007, ECHC deputies found an inmate unconscious on the floor of his cell after he attempted suicide by ingesting a dangerous quantity of another inmate's quetiapine.[9] Deputies found a suicide note in his cell, and ECHC documents do not indicate whether the inmate ever regained consciousness.

- In January 2007, an ECHC inmate committed suicide in view of deputies by diving off a 15-foot railing in the common area. Upon admission to ECHC, the inmate was reportedly evaluated by forensic staff and determined not to be a suicide risk.

In addition to suicides and attempted suicides, we found many examples of inmates who engaged in self-injurious behavior, including banging their heads against the wall, cutting themselves with metal and glass objects, and verbally expressing a desire to die. Documentation provided by the County fails to indicate that these inmates were referred for mental health assessments or further suicide screening. Furthermore, despite prior warnings from the NYSCC, the County's facilities provide ready access to a number of environmental hazards such as screws,

---

[9]    A psychotropic medication used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder.

- 12 -

nuts, and bolts on chairs that could cause injury or be removed
and used as a weapon.[10]  For example:

- In October 2007, ECHC deputies found an inmate, who had
  attempted suicide on a prior occasion, holding a broken
  light bulb to his neck.[11]

- In September 2007, deputies witnessed an inmate smash
  his cell window and cut his arm with a broken piece of
  glass.[12]

- In June 2007, an ECHC inmate verbally threatened
  self-harm after he flooded his cell and smeared feces
  on himself and the cell wall.  Deputies sent the inmate
  for a medical examination regarding injury to his eye.
  There is no indication in the materials provided by the
  County that the inmate received any psychiatric
  evaluation.

- In February 2007, ECHC deputies discovered an inmate
  hoarding 38 pills he was to be taking three times each
  day to treat high blood pressure.  Deputies did not
  refer the inmate for a psychiatric evaluation because
  the inmate reportedly indicated he did not wish to harm
  himself.

The availability of dangerous implements and numerous
examples of self-injurious behavior amplify the County's
inability to monitor and supervise inmates.  The examples also
illustrate the County's inability or unwillingness to refer
inmates for appropriate mental health treatment.  Given the
number of suicides and attempted suicides at these facilities, at
least five of which occurred following the release of the NCCHC
2008 Erie Report placing the County on notice of such issues, it
is evident that County officials are deliberately indifferent and
have not taken these incidents or the recommendations of the
NYSCC and NCCHC seriously.

---

[10]    NYSCC ECHC Cycle 2 Evaluation Aug. 2007, supra, n. 6,
at 4; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, supra, n. 6, at 6.

[11]    Subsequently, this inmate was interviewed by forensic
staff, who placed the inmate on constant observation.

[12]    Subsequently, this inmate was interviewed by forensic
staff, who placed the inmate on constant observation.

- 13 -

B.    Inadequate Mental Health Care

ECDMH fails to provide inmates with adequate mental health care.  ECHC and ECCF inmates require mental health assessments and treatment to avoid the unnecessary suffering of acute and chronic episodes of mental illness.  Generally accepted correctional mental health care standards require that a physician see an inmate usually before, but clearly shortly after, a prescription for psychotropic medication is written so that the physician can evaluate whether the medication should be maintained and to assess the medication order for proper dosage and effectiveness.  Inmates who remain untreated, or who are treated without being seen by a physician, may suffer from a worsening of their symptoms, including suicidal and homicidal thoughts, or from the potentially lethal side effects of medication.

An alarming example of deficient mental health care is the death of inmate Jimmy Roberts.[13]  On May 19, 2007, Mr. Roberts died of pneumonia brought on by starvation and dehydration after spending four months in ECHC.  ECHC staff ignored Mr. Roberts' deteriorating behavior despite clear signs of mental illness and decompensation, such as splashing urine and spreading feces on his face.  The NYSCC investigation of Mr. Roberts' death found that ECHC officials failed to identify Mr. Roberts' medical condition and take the necessary steps to prevent self-injurious behavior.[14]  Moreover, the NYSCC cited several incidents that should have alerted the medical staff to Mr. Roberts' decompensation (e.g., throwing food, rolling in feces).  NYSCC also found that despite Mr. Roberts' increasing psychotic behavior, the ECHC physician failed to take any action to arrange for critically needed care.[15]  The NYSCC found ECHC's care of Mr. Roberts inadequate, rising to the level of professional misconduct.[16]  The NYSCC concluded that the current medical department at the facility is "incapable of providing medical

---

[13]    The name "Jimmie Roberts" is a pseudonym.

[14]    New York State Commission on Corrections, Findings in the Matter of the Death of [Jimmie Roberts], Jan. 10, 2008 ("NYSCC [Roberts] Report").

[15]    Id. at 6-9.

[16]    Id. at 6.

- 14 -

evaluation and treatment" sufficiently to treat inmates who are
seriously ill.[17]

### C.    Inadequate Protection From Harm

Corrections officials must take reasonable steps to provide
"humane conditions" of confinement.  Farmer, 511 U.S. at 832.
Providing humane conditions requires that a corrections system
satisfy inmates' basic needs, such as their need for safety.
Additionally, jail officials have a duty to take reasonable steps
to protect inmates from physical abuse.

To ensure reasonably safe conditions, officials must take
measures to prevent the unnecessary and inappropriate use of
force by staff.  Officials must also take reasonable steps to
protect inmates from violence at the hands of other inmates.  In
addition, officials must provide adequate systems to investigate
incidents of harm, including staff misconduct and alleged
physical abuse of inmates.  Finally, a jail has an obligation to
protect vulnerable inmates from harm, such as those who are at
risk of suicide or at risk of harm from other inmates.  For the
reasons set forth below, ECHC and ECCF fail to meet
constitutional standards in all of these regards.

### 1.    Deficient Policies and Procedures

#### a.    Overall Content and Structure of ECHC and ECCF's Policies and Procedures

Policies and procedures are the primary means by which jail
management communicate their standards and expectations.  Thus,
policies and procedures should be current, accessible to all
correctional officers and staff, and consistent with relevant
legal standards and contemporary correctional practices.
Typically, correctional institutions have a uniform policy that
governs the Jail Administration.  The uniform policy may contain
post orders, much like the ECHC Manual contains, that are
specific to areas such as intake booking and court hold.  Most
importantly, however, the uniform policy would provide
operational guidance on, inter alia, the use of force, use of
restraints, use of chemical agents, suicide prevention, and the
grievance process.  These uniform policies would be enforced
throughout both facilities and all Jail Staff would be trained on
one set of operational guidelines.  Failure to do so may allow
for informal practices to flourish, thus making it difficult to

---

[17]    Id. at 7.

- 15 -

monitor the appropriate application of the institution's governing policies.

ECSO provided us with a copy of the Policies and Procedure Manuals (collectively, the "Manuals") for both ECHC ("ECHC Manual") and ECCF ("ECCF Manual"). The ECHC Manual is dated January 29, 2005, while the ECCF Manual is dated October 7, 2003. A review of the Manuals indicates that many sections are outdated, and many have not been updated in several years. For example, the ECCF use of force policy, Policy 04-09-00 (Physical Force/Corporal Punishment), was last updated in 1991. Similarly outdated are ECCF's suicide prevention screening guidelines, 09-03-01, updated in 1990; restraint policy, 04-09-01, updated in 1997; and grievance policy, 04-11-00, updated in 1999. ECHC policies are similarly dated (i.e., Use of Firearms/Force Report, JMD 04.03.01, updated in 2002; and Contraband Control, JMD 05-03-90, updated in 2003). Notably, in 2004, the ECSO's JMD enacted JMD 02.20.00, requiring the annual review of JMD Policy and Procedures concerning "Classification," "Grievance," and "Suicide Prevention." We are unable to determine, based on the documents that were produced by the County in February 2008 and the County's continued refusal to cooperate with our investigation, whether the County has reviewed or updated these manuals; the date on the materials we received suggests that they have not. Accordingly, we must assume that they have not been updated.

Moreover, the organization of the Manuals is confusing. It is our understanding that the ECSO has custodial responsibilities over both ECHC and ECCF and that the JMD oversees the operation of the facilities. Given this arrangement, it is unclear why there are individual, and dissimilar, manuals for ECHC and ECCF. For example, while the ECCF Manual contains policies on the Use of Force, the ECHC Manual does not,[18] and while Spanish-speaking inmates at ECHC are not provided a translated Inmate Handbook, Spanish-speaking inmates at ECCF are. See infra, Section II.C.9. Similarly, it is unclear why there are different inmate handbooks for each facility.[19] The NYSCC noted this discrepancy in its April 2008 Jail Evaluation, finding deficiencies in the disciplinary sanctions of unsentenced inmates who were housed at ECCF, stating that these inmates who were "transferred to the

---

[18]   The ECHC Manual has a Use of Firearms/Force Report Policy, JMD 04.03.01; however, it is less a policy on appropriate uses of force and more a policy on reporting the use of force.

[19]   ECHC has an Inmate Handbook and ECCF has an Inmate Code of Conduct. See infra, Section II.C.9.

- 16 -

Holding Center for disciplinary reasons were having their
disciplinary hearing at the Holding Center,"[20] subject to ECHC's
inmate rule book and not the ECCF inmate rule book.  It further
found that the two rule books differed in classes of violations
and sanctions.[21]  The NYSCC recommended that JMD "consider
developing and implementing a single inmate rule book" for both
facilities.[22]

<blockquote>

b.    Deficient Use of Force Policies and
Procedures
</blockquote>

While the use of force is sometimes necessary in a
correctional facility, the Constitution forbids excessive
physical force against inmates.  A determination of whether force
is used appropriately requires an evaluation of the need for the
use of force, the relationship between that need and the amount
of force used, the seriousness of the threat reasonably believed
to exist, and efforts made to temper the severity of a forceful
response.  Hudson v. McMillian, 503 U.S. 1, 7 (1992).  Generally
accepted correctional practices provide that appropriate uses of
force in a given circumstance should include a continuum of
interventions, and that the amount of force used should not be
disproportionate to the threat posed by the inmate.  Absent
exigent circumstances, lesser forms of intervention, such as
issuing disciplinary infractions or passive escorts, should be
used or considered prior to more serious and forceful
interventions.  This guidance is typically found in a use of
force policy.  Failure to provide staff with operational guidance
on when the use of force is appropriate is a gross departure from
generally accepted correctional standards.

The ECHC's Manual fails to provide operational guidance on
the use of force.  In contrast with generally accepted
corrections practices, ECHC has no operating policy governing the
application of force at ECHC, and no system in place to monitor
the use of force.  The ECHC Manual makes several vague references
to a "Response Team," apparently utilized to quell emergency
inmate disturbances; however, there is no policy governing the
team's assembly.  ECHC's use of force and its use of the Response
Team, without any operating policies and procedures, fails to

---

[20]  New York State Commission of Correction ECHC Phase 2
Evaluation, Apr. 2008, supra, n. 6, at 4.

[21]  Id.

[22]  Id.

- 17 -

provide inmates with sufficient protection from harm and creates a climate where the unfettered use of force is permissible because there are no operating guidelines holding anyone accountable.

While the ECHC Manual makes several vague references to the "Response Team," the Manual itself does not provide a policy describing the composition of this team, how it is assembled, its purpose and specific use, or how members of this team are trained, if at all. It is also unclear what the exact purpose of the Response Team is; however, JMD 04.03.01 provides that a use of force report must be prepared whenever the Response Team is "required to control an inmate situation wherein force may be used to quell the situation." The policy, however, does not explain what is meant by "control" and "inmate situation," nor does it discuss the appropriate or permissible uses of force by the Response Team. See JMD 04.03.01. Moreover, JMD 06.01.02 makes reference to a "secondary response team" that will be assembled in the event of a riot or hostage situation; again, limited guidance is given on the composition of this "secondary response team." See JMD 06.01.02. Employing a special operations team, like the Response Team, that is to be used in emergency situations without operational guidance as to its structure and use, is a gross departure from generally accepted correctional standards.

Our review of the ECHC Manual did not reveal a Use of Force policy that directs Jail Staff as to when the use of force is appropriate, and what types of force should be used. By contrast, as discussed above, the ECCF manual provides guidance on the use of force, albeit dated. See ECCF Manual, Physical Force/Corporal Punishment, 04.09.00. While the ECHC Manual does contain guidance on the planned use of force, Policy JMD 06.01.03, this policy is strictly limited to planned uses of force initiated by the Quick Entry Team ("QET"). Moreover, this policy is located in the Emergency Preparedness section of the ECHC Manual, further limiting its application to situational necessity. The ECHC Manual also contains guidance on the reporting of force; however, this policy fails to provide operational guidance on when the use of force itself is appropriate. See ECSO Use of Firearms/Force Report, JMD 04.03.01. The ECHC Manual should provide written operational guidance on what are legally acceptable uses of force, in keeping with Constitutional, federal, and state guidelines, as well as generally accepted correctional standards. However, the ECHC Manual does not provide any language for when the use of force, absent an emergency situation, is permissible.

- 18 -

2.   Excessive Use of Force

Our investigation revealed that inmates at ECHC and ECCF are regularly subjected to inappropriate, excessive and degrading uses of physical force.   The following are illustrative examples:

- Inmates we interviewed consistently reported that ECSO deputies would take ECHC inmates on "elevator rides," during which deputies would reportedly physically assault inmates.   Inmates consistently described incidents in which deputies would take handcuffed inmates to an isolated elevator (which was not equipped with a security camera) where they would be beaten and had their heads slammed against the elevator walls.

- In August 2008, an ECHC inmate was handcuffed, stripped, and cavity searched by a deputy who then used the same rubber gloves to search other inmates.   When the inmate requested that the deputy change his gloves, which were dirty with blood and fecal matter, the deputy struck the inmate on the head and forcibly performed the search, stating that he "did not have to do a damn thing."

- In 2008, according to inmate interviews, ECSO deputies ordered other inmates to go into the cell of an inmate who refused to shower, pull the inmate out of the cell, strip him and wash him on the floor of the pod common area with rags and a bucket of water.

- In January 2008, ECSO deputies reportedly targeted inmates who were screaming as a result of the New Year.   Inmates told us that, in the case of one of the inmates, the deputies punched, kicked, and reportedly tied a sheet around the inmate's neck, threatening to hang him.   The inmate was then shackled and taken to an isolation cell, where the deputies continued to punch and kick him.

- In August 2007, during the booking process, ECHC deputies struck a pregnant inmate in the face, threw her to the ground, and kneed her in the side of her stomach.   When she informed deputies that she was pregnant, the deputies allegedly replied that they thought she was fat, not pregnant.   The inmate lost her two front teeth as a result of the assault.

- 19 -

- An ECCF inmate died of a stroke in March 2007, after suffering a brain injury when ECCF deputies smashed his head against a wall.  The inmate requested medical help following the incident, but was ignored despite noticeable signs of injury (dragging his foot when walking and continually dropping things).

- In April 2006, an ECHC inmate (held in the facility for urinating in public) was knocked unconscious and sustained a collapsed lung, fractures to six ribs, and a spleen injury (resulting in removal) as a result of a beating by County deputies.  The inmate alleges that the incident arose from his attempt to air out his cell from the odor of other inmates' defecation and vomit.

3. Inadequate Reporting of Use of Force

Effective measures to prevent excessive and inappropriate uses of force include the adequate reporting of information to permit the identification of potential problem cases and effective internal investigations.  We find that ECHC fails to elicit adequate information about use of force incidents, making management review ineffective.  Generally accepted correctional standards require written reports of uses of force.  These reports should be submitted to administrative staff for review.  Although the County of Erie produced incident reports for ECHC, it did not produce any of the use of force forms that reportedly accompany these reports.  The incident reports themselves indicate whether a use of force report was filed under the "Action Taken" section of the Incident Report.  While most of the incident reports where force was used indicated that a use of force form was submitted, there were several incidents where force was clearly used, but the submission of a use of force form was not indicated.  For example:

- An October 2007 report indicates that two deputies were injured subduing an inmate who attempted to strike a deputy.  While the report indicates that the deputies secured the inmate on the floor with handcuffs, there is no indication what type or level of force the deputies used to achieve compliance.

- Similarly, a September 2007 incident report describing an incident in which two deputies were injured subduing an inmate who struck a deputy, indicates only that the deputies took the inmate to the ground and secured him in handcuffs.  There is no indication what type or level of force the deputies used to achieve compliance.

- 20 -

• An August 7, 2007 report indicates that an ECHC inmate who struck a deputy was secured by the response team, placed in mechanical restraints, and put into an isolation cell. However, there is no information on the force used to secure the inmate or the length of time he was restrained, nor is there any indication whether medical clearance was secured before the inmate was placed in restraints.

JMD's failure to ensure complete use of force reporting prevents adequate monitoring of the use of force within its facilities. As a result, the ECSO is unable to accurately gauge the amount of force used and whether such force is appropriately used.

### 4. Inadequate and Ineffective Inmate Supervision

#### a. Deputy-Encouraged Violence

ECSO deputies not only fail to protect inmates from harm, but, as our investigation revealed, they affirmatively place inmates in harm's way by pitting inmates against one another in combat. We have received reports of ECSO deputies relying on inmates to discipline other inmates with force. These inmates, sometimes referred to as the deputies' "pet," receive extra privileges, such as extra meals and hygiene products. Alarmingly, we have learned of ECSO deputies harassing inmates charged with a sexual offense. We have received numerous reports of deputies openly announcing the charges of alleged sexual offenders, including describing inmates as "Rape-Os." Deputies would reportedly announce an inmate's charge in the presence of other inmates and then leave the room, allowing the other inmates an opportunity to physically assault the alleged sexual offender.

#### b. Inmate-on-Inmate Violence

Insufficient inmate supervision is a serious problem at ECHC and ECCF. The County is well aware of this issue. Undersheriff Brian D. Doyle has publicly stated that ECHC does not have sufficient "security staff."[23] Indeed, our review of the County's own incident reports confirms this admission. Incident reports revealed that between January 1, 2007 and February 9, 2008, there were over 70 reported incidents of inmate-on-inmate

---

[23] Gene Warner, <u>Inmate Well-Being Comes Under Scrutiny;</u> <u>Medical Care Limited at County Facilities</u>, Buffalo News, Aug. 5, 2007.

- 21 -

assaults, including sexual assaults.  In many of the incidents of inmate-on-inmate violence, ECSO deputies on duty were not present, giving inmates ample opportunity to fight.  The following examples are illustrative:

- On December 1, 2007, an inmate was held down by another inmate and punched and kicked by a third inmate.  The victimized inmate indicated that he was attacked because he was held on sodomy charges.

- On April 12, 2007, an inmate was grabbed by the throat and punched in the face by three other inmates, suffering a swollen right eye and left cheek as a result of the attack.  According to the County's records, the deputy on duty was taking a "bathroom break" when the assault occurred.

- On March 28, 2007, deputies discovered an inmate, who had been in a fight with another inmate, lying on the floor, bleeding from a head wound.

- On February 2, 2007, an inmate was stabbed with a broken broom handle.  The deputy on duty reported that he did not see the assault because he was moving a box into the elevator at the time.

- On January 24, 2008, an inmate was sexually harassed and assaulted by three inmates who pulled his pants down, slapped him on the buttocks, called him "honey," grabbed towards his genitalia in a teasing manner, and grabbed his nipples.  There is no indication from this incident report whether any of the aggressors were disciplined for their actions.

ECSO deputies do not appear to consistently intervene to stop inmate violence.  There have been several incidents in which deputies either watched an altercation escalate from a verbal disagreement to a physical altercation, or allowed other inmates to break up a fight and detain the inmates until additional deputies arrived.  For example:

- On November 26, 2007, a deputy witnessed an inmate throw a chair across the law library at another inmate because he thought the other inmate was a "snitch."

- On November 19, 2007, a deputy witnessed two inmates arguing and then fighting.  He also witnessed a third inmate join the fight and punch and kick another inmate