- 22 -

in the head.  There is no indication in the report whether this deputy attempted to break up the fight or even intervened during the argument, before it escalated to a fight.

- On October 30, 2007, a deputy witnessed an inmate strike another inmate who had been knocked to the ground.  When the attacking inmate refused the deputy's order to stop fighting, two other inmates interceded to restrain the attacker until additional deputies arrived on the scene.

As the incident reports demonstrate, and as our interviews consistently confirmed, inmates who are not adequately supervised have opportunities to engage in fights.  The situation in the County facilities appears so volatile that minor slights appear to instigate physical altercations.  We noted numerous instances in which inmates fought one another for inconsequential reasons, such as:  one inmate denied another inmate access to a newspaper, an inmate cut ahead of another inmate in the lunch line, and one inmate told another inmate that he had "smelly feet."  Each of these exchanges led to fights among inmates.  As the above examples demonstrate, ECSO and JMD are not meeting constitutional obligations to provide for the safety and well-being of inmates.

     c.    **Unprofessional and Provocative Attitude Towards Inmates**

Establishing a professional environment in a correctional setting is critical to maintaining the safety and security of inmates and staff.  In addition to reports that deputies have encouraged inmate violence, we have also learned that deputy supervisors at ECCF have permitted a culture of unprofessional and provocative attitude towards inmates to flourish within the facility.[24]

Notably, in June 2008 the NYSCC cited ECCF Jail staff for "unprofessional and provocative attitude toward the inmate population"[25] for posting informational sheets labeled "Frequently Asked Questions" within the dormitories housing pre-trial detainees that contained such comments as "Deputies are here to tell you what to do;" "Deputies decide when you go to

---

[24]    Letter from NYSCC to Sheriff Timothy Howard, dated June 5, 2008, Cycle 3 Evaluation, at 12.

[25]    <u>Id.</u>

- 23 -

exercise;"[26] and "How do you become a Lima unit porter? Don't ask
we will ask you."[27]  The NYSCC found these sheets to be
unprofessional and that ECSO should view these statements "as an
embarrassment to the corrections profession."[28]  Moreover, the
NYSCC found that the "condescending tone ... perpetuates a
negative work environment,"[29] and the failure of "deputy sheriff
supervisors ... to remove such posting and take further action is
unconscionable."[30]  These "informational sheets," coupled by the
reports of deputy encouraged violence (see Section II.C.4.a,
supra) and sexual misconduct (see Section II.C.6, infra) further
illustrates a culture that undervalues the safety and well-being
of inmates housed within its facility.  Indeed, a condescending
attitude towards an inmate population may lead security staff to
believe that they have an unfettered control over inmates that
allow them to engage in unconstitutional behavior, such as
encouraging inmate violence and engaging in inappropriate sexual
conduct with inmates.

     d.    **Inadequate Division of Supervisory
Responsibility**

    ECCF houses both pre- and-post-trial inmates.  ECSO employs
two separate work forces to supervise "unsentenced" and
"sentenced" inmates at ECCF.  Specifically, deputies are assigned
to "unsentenced inmates," while correctional officers are
assigned to "sentenced inmates."[31]  The NYSCC found this
arrangement "jeopardizes the safety and security of staff and
inmates at the Correctional Facility."[32]  According to NYSCC,
because the security staff are members of two distinct unions,
based on their work assignment, there is confusion over which
union or security detail has specific control over a particular
inmate.  Indeed, NYSCC's staff "witnessed members of both unions

---

[26]    <u>Id.</u>

[27]    <u>Id.</u>

[28]    <u>Id.</u>

[29]    <u>Id.</u>

[30]    <u>Id.</u>

[31]    <u>Id.</u>

[32]    Letter from NYSCC to Sheriff Timothy Howard, dated
June 5, 2008, Cycle 3 Evaluation, at 11.

- 24 -

openly debating and arguing [over] which union has authority over an inmate."[33] The NYSCC further noted that each work force has different break schedules and different work hours, "affect[ing] the lock-in time of inmates during the count." Moreover, while both work forces are "accountable to the Chief and Superintendent of the Correctional Facility," "each union member is only accountable to the supervisors in their respective unions."[34] Accountability and supervisory responsibility was a noted problem where, for example, "during evening, nights, and weekends" the highest ranking employee for deputies "is a Sergeant" whereas the highest ranking corrections officer is "the Tour Commander."[35] This confusion in supervisory responsibilities amplifies the deficiencies in inmate supervision.

### 5. Inadequate Classification

ECHC and ECCF have an inadequate classification system, and it contributes to unsafe conditions at the facilities. Generally accepted correctional standards require separation of problematic inmates and those who are more vulnerable to violence and abuse from the general population. ECHC and ECCF's failure to do so makes supervision more difficult and increases the risk of harm to both staff and inmates.

The County's classification system is flawed and fails to adequately assess critical factors such as an inmate's criminal history while in custody, escape history, and likelihood of victimization. While the County's classification instrument does *identify* these areas, the JMD fails to provide operational guidance on *how* to address such issues. As the NYSCC noted, this is a major concern because the classification instrument influences how inmates are classified at ECHC and ECCF; "the quality of any classification determination and subsequent housing assignment is suspect" because "classification reviews and housing assignments are substantially based on outcomes of a flawed classification system."[36] While officials at ECHC and ECCF cannot be expected to prevent all altercations between inmates, the Constitution requires correctional officers and County officials to take reasonable steps to protect inmates

---

33    *Id.*

34    *Id.*

35    *Id.*

36    NYSCC 2006 Evaluation, *supra*, n. 6, at 21, 24.

- 25 -

from violence.  Disturbingly, the County was made aware of the
inadequacies of its classification through an April 2007 NYSCC
report, followed by an August 2007 NYSCC report indicating that
the issues remained unaddressed.[37]

As an example of the problems that an inadequate
classification system can lead to, we learned of a situation in
August 2008 in which a 16 year-old boy was reportedly placed in
the "bullpen" at ECHC with adults.  Placed among an adult
population, this vulnerable youth was reportedly attacked and
sexually assaulted in the middle of the night.

### 6.  Sexual Misconduct

Our review of investigative reports revealed incidents of
sexual misconduct at ECHC and ECCF resulting from staff-on-inmate
and inmate-on-inmate interaction.  For example:

- On September 16, 2008, a male ECCF deputy resigned
  after engaging in inappropriate sexual conduct with a
  female inmate.

- A male ECCF deputy reportedly sexually harassed several
  inmates in his unit by staring at the male inmates
  while they were in the shower.  This deputy reportedly
  engaged in this conduct frequently and regularly.  In
  at least one instance, the deputy placed his hand on an
  inmate who attempted to leave the shower.  The deputy
  reportedly admired the inmate's physique and told him,
  "we should work out together."

- A male ECCF deputy reportedly engaged in lewd conduct
  with an inmate, placing his fingers through his uniform
  pants zipper to simulate fellatio and asking the inmate
  "do you want to suck it?"

- On September 9, 2007, a female inmate accused a male
  deputy of rape.  The inmate was sent to the hospital
  and subsequently moved to a different unit within ECHC.
  There is no indication of whether an investigation was
  conducted following the report of rape, nor whether the
  deputy was, or would be, moved from the women's ward
  while the charges were being investigated.

---

[37]    NYSCC ECHC Cycle 2 Evaluation Aug. 2007, supra, n. 6,
at 5; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, supra, n. 6, at 8.

- 26 -

### 7.   Contraband and Vandalism

Another indicator of inadequate inmate supervision is the amount of dangerous contraband recovered from the housing units and the ease with which inmates can fabricate homemade weapons. Due to the dilapidated condition of scores of cells, shower areas, and various dayroom features, inmates have ample material for fabricating weapons, including floor tiles, metal from light fixtures, metal from the ventilation system, glass from cell light bulbs, electrical wiring, and plumbing fixtures. Inmates have been found with shanks of varying size that are made of broken glass and metal rods. Inmates have also been found with handcuff keys and a syringe, and in March 2007 an inmate handed deputies a 40-caliber hollow point bullet he found under his cellmate's bed. At the time, both inmates were assigned to a cell designated for "constant observation." While it is virtually impossible for any correctional facility to completely deter inmates from obtaining materials for weapons, the problem at ECHC and ECCF is exacerbated by inadequate supervision.

### 8.   Grievance System

An inmate grievance system is a fundamental element of a functional jail system, intended to provide a mechanism for allowing inmates to raise concerns and issues to the administration. If viewed as credible by inmates, it can also serve as a source of intelligence to staff regarding potential security breaches as well as staff excessive force or other misconduct. The grievance system should be readily accessible to all inmates. Inmates should be able to file their grievances in a secure and confidential manner and without the threat of reprisals. Staff responsible for answering inmate grievances should do it in a responsive and prompt manner. We note a number of serious deficiencies with the inmate grievance process at ECHC and ECCF.

The grievance system at ECHC and ECCF is inadequate and open to abuse. NYSCC questioned the integrity of the grievance program, finding the system informal, the policies inadequate, and jail officials unwilling to investigate allegations or quick to categorize grievances as disciplinary and therefore non-grievable, even when they were.[38] We note that the NYSCC has cited the County for such problems in 2007 and 2008. Because the

---

[38]   _See generally_ NYSCC ECHC Cycle 2 Evaluation Aug. 2007, _supra_, n. 6, at 6; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, _supra_, n. 6, at 10; NYSCC 2006 Evaluation, _supra_, n. 6, at 28-33.

- 27 -

County provided us with only a very limited number of grievances for review, it is unclear whether the County has remedied these deficiencies. Therefore, we must conclude that the NYSCC findings remain unremedied. In June 2008, the NYSCC found that no grievances had been filed by pre-trial detainees housed at ECCF.[39] This clearly indicates that the grievance system is not functional, thus depriving the JMD of a valuable source of information concerning questionable constitutional treatment.

One partial explanation for this is the bifurcated grievance system that the JMD employs. Specifically, inmates are instructed to utilize an informal grievance process that encourages inmates to raise their grievance with Jail Staff and allow Jail Staff an opportunity to informally resolve the grievance, rather than submit a formal grievance that is reviewed by the grievance officer. Although inmates are told that they may file a formal written grievance at any time, it is impossible for JMD to account for whether a request for a formal grievance is actually met. Encouraging an inmate to pursue a grievance informally can be problematic in some circumstances, especially in those instances in which unlawful actions have occurred. Inmates who may have been subjected to unlawful conduct will, most likely, be reluctant to seek resolution from those who may have witnessed or been involved in the very actions that would be the basis for the grievance. The ECSO's failure to monitor the application of the grievance system makes it deliberately indifferent to serious allegations of force, harassment, and medical care to be ignored. Numerous inmates reported submitting a grievance, only to have it taken out of the mail slot and destroyed by deputies.

## 9.  Access to Information

Generally accepted correctional standards require that newly admitted inmates receive an opportunity to learn about the facility rules and regulations, services that are available, policies and procedures that affect the inmate, and facility schedules. Each inmate should receive a facility handbook, containing all the relevant information, and should have an opportunity to have the information explained to him or her if the inmate cannot read. Typically, facilities have an orientation procedure as a part of the intake processing.

---

[39]    Letter from NYSCC to Sheriff Timothy Howard, dated June 5, 2008, Cycle 3 Evaluation, at 9.

- 28 -

It is our understanding that inmates are provided a copy of either the ECHC Inmate Handbook or the ECCF Code of Conduct upon arrival at the respective facility. However, these handbooks are not necessarily made available in Spanish. While ECCF offers a Spanish translation of the ECCF Code of Conduct, the translated version we received in February 2008 was last updated on November 20, 1992; the English version was revised on August 21, 2007. The County of Erie did not produce a Spanish translated version of the ECHC Inmate Handbook in response to our request. In order for inmates to avail themselves of the programs a facility offers or familiarize themselves with the rules and regulations within a given facility, to which they will be held accountable, inmates must be made aware of facility rules and protocols. Failure to do so is inconsistent with generally accepted correctional standards.

### D. Inadequate Medical Care

ECHC and ECCF officials are responsible for providing adequate medical care to inmates. A jail may not deny or intentionally interfere with medical treatment. A delay in providing medical treatment may be so significant that it amounts to a denial of treatment. Our investigation revealed that medical care provided at ECHC and ECCF falls below constitutionally required standards of care.

One key deficiency is the lack of on-site health care administrators to manage healthcare services at the facilities. Although a physiacian is assigned to all Erie County Detention facilities, the physician does not monitor the "appropriateness, timeliness and responsiveness of care and treatment or review[] the recommendations for treatment made by health care providers in the community," and "[t]he physician is not involved in quality improvement reviews, training staff, or reviewing policy and procedures."[40] This level of oversight is critically important to ensure constitutionally adequate medical care. For example, adequate oversight and management would identify problems in inmate medical records, provide advice on training, and assist in the development of policies that are consistent with generally accepted correctional healthcare standards. Without this oversight, it is impossible for ECSO and JMD to attest to the adequacy of medical care within their facilities. Indeed, the NCCHC could not adequately determine the quality of

---

[40]    NCCHC 2008 Erie Report, _supra_, n. 5, at 8.

- 29 -

health care for its 2008 review, because the inmate health records were incomplete.[41]

The administration of health care services in ECHC and ECCF is inadequate, as there are no quality improvement programs or monitoring procedures in place to internally assess the quality of heath care at the facilities.[42]  Moreover, ECHC and ECCF medical policies and procedures fail to provide staff operational guidance on quality of care.[43]  The NYSCC cited both the ECHC and ECCF in 2007 and 2008 for violating state law and employing licensed practical nurses[44] ("LPN") without the direction or supervision of a registered nurse, as required by state law.[45]  Specifically, the NYSCC cited the "incompetent assessment" of an LPN for returning inmate John Jackson,[46] who was suffering from congestive heart failure, to his cell -- Mr. Jackson later

---

[41]    Id. at 7.

[42]    Id. at 9.

[43]    Id. at 8.  NCCHC noted that the policies were "under revision using the NCCHC *Standards* to revise the manual." (Emphasis in the original).

[44]    LPNs care for people who are sick, injured, convalescent, or disabled under the direction of physicians and registered nurses.  LPNs are not to perform "physical assessments of patients" or make "independent clinical decisions [or] patient dispositions without direction from a registered professional nurse or licensed physician."  Letter from the NYSCC to Sheriff Timothy Howard, dated Mar. 29, 2007 (regarding the use of LPNs at ECCF, citing Article 139, New York State Education Law, Section 6902).

[45]    Letter from the NYSCC to Sheriff Timothy Howard, dated May 28, 2008 (regarding the use of LPNs at ECHC); Letter from NYSCC to Sheriff Timothy Howard, dated Mar. 29, 2007 (regarding the use of LPNs at ECCF, citing Article 139, New York State Education Law, Section 6902); Letter from the NYSCC to Anthony J. Billittier III, M.D., Commissioner, Erie County Department of Health, dated Mar. 29, 2007 (regarding the death of inmate [John Jackson]).

[46]    The name "John Jackson" is a pseudonym.

- 30 -

died.[47]  Following an investigation into Mr. Jackson's death, the NYSCC found that the use of LPNs at ECCF, without the supervision of a registered nurse, was "commonplace."[48]  The NYSCC also criticized ECSO's response to their letter notifying the Jail that the "medical care that Mr. Jackson received was negligent and inadequate."[49]  The NYSCC's Medical Review Board found that ECSO's "flagrantly indifferent and dismissive attitude in response to a critical incident with a fatal outcome and to the requirements of state law and regulations are in no small part causative factors in such outcomes."[50]  In May 2008, a little over a year after this finding, the NYSCC once again cited ECSO for similar professional misconduct.  This time, ECHC was cited for employing LPNs without adequate supervision.[51]

Through our review of incident reports, documents provided by the County, and recent state oversight reports, we find ECHC and ECCF document management of inmate medical records poor and often incomplete.  We note that these problems have persisted for years, despite the NYSCC placing the County on notice of such deficiencies since 2005.[52]  As recently as early 2008, the NCCHC similarly concluded that the County has not addressed this issue.[53]  In addition to the 2008 NCCHC finding, we draw

---

[47]    Letter from the NYSCC to Sheriff Timothy Howard, dated Mar. 29, 2007 (finding the ECSO "summarily disregarded the facts that the medical care that Mr. [Jackson] received was negligent and inadequate"); Letter from the NYSCC to Anthony J. Billittier III, M.D., Commissioner, Erie County Department of Health, dated Mar. 29, 2007.

[48]    Letter from the NYSCC to Anthony J. Billittier III, MD, Commissioner, Erie County Department of Health, dated Mar. 29, 2007.

[49]    Letter from the NYSCC to Sheriff Timothy Howard, dated Mar. 29, 2007.

[50]    Id.

[51]    Letter from the NYSCC to Sheriff Timothy Howard, dated May 28, 2008.

[52]    Letter from the NYSCC to Sheriff Timothy Howard, dated Sept. 27, 2005 (citing deficiencies in the maintenance of inmate medical records).

[53]    NCCHC 2008 Erie Report, supra, n. 5, at 7, 24-25.

- 31 -

additional negative inferences from the County's lack of cooperation with our investigation by failure to provide us with the requested inmate medical documents and access to the facilities.

Inmates at ECHC and ECCF suffering from serious medical conditions require continual observation and consistent treatment and care in order to protect them from harm.  The following examples illustrate that inmates at these facilities are not receiving adequate medical care.

- In December 2007 and January 2008, four inmates suffered multiple seizures.  At least two of the inmates were told to sleep on the floor, and there is no indication that any of the inmates received medication after being treated at the hospital.  One of the four inmates with a seizure history was transferred to the hospital after deputies found him lying unresponsive on the floor.  An additional inmate, with a seizure history prior to detention, was found shaking on the floor of her cell and was not immediately sent for a medical evaluation.

- In April 2007, ECCF was cited for providing inadequate dental care to an inmate suffering from pain and a sensitivity to food and liquids.[54]  The Citizens Policy and Complaint Review Council found that ECCF took too long to respond to the inmate's request to see a doctor regarding his pain, finding 21 days unreasonably long.[55]

- In March 2007, an ECHC nurse, while delivering prescribed medication to an inmate, discovered that the inmate had died due to unknown causes.  Earlier in the day, the inmate had refused food and requested that his cell window be opened.

### 1.  Inadequate Administration of Medication

It appears that ECHC and ECCF nursing staff who store and administer medication may be untrained in critical areas of security, accountability, common side effects of medications and

---

[54]    Letter from the NYSCC to Sheriff Timothy Howard, dated Apr. 24, 2007.

[55]    Id.

- 32 -

documentation of administration of medicines. Alarmingly, the County was made aware of this deficiency through NYSCC evaluations in 2005 and 2006, as well as the NCCHC 2008 evaluation.[56] Further, we received consistent reports from ECCF inmates that County deputies withhold inmate medication as a source of intimidation or punishment. The following examples illustrate the gravity of the situation:

- Despite receiving warnings from State oversight agencies as recently as 2008, nursing staff fail to ensure that inmates swallow their medication and fail to check inmate identification prior to administering medication. We reviewed incidents from 2007 in which an inmate attempted suicide by ingesting another inmate's psychotropic medication; another inmate hoarded his medication for several weeks before deputies located it on his shelf; and a third inmate admittedly faked a seizure in order to obtain his prescription medication.

- The NYSCC's review found controlled substances "placed in a paper bag and stored in the narcotic cabinet after they have been discontinued or when the inmate has been discharged ... [and that] ... [t]hese controlled substances are not counted each shift," in violation of Federal and State laws.[57]

---

[56]     Letter from the NYSCC to Sheriff Timothy Howard, dated July 17, 2006 ("There is an inadequate system for the management of pharmaceuticals, including controlled substances"); Letter from NYSCC to Sheriff Patrick Gallivan, dated Apr. 18, 2005 (citing ECSO for not screening detainees); see also, Letter from the NYSCC to Sheriff Patrick Gallivan, dated Feb. 22, 2005 and Letter from the NYSCC to Sheriff Timothy Howard, dated Sept. 27, 2005 (both addressing the inadequacy of ECHC's management of pharmaceuticals).

[57]     Letter from the NYSCC to Sheriff Timothy Howard, dated July 17, 2006. In February 2005 ECSD was cited for leaving "two large boxes of controlled substances unattended in an unsecured area in the medical unit," in violation of Federal and State laws that require the restriction of controlled substances "to a secure area under double lock." Letter from the NYSCC to Sheriff Patrick Gallivan, dated Feb. 22, 2005.

- 33 -

The above examples indicate that procedures for medication administration at the ECHC and ECCF are not consistent with generally accepted correctional standards.

### 2.    Inadequate Infection Control

ECHC and ECCF fail to adequately treat, contain, and manage infectious disease.  ECHC and ECCF's management of Tuberculosis ("TB"),[58] Methicillin-resistant Staphylococcus aureus ("MRSA"),[59] and other infectious diseases deviates from generally accepted correctional medical standards.  This failure is dangerous and places inmates, staff, and the community at unnecessary risk of serious health problems.

Generally accepted correctional standards for the management of communicable diseases in correctional facilities require the development of a management plan.  This plan, at a minimum, should address the screening, diagnosis, and treatment of HIV/AIDS; Sexually Transmitted Diseases; Hepatitis; MRSA; TB; and outbreaks of communicable diseases.  ECHC and ECCF, however, have no written exposure control plan approved by the responsible physician.[60]  The lack of a written exposure control plan has resulted in deficiencies related to the containment and treatment of TB and MRSA.  For example, the nursing staff at ECHC have confirmed that TB PPD testing is not performed on detainees at

_____

[58]    TB is a life threatening respiratory ailment commonly found in correctional facilities.  TB is prevalent in correctional facilities because of poor circulation or inadequate ventilation, and the close quarters of a transient population.

[59]    MRSA is a potentially dangerous drug-resistant bacteria that can cause serious systemic illness, permanent disfigurement, and death.  A MRSA infection is sometimes confused by detainees and medical staff as a spider or insect bite, causing treatment to be delayed while the infection has time to worsen or spread.  See http://www.aafp.org/fpr/20041100/10.html.  MRSA is resistant to common antibiotics, such as methicillin, oxacillin, penicillin, and amoxicillin.  MRSA is almost always spread by direct physical contact.  However, spread may also occur through indirect contact by touching objects such as towels, sheets, wound dressings, and clothes.  MRSA can be difficult to treat and can progress to life-threatening blood or bone infections.  See MedicineNet.com, http://www.medicinenet.com/staph_infection/page2.htm.

[60]    NCCHC 2008 Erie Report, supra, n. 5, at 10.

- 34 -

the Holding Center, in contradiction to generally accepted correctional medical standards.[61]    Indeed, we have received numerous reports from inmates housed at ECHC between 2007 and 2008, confirming that they were not tested for TB upon arrival at the facility.    Similarly deficient is ECHC's and ECCF's medical staffs' failure to identify symptoms clinically associated with a MRSA infection (e.g., red bumps, rashes, and the "spider bite"). We have received numerous reports from inmates held at these facilities who exhibited commonly known signs associated with MRSA and did not receive treatment.

Moreover, jail medical staff not only fail to screen inmates when they arrive at the facility and provide adequate surveillance of infectious diseases; medical staff also do not provide discharge planning, therefore providing no monitoring for inmates with communicable or infectious diseases, understood to be a basic part of generally accepted correctional practices.[62]

### E.    Environmental Health and Safety Deficiencies

ECHC has severe environmental health and safety problems at numerous levels of operation.[63]    Despite repeated NYSCC citations for poor sanitation and maintenance, ECSO and JMD have repeatedly failed to correct the problems.    In 2007, NYSCC found maintenance and sanitation categorically inadequate throughout ECHC, exposing inmates and staff to unhealthy and unsafe conditions.    State regulators cited ECSO and JMD on several occasions for overall poor sanitation, finding sanitation conditions "deplorable," with walls covered in toothpaste and cell bars covered in towels

---

[61]    Letter from NYSCC to Sheriff Timothy Howard, dated Oct. 10, 2007; Letter from NYSCC to Sheriff Patrick Gallivan, dated Apr. 18, 2005.

[62]    NCCHC 2008 Erie Report, supra, n. 5, at 10.

[63]    Given our limited access to inmates held at ECCF, we are unable to assess whether similar sanitation problems exist at ECCF to the degree to which they exist at ECHC.    We have received reports, however, that conditions at ECCF are also unsanitary.

- 35 -

and sheets.[64]  NYSCC staff, for example, found a significant
accumulation of Styrofoam food trays and other clutter in the
cells.  This is a serious problem, as it can attract insects and
other vermin, as well as allow for the spread of disease.
Maintenance and sanitation are categorically inadequate
throughout the facility, exposing inmates and staff to unhealthy
and unsafe environments as a result.  We learned of one inmate
who indicated he was housed, for at least one month, in an ECHC
cell with four inches of standing water due to toilet flooding.

     In a correctional setting where inmates and staff are
dependent on maintenance staff for their water, heat, lighting,
and ventilation, it is expected that these issues would be
addressed in a timely manner in order to reduce risks of illness
and injury to inmates and staff alike.  That is not the case
here.  NYSCC has cited ECSO and JMD for electrical hazards that
neither correctional officers nor maintenance staff seemed to be
concerned about, despite the potential for harm being readily
apparent.  In both April and August 2007, the NYSCC found ECHC
supervisors were "not holding staff accountable for the
sanitation of their assigned housing areas."[65]  Critical
sanitation deficiencies included the failure of jail staff to
properly secure sanitation equipment and supplies when not in
use.  Inmates have used sanitation equipment, like a broom, as a
weapon.  In one case, the handle was broken and used to stab
another inmate.

     ECSO and JMD were also cited for poor facility maintenance.
The NYSCC found the padding and cushion material on chairs in the
day room were torn or removed, exposing screws, nuts, and bolts
that could be used to cause injury.

**Redacted for Public Posting – Sensitive Security Information**

--------------------------------

     [64]    NYSCC ECHC Cycle 2 Evaluation Aug. 2007, supra, n. 6,
at 5; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, supra, n. 6, at 9.
The covering of cell bars with towels and sheets results not only
in poor sanitation but also in security risks, as correctional
officers are unable to see into cells when the bars are covered
with towels.

     [65]    NYSCC ECHC Cycle 2 Evaluation Apr. 2007, supra, n. 6,
at 9; NYSCC ECHC Cycle 2 Evaluation Aug. 2007, supra, n. 6, at 5.

- 36 -

███████████████████████████ This is a serious
security risk that should be corrected immediately.

    Laundry services at ECHC and ECCF are similarly inadequate.
As of August 2007, "[i]nmates [were] required to either wash
their facility-issued and/or personally owned undergarment in a
cell sink or arrange for the pick-up and washing of these items
by family or friends."[67]  This poses a serious problem, as soiled
and/or improperly washed clothing can retain bacteria and other
contagion that can cause infection or spread disease.  Moreover,
inmates are forced to dry their clothes by hanging them in their
cells, thereby obstructing a deputy's view into the cell, thus
compromising security.  Lastly, the NYSCC noted that no clothing
exchange was provided to inmates, as required under New York
law.[68]

### III.    RECOMMENDED REMEDIAL MEASURES

    In order to rectify the identified deficiencies and protect
the constitutional rights of inmates confined at ECHC and ECCF,
ECSO and JMD should implement, at a minimum, the following
remedial measures:

**A.    Suicide Prevention Measures**

    1.    Provide adequate treatment for inmates with
self-injurious behavior.



[67]    NYSCC ECHC Cycle 2 Evaluation Aug. 2007, _supra_, n. 6,
at 4.  Again, this inadequacy in sanitation also represents a
security risk.

[68]    NYSCC ECHC Cycle 2 Evaluation Aug. 2007, _supra_, n. 6,
at 4; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, _supra_, n. 6, at 7;
NYSCC 2006 Evaluation, _supra_, n. 6, at 13.

- 37 -

2.  Develop policies and procedures to ensure appropriate management of suicidal inmates and the establishment of a suicide prevention program.

3.  Ensure that all staff are educated and adequately trained on suicide recognition, intervention, and management, including pre-service and annual in-service suicide prevention training, and that, prior to assuming their duties and on a regular basis thereafter, all staff who work directly with inmates have demonstrated competence in identifying and managing suicide.

4.  Ensure that ECHC and ECCF have written suicide prevention policies that include an operational description of the requirements for both pre-service and annual in-service training.

5.  Screen all inmates upon intake, including questioning to assess current and past suicide risk.

6.  Document inmate suicide attempts at ECHC and ECCF in the inmate's correctional record in the classification system, in order to ensure that intake staff will be aware of past suicide attempts if an inmate with a history of suicide attempts is admitted to ECHC and ECCF again in the future.

7.  Ensure that intake staff are sufficiently experienced and qualified to identify inmates who pose a risk for suicide, and that such inmates are promptly referred to the appropriate mental health professionals and provided appropriate housing.

8.  Ensure that follow-up evaluations by mental health professionals of all new inmates are conducted within 14 days of intake.

9.  Ensure that inmates on suicide precautions receive adequate mental status examinations by a mental health clinician.

10. Ensure that suicidal inmates are housed in an area that is safe for them with appropriate supervision and observation by staff.

- 38 -

11. Ensure that 15- and 30-minute checks of inmates under observation for risk of suicide are timely performed and appropriately documented.

12. Provide different levels of supervision of an inmate based on the presenting risk factors for suicide.

13. Ensure that detainees placed on suicide watch are assessed adequately, monitored appropriately to ensure their health and safety, and released from suicide watch as their clinical condition indicates, according to professional standards of care.

14. Ensure that cut-down tools are readily available to staff in all housing units.  Train staff in the use of cut-down tools.

15. Ensure a component of administrative review is implemented following a suicide or a suicide attempt to identify what could have been done to prevent the suicide.

B.  **Mental Health Care**

1. Timely and Appropriate Evaluation of Inmates

    a. Ensure ECHC and ECCF properly identify inmates with mental illness through adequate screening, and that such screening is incorporated into each inmate's medical record.

    b. Ensure that inmates with potentially serious chronic mental health illness are referred for prompt mental health evaluations and examinations by a psychiatrist.

    c. Provide adequate mental health assessment and treatment in accordance with generally accepted correctional standards of mental health care.

    d. Ensure that adequate crisis services are available to address the psychiatric emergencies of inmates.

    e. Provide staffing adequate for inmates' serious mental health needs.  Provide adequate on-site psychiatry coverage.  Ensure that psychiatrists see inmates in a timely manner.  Ensure that

- 39 -

psychotropic medication prescriptions are reviewed by a psychiatrist on a regular, timely basis.

2.   Assessment and Treatment

a.   Ensure that treatment plans adequately address inmates' serious mental health needs and that the plans contain interventions specifically tailored to the inmates' diagnoses and problems, consistent with generally accepted correctional practices. Provide therapy services where necessary for inmates with serious mental health needs. Provide adequate opportunities for inmates and staff to have confidential communications related to mental health treatment, while maintaining appropriate security precautions.

b.   Ensure that mental health evaluations done as part of the disciplinary process include recommendations based on the inmate's mental health status.

c.   Ensure that medications are provided to inmates in a timely manner and that they are properly monitored.

d.   Provide staffing adequate for inmates with serious mental health needs. Ensure that services, such as distribution of medications, are performed by nurses or other properly trained staff.

e.   Provide policies and procedures that require the appropriate assessment of inmates with mental illness.

f.   Ensure adequate medical documentation and general procedures as part of the mental health assessments that account for inmates' psychiatric histories.

3.   Psychotherapeutic Medication Administration

a.   Ensure timely responses to orders for medication and laboratory tests, and prompt documentation thereof in inmates' charts.

b.   Ensure that adequate psychotherapeutic medication administration is provided in accordance with

- 40 -

generally accepted correctional mental health care standards.

c.  Ensure that changes to inmates' psychotropic medications are clinically justified.  Screen inmates on psychotropic medications for movement disorders and provide treatment where appropriate.

4.  Other Mental Health Issues

a.  Ensure that administrative segregation and observation status are not used to punish inmates for symptoms of mental illness and behaviors that are, because of mental illness, beyond their control.

b.  Ensure that ECHC and ECCF mental health records are centralized, complete, and accurate.

c.  Ensure that ECHC and ECCF quality assurance system is adequate to identify and correct serious deficiencies with the mental health system.

d.  Ensure that a psychiatrist or physician conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible.  Seclusion or restraint orders should include sufficient criteria for release.

e.  Ensure that all staff who directly interact with inmates (including Correctional Officers) receive competency-based training on basic mental health information (e.g., diagnosis, specific problematic behaviors, psychiatric medication, additional areas of concern); recognition of signs and symptoms evidencing a response to trauma; and the appropriate use of force for inmates who suffer from mental illness.

C.  Protection from Harm

1.  Use of Force

a.  Develop and maintain comprehensive and updated policies and procedures, in accordance with generally accepted correctional standards, regarding permissible use of force.

- 41 -

b. Develop and maintain comprehensive policies and procedures, consistent with generally accepted correctional standards, regarding the establishment and deployment of the Response Team and Quick Entry Team, including permissible uses of force, use of force reporting, and necessary training specific for membership on this team.

c. Establish effective oversight of the use of force.

d. Develop an effective and comprehensive training program in the appropriate use of force.

2. Safety and Supervision

a. Ensure that correctional officer staffing and supervision levels are appropriate to adequately supervise inmates.

b. Ensure that inmate common areas are adequately supervised whenever inmates are present.

c. Ensure frequent, irregularly timed, and documented security rounds by correctional officers inside each housing unit.

d. Ensure that staff adequately and promptly report incidents.

e. Develop a process to track all serious incidents that captures all relevant information, including: location, any injuries, if medical care is provided, primary and secondary staff involved, reviewing supervisor, external reviews and results (if applicable), remedy taken (if appropriate), and administrative sign-off.

f. Establish a procedure to ensure that inmates do not possess or have access to contraband. Conduct regular inspections of cells and common areas of the housing units for contraband.

g. Conduct regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

- 42 -

h.  Review, and revise as applicable, all security policies and Standard Operating Procedures on an annual basis.

i.  Provide formal training on division-specific post orders each time a correctional officer is transferred from one division to another.

j.  Develop and implement specialized training for officers assigned to special management units, which include the Special Incarceration Units, disciplinary segregation, and protective custody units.  Officers assigned to these units should possess a higher level of experience and be regularly assigned to these units for stability purposes.

k.  Develop and implement appropriate training for corrections staff addressing security administration regarding:

(1)  Identification, prevention, and intervention in inmate-on-inmate violence; and

(2)  Professionalism and appropriate interaction between corrections staff and inmates.

l.  Ensure that adequate supervisory staff is in place to prevent staff provocation and staff encouragement of inmate violence.

m.  Develop and implement adequate policies and procedures to ensure appropriate investigation of staff-on-inmate violence and to ensure that appropriate corrective actions are taken.

n.  Ensure the adequate division of supervisory responsibility at ECCF, including, the establishment of clear lines of authority per shift, irrespective of union affiliation.

3.  Classification

a.  Develop and implement policies and procedures for an objective classification system that separates inmates in housing units by classification levels.

- 43 -

   b.   Update facility communication practices to provide officers involved in the classification process with current information as to cell availability on each division.

   c.   Update the classification system to include information on each inmate's history.

4.  Sexual Misconduct

   a.   Ensure that staff is trained and/or retrained on the Prison Rape Elimination Act.

   b.   Establish a zero tolerance standard regarding any form of sexual harassment or sexual misconduct that involves inmates, staff or any other individual that has contact with inmates.

   c.   Prompt written corrective action must follow any deficiency or negative finding that is revealed in either an administrative or criminal investigation surrounding sexual misconduct or sexual harassment.

5.  Inmate Grievance Procedure

   a.   Develop and implement policies and procedures to ensure inmates have access to an adequate grievance process. Such process should ensure that grievances are processed and legitimate grievances addressed and remedied in a timely manner, responses are documented and communicated to inmates; inmates need not confront staff prior to filing grievances about them, and inmates may file grievances confidentially.

   b.   Ensure that grievance forms are available on all units.

   c.   Ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, referred for investigation.

- 44 -

6.  **Access to Information**

    a.  Ensure that newly admitted inmates receive information they need to comply with facility rules and regulations, report misconduct, access medical and mental health care, and seek redress of grievances.

    b.  Ensure that inmates who are not literate are afforded the opportunity to have information on facility rules and services explained to them orally.

D.  **Medical Care**

    1.  **Intake Screening**

        a.  Ensure that adequate intake screening and health assessments are provided for inmates in accordance with generally accepted correctional standards of care.  Develop and implement an appropriate medical intake screening instrument that identifies observable and non-observable medical needs, including infectious diseases, and ensure timely access to a physician when presenting symptoms require such care.

        b.  Ensure that acute and chronic health needs of inmates are identified in order to provide adequate medical care.

        c.  Ensure that medical screening information is reviewed in a timely manner by trained and appropriate medical care providers.

        d.  Ensure that tuberculosis ("TB") screening is conducted in a timely manner.  Provide adequate treatment and management of communicable diseases (e.g., TB and Methicillin-resistant Staphylococcus aureus ("MRSA"), HIV, and Hepatitis).

    2.  **Acute care**

        a.  Provide timely medical appointments and follow-up medical treatment.  Ensure that inmates receive treatment that adequately addresses their serious medical needs.  Ensure that inmates receive acute care in a timely and appropriate manner.

- 45 -

    b.   Provide adequate acute care for inmates with serious and life-threatening conditions.

    c.   Ensure that staff are adequately trained and prepared to handle emergency situations in accordance with generally accepted correctional standards.

3.   Chronic care

    a.   Ensure that inmates receive thorough assessments for, and monitoring of, their chronic illness. Develop clinical practice guidelines for inmates with chronic and communicable diseases. Ensure that standard diagnostic tools are employed to administer the appropriate preventative care in a timely manner.

    b.   Adopt and implement appropriate clinical guidelines for chronic diseases such as HIV, hypertension, diabetes, asthma, and elevated blood lipids, and policies and procedures on, among other things, timeliness of access to medical care, continuity of medication, infection control, medicine dispensing, intoxication/detoxification, record-keeping, disease prevention, and special needs.

    c.   Ensure that medical staff are adequately trained to identify inmates in need of immediate or chronic care, and provide timely treatment or referrals for such inmates.

    d.   Ensure that inmates with chronic conditions are routinely seen by a physician to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

    e.   Ensure adequate follow-up treatment and medication administration concerning all inmates with chronic conditions.

- 46 -

4.  Treatment and Management of Communicable Disease

   a.  Provide adequate treatment and management of communicable diseases, including TB and Methicillin-resistant Staphylococcus aureus.

   b.  Ensure that inmates with communicable diseases are appropriately screened, isolated, and treated.

   c.  Ensure that HVAC and negative pressure systems are properly maintained and functioning.

   d.  Develop and implement an adequate TB control plan in accordance with generally accepted correctional standards of care.  Such should provide guidelines for identification, treatment, and containment to prevent transmission of TB to staff or inmates.

   e.  Develop and implement policies that adequately manage contagious skin infections.  Develop a skin infection control plan to set expectations and provide a work plan for the prevention of transmission of skin infections, including drug-resistant infections to staff and other inmates.

   f.  Develop and implement adequate guidelines to ensure that inmates receive appropriate wound care.

5.  Follow-Up Care

   a.  Provide adequate care and maintain appropriate records for inmates following hospitalization. Ensure that inmates who receive specialty or hospital care are evaluated upon their return to the facility and that, at a minimum, discharge instructions are noted and appropriately provided.

6.  Record Keeping

   a.  Ensure that medical records are adequate to assist in providing and managing the medical care needs of inmates at ECHC and ECCF.

   b.  Ensure that medical records are complete, accurate, readily accessible, and systematically organized.  All clinical encounters and reviews of

- 47 -

inmates should be documented in the inmates'
records.

7. Medication Administration

    a.   Ensure that treatment and administration of
medication to inmates is implemented in accordance
with generally accepted correctional standards of
care.

    b.   Ensure that administration of medication is
accurate and adequately documented. Develop
policies and procedures for the accurate
distribution of medication and maintenance of
medication records. Provide a systematic review
of the use of medication to ensure that each
inmate's prescribed regimen continues to be
appropriate and effective for his condition.

    c.   Ensure that medicine distribution is hygienic and
appropriate for the needs of inmates.

8. Staffing, Training, and Supervision

    a.   Provide adequate staffing, training, and
supervision of medical and correctional staff
necessary to ensure adequate medical care is
provided.

    b.   Ensure that medical staffing is adequate for
inmates' serious medical needs and that physicians
adequately monitor their patients.

    c.   Provide adequate physician oversight and
supervision of medical staff, including
supervision for LPNs.

    d.   Ensure that there is an adequate number of
correctional officers to escort inmates to medical
units.

9. Quality Assurance Review

    a.   Ensure that ECHC and ECCF's quality assurance
system is adequate to identify and correct serious
deficiencies with the medical system.

- 48 -

b.  Ensure that ECHC and ECCF's quality assurance
system is capable of assisting in managing and
treating inmate medical needs.  At a minimum, such
a system should be reliable and capable of
tracking medically-related incidents.

E.  **Sanitation and Environmental Conditions**

1.  Sanitation and Maintenance of Facilities

a.  Develop and implement policies and procedures to
ensure adequate cleaning and maintenance of the
facilities with meaningful inspection processes
and documentation.  Such policies should include
oversight and supervision, as well as establish
daily cleaning requirements for toilets, showers,
and housing units.

b.  Ensure prompt and proper maintenance of shower,
toilet, and sink units.

c.  Ensure proper ventilation and airflow in all cells
and housing units.

d.  Ensure adequate lighting in all housing units and
prompt replacement and repair of malfunctioning
lighting fixtures, so that officers and inmates
are not exposed to the security danger that lack
of visibility presents.

2.  Environmental Control

a.  Ensure adequate control and observation of ECHC
and ECCF cells, particularly with regard to
razors, fire loading materials, commissary items,
and cleaning supplies.

b.  Repair electrical shock hazards; develop and
implement a system for maintenance and repair of
electrical outlets, devices, and exposed
electrical wires.

3.  Sanitary Laundry Procedures

a.  Ensure that laundry delivery procedures protect
inmates from exposure to contagious disease,
bodily fluids, and pathogens by preventing clean

- 49 -

laundry from coming into contact with dirty
laundry or contaminated surfaces.

b.  To limit the spread of MRSA and other infectious
disease, require inmates to provide all clothing
and linens for ECHC and ECCF laundering and
prevent inmates from washing and drying laundry
outside the formal procedures.

c.  To limit the spread of MRSA and other infectious
disease, ensure that clothing and linens returned
from off-site laundry facility are clean,
sanitized, and completely dry.

d.  Provide all inmates with properly cleaned and
adequate bedding and clothing

* * *

IV.  CONCLUSION

Please note that this letter is a public document and will
be posted on the Civil Rights Division's website.

We invite the State to discuss with us the remedial
recommendations, with the goal of remedying the identified
deficiencies without resort to litigation.  In the event that we
are unable to reach a resolution regarding our concerns, the
Attorney General is empowered to institute a lawsuit pursuant to
CRIPA to correct deficiencies of the kind identified in this
letter, 49 days after appropriate officials have been notified of
them.  42 U.S.C. § 1997b(a)(1).  If you have any questions
regarding this letter, please call Shanetta Y. Cutlar, Chief of
the Civil Rights Division's Special Litigation Section, at
(202)514-0195.

Sincerely,

S/Loretta King

Loretta King
Acting Assistant Attorney General

cc:  Timothy B. Howard
Erie County Sheriff

- 50 -

Robert Koch
Superintendent
Erie County Sheriff's Department,
Jail Management Division

Cheryl A. Green
County Attorney
Erie County

Kathleen Mehltretter
Acting United States Attorney
Western District of New York