EXHIBIT B



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*     *Washington, D.C. 20530*

**JUL 1 5 2009**

The Honorable Chris Collins
County Executive
Rath Building – 16th Floor, Rm. 1600
Buffalo, NY 14202

RE: <u>CRIPA Investigation of the Erie County Holding Center
and the Erie County Correctional Facility</u>

Dear Mr. Collins:

We write to report the Civil Rights Division's investigative
findings of conditions at the Erie County Holding Center ("ECHC")
and the Erie County Correctional Facility ("ECCF").  On November
13, 2007, we notified then Erie County Executive Joel Giambra
that we had initiated an investigation of these facilities
pursuant to the Civil Rights of Institutionalized Persons Act
("CRIPA"), 42 U.S.C. § 1997, which authorizes the Department of
Justice to seek remedies for any pattern or practice of conduct
that violates the constitutional rights of incarcerated persons.
Initially, we informed Executive Giambra that our investigation
would focus on medical care, mental health care, and protection
from harm; however, in the course of our investigation, we also
became aware of environmental health and sanitation conditions
that warranted investigation.

We note that, initially, the County of Erie (the "County")
cooperated with our investigation, providing the United States
with some of the requested documents from January 1, 2007,
through March 1, 2008.  Specifically, the County provided ECHC
incident reports; some grievances; state and national corrections
reports; and ECHC and ECCF policies and procedures.  However, the
County did not produce corresponding medical reports, which
limited our ability to assess the number and severity of injuries
that inmates suffered following incidents of self-injurious
behavior, attempted suicides, actualized suicides,
inmate-on-inmate violence, and excessive use of force by staff.

- 2 -

Initially, we planned to tour ECHC and ECCF in March 2008, but we re-scheduled our tour to August 2008 at the County's request, due to the appointment of a new County Attorney. In the months leading up to the scheduled August tour, the County broke off all communication with us despite our repeated outreach and offers to meet and discuss the County's concerns. On June 16, 2008, the new County Attorney notified us that the County would no longer cooperate with our investigation. The County refused, and continues to refuse, to allow us access to the facilities, staff, or inmates.

The County's unreasonable denial of our request for access is especially troubling, given that inmates committed suicide on March 31, 2008, and April 30, 2008, well after we placed the County on notice that our investigation would review allegations of deficient suicide prevention measures. If the County had agreed to our proposed investigation procedures, County officials would have had an early opportunity to work directly with our experts and staff, in an effort to improve conditions at the facilities with the hopes of avoiding such incidents. They also would have had an opportunity to address any identified problems on a voluntary, proactive basis at an early stage of this investigation.

Furthermore, while we strongly disagree with the County's decision to deny us access to the facilities, the County's denial of our request for access to Erie County inmates, even during regular visiting hours, is unreasonable and devoid of any legal or penological support. Inmates have a First Amendment right to speak with government representatives about the conditions of their confinement and the County has no legitimate penological basis to deny the inmates access to United States government representatives.

In December 2008, we informed the County of our plans to travel to the County to interview inmates at ECHC and ECCF. The County again denied us access to ECHC and ECCF inmates. Despite the County's refusal to cooperate, during our December 2008 visit to the County of Erie, we were able to communicate with a number of current and recently transferred ECHC inmates through an arrangement with the United States Marshals Service ("USMS") and various state facilities.[1]

---

[1]     We appreciate the assistance provided to us by the New York State Department of Correctional Services and the staff at the Attica, Orleans, and Wende facilities.

- 3 -

We later learned that the County interviewed some of the ECHC inmates with whom we communicated. We were told that these interviews were videotaped, that the inmates were asked what we had spoken to them about, and that they were required to sign a form.[2] We stressed to the County that such interviews could be construed as retaliation, which is unlawful under CRIPA, but we were given no assurances that the County would desist from such behavior. Notably, we repeated our offer to meet with the County, in order to explain our investigative process, instead of having the County attempt to secure this information from inmates in a manner the inmates might find troubling. Again, our offer was rejected.

By law, our investigation must proceed regardless of whether officials choose to cooperate. Indeed, when CRIPA was enacted, lawmakers considered the possibility that state and local officials might not cooperate in our federal investigation. See H.R. CONF. REP. 96-897, at 12 (1980), reprinted in 1980 U.S.C.C.A.N. 832, 836. Such non-cooperation is a factor that may be considered adversely when drawing conclusions about a facility. See id. We now draw such an adverse conclusion.[3]

Consistent with the statutory requirements of CRIPA, we write to advise you of the findings of our investigation, the facts supporting them, and the minimum remedial measures that are necessary to address the deficiencies we have identified. As described more fully below, we conclude that the conditions of confinement violate the constitutional rights of inmates confined at ECHC and ECCF. In particular, we find that, based on constitutionally deficient practices, the Erie County Sheriff's Office ("ECSO"), the Jail Management Division ("JMD"), and the Erie County Department of Mental Health ("ECDMH"), through the Adult Forensic Mental Health Clinic, fail to protect inmates from serious harm or the risk of serious harm.

---

[2]   We requested copies of any videotapes from these interview sessions and any forms signed by the inmates, but our request was denied by the County.

[3]   The County's non-cooperation constitutes only one factor that we consider in preparing our statutory findings and recommendations. We also have considered the documentation provided by the County, reports issued by the National Commission on Correctional Health Care and the New York State Commission on Corrections, news articles, and interviews with private attorneys, inmates, and local law enforcement officers.

- 4 -

## I.   BACKGROUND

### A.   Facility Description

ECHC is a pre-trial detention center located in Buffalo, New York; ECCF is a correctional facility located in Alden, New York. Both facilities are under the authority of Erie County Sheriff Timothy B. Howard, and are managed by the Superintendent of the County's JMD.[4]  ECHC is the second largest pre-trial detention facility in New York.  ECHC was built to house 680 inmates with the combination of "pod," open bay "dorm," and traditional linear-type cells.  ECCF was built to house 1,070 convicted prisoners, parole violators, and ECHC overflow inmates. Approximately 23,000 people are processed through the two facilities each year, with a daily population of approximately 1,600.  The ECSO provides medical and dental services to both facilities, while the Erie County Department of Mental Health Services, through the Adult Forensic Mental Health Clinic, provides the mental health services for both facilities.[5]  ECHC and ECCF inmates may also be admitted to the Erie County Medical Center's secure Psychiatric Service Unit, guarded by in-hospital sheriff's deputies.

### B.   Legal Standards

CRIPA authorizes the Attorney General to investigate and take appropriate action to enforce the constitutional rights of jail inmates and detainees subject to a pattern or practice of unconstitutional conduct or conditions.  42 U.S.C. § 1997.

When a jurisdiction takes a person into custody and holds him there against his will, the Constitution imposes upon the jurisdiction a corresponding duty to assume some responsibility for the inmate's safety and general well-being.  County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998) (citing DeShaney v. Winnebago County Dept. of Social Servs., 489 U.S. 189, 199-200 (1989)).  Generally, county governments must provide persons confined in a jail with reasonably safe conditions of

---

[4]     The Superintendent of the Holding Center oversees the Administration, Security, and Programs of both facilities and reports directly to the Undersheriff, who reports directly to the Sheriff.

[5]     National Commission on Correctional Health Care, Health Services Study:  Erie County Corrections Facilities ("NCCHC 2008 Erie Report"), at 2 (Jan. 10, 2008, revised, Feb. 11, 2008).

confinement.  See Bell v. Wolfish, 441 U.S. 520 (1979).
Specifically, the Eighth and Fourteenth Amendments require that
inmates, both pre- and post-trial, "receive adequate food,
clothing, shelter, and medical care."  Farmer v. Brennan,
511 U.S. 825, 832 (1994); Benjamin v. Fraser, 343 F.3d 35
(2d. Cir. 2003).

The Eighth Amendment protects prisoners from present,
continuing, and future harm.  See Helling v. McKinney,
509 U.S. 25, 33 (1993).  Prison officials have a duty to protect
inmates from harm caused by other inmates and from excessive
physical force by correctional staff.  See Farmer, 511 U.S. at
833; see also, Ayers v. Coughlin, 780 F. 2d 205, 209 (2d Cir.
1986).  The Eighth Amendment further requires that inmates
receive access to adequate medical and mental health care.  See
Farmer, 511 U.S. at 832; Benjamin, 343 F.3d at 50.  Deliberate
indifference to the serious medical needs of inmates, including
pre-trial detainees, constitutes an unnecessary and wanton
infliction of pain contrary to contemporary standards of decency
and violates the Eighth Amendment.  See Estelle v. Gamble, 429
U.S. 97, 104 (1976); Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir.
1996).

The Fourteenth Amendment protects pre-trial detainees from
being punished or exposed to conditions or practices not
reasonably related to the legitimate governmental objectives of
safety, order, and security.  Bell, 441 U.S. at 535-37, 547-48;
Benjamin, 343 F.3d at 50.  Although the Eighth Amendment does not
apply to pre-trial detainees, they "retain at least those
constitutional rights . . . enjoyed by convicted prisoners [under
the Eighth Amendment]."  Bell, at 545; Benjamin, 343 F.3d at 50
("under the Due Process Clause, [pre-trial detainees] may not be
punished in any manner - neither cruelly and unusually nor
otherwise"); Weyant v. Okst, 101 F.3d 845 (2d Cir. 1996).

### 1.  Protection From Harm

The Eighth and Fourteenth Amendments forbid excessive
physical force against inmates and pre-trial detainees.  See
Hudson v. McMillian, 503 U.S. 1 (1992), Farmer, 511 U.S. at 832;
see also, United States v. Walsh, 194 F.3d 37, 48 (2d Cir. 1999)
("the right of pre-trial detainees to be free from excessive
force amounting to punishment is protected by the Due Process
Clause of the Fourteenth Amendment.")(citing Bell, 441 U.S. at
535 [citations omitted]).  This is true even when the use of
force does not result in significant injury.  Id.  A jail or
prison official who inflicts force maliciously and sadistically
to cause an inmate harm violates the Eighth and Fourteenth

- 6 -

Amendments. See Livingston v. Griffin, 2007 U.S. Dist. Lexis 36941, at *30 (May 21, 2007)(citing Hudson, 503 U.S. at 9); Walsh, 194 F.3d at 47-48 (applying Fourteenth Amendment protections to pre-trial detainees in criminal case against corrections officer accused of violating inmate's constitutional rights). Courts have "applied the same Eighth Amendment standards to the deliberate indifference claims of pre-trial detainees." Patrick v. Amicucci, 2007 WL 840124, at *3 (S.D.N.Y. Mar. 19, 2007).

In determining whether excessive force was used, courts examine a variety of factors, including:

> "[T]he need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response."

Hudson, 503 U.S. at 7-8.

In determining whether conduct rises to the level of a constitutional violation, the Second Circuit requires that the "prison official have 'knowledge that an inmate faces substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate the harm.'" Patrick, 2007 WL 840124 at *3 (citing Lee v. Artuz, 2000 WL 231083, at *5 (S.D.N.Y. Feb. 29, 2000)), quoting from Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996). The Second Circuit also requires that "an injured inmate . . . show not only that he was exposed to a substantial risk of serious harm but also that the defendant officials acted with deliberate indifference to his health or safety." Patrick, 2007 WL 840124 at *3, (citing Farmer, 511 U.S. at 837). Liability arises where an official knew of and disregarded "an excessive risk to inmate health or safety [and is both] aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Id. Prison officials have been found liable when "they are on notice of a substantial risk of serious harm to an inmate and fail to take reasonable steps to protect him [or her]." Id.

The right to be protected from harm includes the right to be reasonably protected from constant threats of violence. See Farmer, 511 U.S. at 833. This includes protecting inmates from sexual assault from other inmates and correctional officers. See Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997) (finding the "sexual abuse of a prisoner by a corrections officer has no

- 7 -

legitimate penological purpose, and is 'simply not part of the penalty that criminal offenders pay for their offenses against society.'") (citing <u>Farmer</u>, 511 U.S. at 834)); <u>Villante v. Dep't. of Corr.</u>, 786 F.2d 516, 522-23 (2d Cir. 1986)(finding inmate stated a cause of action for deliberate indifference where guards failed to protect inmate from sexual threats and abuse by other inmates); <u>Rodriguez v. McClenning</u>, 399 F. Supp. 2d 228, 236-238. (S.D.N.Y. 2005) (finding officer's sexual assault of prisoner constituted an Eighth Amendment violation); <u>Noguera v. Hasty</u>, 2001 WL 243535, at *2 (S.D.N.Y. Mar. 12, 2001); <u>Colman v. Vasquez</u>, 142 F.Supp. 2d 226, 237 (D.Conn. 2001).

Lastly, "a corrections officer bears an affirmative duty to intercede on behalf of an inmate when the officer witnesses other officers maliciously beating that inmate in violation of the inmate's Eighth [and Fourteenth] Amendment rights." <u>Jones v. Huff</u>, 789 F. Supp. 526, 535 (N.D.N.Y. 1992)(citing <u>O'Neill v. Krzeminski</u>, 839 F.2d 9, 11 (2d Cir. 1988)); <u>see also</u>, <u>Walsh</u>, 194 F.3d at 48 (holding "<u>Hudson</u> analysis is applicable to excessive use of force claims brought under the Fourteenth Amendment."). "The duty arises if the officer has a reasonable opportunity to intercede." <u>Id.</u> (citing <u>O'Neill</u>, 839 F.2d at 11).

## 2.   Medical and Mental Health Care

The Constitution requires that prison officials address inmates' serious medical and mental health needs. <u>Estelle</u>, 429 U.S. at 104. Officials act with deliberate indifference when an inmate needs serious medical or mental health care and the officials fail to, or refuse to, obtain or provide that care. <u>Id.</u>; <u>see also</u>, <u>Hathaway v. Coughlin</u>, 37 F. 3d 63 (2d Cir. 1994); <u>Kaminsky v. Rosenblum</u>, 929 F. 2d 922 (2d Cir. 1991); <u>Chance v. Armstrong</u>, 143 F. 3d 698 (2d Cir. 1988). The "deliberate indifference to a prisoner's serious medical needs constitutes the 'unnecessary and wanton infliction of pain'" in violation of the Eighth Amendment. <u>Estelle</u>, at 104 (citation omitted). This includes protecting prisoners whose health problems are "'sufficiently imminent' and 'sure or very likely to cause serious illness and needless suffering in the next week or month or year.'" <u>Young v. Coughlin</u>, 1998 U.S. Dist. LEXIS 764, at *11 (S.D.N.Y. Jan. 29, 1998)(citing <u>Helling</u>, 509 U.S. at 33).

The constitutional responsibility to provide minimally sufficient medical care includes treatment of psychiatric or mental health illnesses. <u>Langley v. Coughlin</u>, 888 F.2d 252, 254 (2d Cir. 1989). Prison officials have an obligation to protect an inmate from self-inflicted injury where the prison official

- 8 -

knew or had reason to know "of a potential suicide risk to an inmate . . . ." Eze v. Higgins, 1996 WL 861935, at *7 (W.D.N.Y. 1996) (citing Hudson, 468 U.S. at 526-27 (1984)).  Prison officials act with a deliberate indifference to the risk of suicide when they fail "to discover an individual's suicidal tendencies . . . [or] could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide . . . ."  Kelsey v. City of New York, 2006 U.S. Dist. LEXIS 91977, at *16 (E.D.N.Y. Dec. 18, 2006) (citing Rellergert v. Cape Girardeau County, 924 F.2d 794, 796 (8th Cir. 1991)).

### 3.   Sanitation

Inmates are constitutionally entitled to environmental conditions that do not pose serious risks to health and safety, including deficient sanitation, inadequate fire safety, inadequate ventilation, and pest infestation. Benjamin, 343 F.3d at 52 (affirming district court findings that "inadequate ventilation, lighting, and exposure to extremes of temperature violated the detainees' constitutional rights"); Harris v. Westchester County Dep't of Corr., 2008 U.S. Dist. LEXIS 28372, at *18 (S.D.N.Y. Apr. 2, 2008) (finding a leaking ceiling an "unsafe prison condition").

In the Second Circuit, "challenges by pre-trial detainees 'to the environmental conditions of their confinement are properly reviewed under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth.'"  Harris, 2008 U.S. Dist. LEXIS at *17, citing Benjamin, 343 F.3d at 49-50.  "Where a pre-trial detainee alleges 'a protracted failure to provide safe prison conditions, the deliberate indifference standard does not require the detainees to show anything more than actual or imminent substantial harm.'"  Harris, 2008 U.S. Dist. LEXIS at *17, citing Benjamin, 343 F.3d at 51 (emphasis omitted).  Challenges by sentenced inmates to environmental conditions of confinement, however, are protected by the Eighth Amendment, and in order for an inmate to prevail on an environmental conditions of confinement claim, an inmate must meet the deliberate indifference standard.  See Hathaway, 37 F.3d at 66.

## II.   FINDINGS

The ECSO and JMD's administration of ECHC and ECCF is woefully inadequate and has resulted in a pattern of serious harm to inmates, including death.  We find that the County, ECSO, JMD,

- 9 -

and ECDMH fail to provide adequate suicide prevention; mental health care; medical care; protection from harm; and safe and sanitary environmental conditions.  In making these findings, we are cognizant that the County has received similar notice regarding conditions in ECHC and ECCF from the New York State Commission on Corrections ("NYSCC") and the National Commission on Correctional Health Care ("NCCHC") on multiple occasions, but has yet to remedy these issues.[6]

### A.   Inadequate Suicide Prevention

Constitutional requirements mandate the development of suicide prevention standards.  These standards require:  (1) an appropriate policy and procedure; (2) education and training for all staff members; (3) appropriate screening to assess suicide risk; (4) appropriate housing for those identified as at risk; (5) appropriate supervision, observation, and monitoring of those inmates so identified; (6) appropriate referrals to mental health providers and facilities; (7) appropriate communication between correctional health care personnel and correctional personnel; (8) appropriate intervention addressing procedures of how to handle a suicide in progress; and (9) appropriate notification, reporting, and review if a suicide does occur.

ECHC and ECCF's current suicide prevention practices do not comport with generally accepted standards of correctional mental health care.  Although the policies we reviewed appear sound, it is clear by the number of recent suicides and attempted suicides that there are serious problems with how the policy is

---

[6]    See, e.g., New York State Commission on Corrections, Minimum Standards Evaluation - Erie County Jail Management Division ("NYSCC 2006 Evaluation")(2006); New York State Commission on Corrections Erie County Holding Center Cycle 2 Evaluation, Apr. 30, 2007 ("NYSCC ECHC Cycle 2 Evaluation Apr. 2007"); New York State Commission on Corrections Erie County Holding Center Cycle 2 Evaluation, Aug. 6, 2007 ("NYSCC ECHC Cycle 2 Evaluation Aug. 2007"); New York State Commission on Corrections ECHC Phase 2 Evaluation, Apr. 2008; National Commission on Correctional Health Care, Health Services Study: Erie County Corrections Facilities ("NCCHC 2008 Erie Report")(Jan. 10, 2008, revised, Feb. 11, 2008); and numerous letters from the NYSCC to Erie officials, cited throughout.

- 10 -

implemented and followed.[7]  Moreover, despite a 2008 NCCHC
warning, the County continues to house suicidal inmates in unsafe
cells that allow an inmate multiple ways to facilitate committing
suicide, including:  using steel beds, wall plates removed from
the wall, accessible grab bars, and bars on windows.[8]  ECHC
inmates have exploited cell deficiencies, incorporating them into
their suicide attempts.  Since 2003, at least 23 inmates either
committed, or attempted to commit, suicide, or took steps that
demonstrated suicidal ideation.  Between 2007-2008 there were
three suicides and at least ten attempted suicides.  Below, we
provide examples of the County's inability to supervise inmates,
identify inmates at risk for suicide, correct deficiencies in
cells that facilitate suicide attempts, and prevent likely
suicide attempts.

- ECHC inmates have committed suicide by hanging
  themselves from air vents using bed sheets.  In 2008
  alone, two inmates died in such a manner, raising the
  total to over 15 inmates who have committed, or
  attempted to commit, suicide in a similar fashion since
  2002.

- In the past two years, more than five inmates who
  attempted suicide by hanging or self-strangulation were
  unsuccessful only because a guard or another inmate
  discovered the attempt and cut down the self-made noose
  or otherwise removed the fabric from around the
  inmate's neck.  In one instance, ECHC deputies
  discovered a distraught inmate in his cell only after
  the rope broke during his attempt to hang himself.

---

[7]     For example, the Suicide Prevention Policy requires
that inmates housed in Constant Observation receive
uninterrupted, personal visual observation.  Yet, inmates held in
constant observation are still finding ways to hide contraband,
such as a bullet.  Similarly, the policy requires that the
dispensation of psychotropic medication be adequately monitored,
yet one inmate attempted suicide by ingesting another inmate's
medication, while yet another inmate hoarded his medication for
weeks without notice.

[8]     NCCHC 2008 Erie Report, supra, n. 5, at 10 ("The cells
used to house suicidal inmates were not 'suicide-proof.'  There
were multiple ways to facilitate committing suicide, including
using the steel beds, wall plates that are lifted from the wall,
handicapped bars, bars on windows, etc.").

- 11 -

- In December 2008, an ECHC inmate attempted suicide by hanging.  This was the inmate's third suicide attempt.

- In March 2008, an ECHC inmate committed suicide by hanging, despite a warning from the inmate's family that the inmate could be suicidal.

- In February 2008, a 17-year-old ECHC inmate attempted suicide by hanging.  Two other inmates grabbed his legs and successfully untied the sheets from the bars.

- In November 2007, an ECHC inmate attempted suicide while under constant observation.  Despite the suicide attempt, ECHC officials released the inmate into general population, where he again attempted suicide six days after his earlier attempt.

- In May 2007, ECHC deputies found an inmate unconscious on the floor of his cell after he attempted suicide by ingesting a dangerous quantity of another inmate's quetiapine.[9]  Deputies found a suicide note in his cell, and ECHC documents do not indicate whether the inmate ever regained consciousness.

- In January 2007, an ECHC inmate committed suicide in view of deputies by diving off a 15-foot railing in the common area.  Upon admission to ECHC, the inmate was reportedly evaluated by forensic staff and determined not to be a suicide risk.

In addition to suicides and attempted suicides, we found many examples of inmates who engaged in self-injurious behavior, including banging their heads against the wall, cutting themselves with metal and glass objects, and verbally expressing a desire to die.  Documentation provided by the County fails to indicate that these inmates were referred for mental health assessments or further suicide screening.  Furthermore, despite prior warnings from the NYSCC, the County's facilities provide ready access to a number of environmental hazards such as screws,

---

[9]      A psychotropic medication used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder.

- 12 -

nuts, and bolts on chairs that could cause injury or be removed and used as a weapon.[10]  For example:

- In October 2007, ECHC deputies found an inmate, who had attempted suicide on a prior occasion, holding a broken light bulb to his neck.[11]

- In September 2007, deputies witnessed an inmate smash his cell window and cut his arm with a broken piece of glass.[12]

- In June 2007, an ECHC inmate verbally threatened self-harm after he flooded his cell and smeared feces on himself and the cell wall.  Deputies sent the inmate for a medical examination regarding injury to his eye.  There is no indication in the materials provided by the County that the inmate received any psychiatric evaluation.

- In February 2007, ECHC deputies discovered an inmate hoarding 38 pills he was to be taking three times each day to treat high blood pressure.  Deputies did not refer the inmate for a psychiatric evaluation because the inmate reportedly indicated he did not wish to harm himself.

The availability of dangerous implements and numerous examples of self-injurious behavior amplify the County's inability to monitor and supervise inmates.  The examples also illustrate the County's inability or unwillingness to refer inmates for appropriate mental health treatment.  Given the number of suicides and attempted suicides at these facilities, at least five of which occurred following the release of the NCCHC 2008 Erie Report placing the County on notice of such issues, it is evident that County officials are deliberately indifferent and have not taken these incidents or the recommendations of the NYSCC and NCCHC seriously.

---

[10]     NYSCC ECHC Cycle 2 Evaluation Aug. 2007, supra, n. 6, at 4; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, supra, n. 6, at 6.

[11]     Subsequently, this inmate was interviewed by forensic staff, who placed the inmate on constant observation.

[12]     Subsequently, this inmate was interviewed by forensic staff, who placed the inmate on constant observation.

- 13 -

### B.   Inadequate Mental Health Care

ECDMH fails to provide inmates with adequate mental health care.   ECHC and ECCF inmates require mental health assessments and treatment to avoid the unnecessary suffering of acute and chronic episodes of mental illness.   Generally accepted correctional mental health care standards require that a physician see an inmate usually before, but clearly shortly after, a prescription for psychotropic medication is written so that the physician can evaluate whether the medication should be maintained and to assess the medication order for proper dosage and effectiveness.   Inmates who remain untreated, or who are treated without being seen by a physician, may suffer from a worsening of their symptoms, including suicidal and homicidal thoughts, or from the potentially lethal side effects of medication.

An alarming example of deficient mental health care is the death of inmate Jimmy Roberts.[13]   On May 19, 2007, Mr. Roberts died of pneumonia brought on by starvation and dehydration after spending four months in ECHC.   ECHC staff ignored Mr. Roberts' deteriorating behavior despite clear signs of mental illness and decompensation, such as splashing urine and spreading feces on his face.   The NYSCC investigation of Mr. Roberts' death found that ECHC officials failed to identify Mr. Roberts' medical condition and take the necessary steps to prevent self-injurious behavior.[14]   Moreover, the NYSCC cited several incidents that should have alerted the medical staff to Mr. Roberts' decompensation (e.g., throwing food, rolling in feces).   NYSCC also found that despite Mr. Roberts' increasing psychotic behavior, the ECHC physician failed to take any action to arrange for critically needed care.[15]   The NYSCC found ECHC's care of Mr. Roberts inadequate, rising to the level of professional misconduct.[16]   The NYSCC concluded that the current medical department at the facility is "incapable of providing medical

---

[13]    The name "Jimmie Roberts" is a pseudonym.

[14]    New York State Commission on Corrections, Findings in the Matter of the Death of [Jimmie Roberts], Jan. 10, 2008 ("NYSCC [Roberts] Report").

[15]    Id. at 6-9.

[16]    Id. at 6.

- 14 -

evaluation and treatment" sufficiently to treat inmates who are seriously ill.[17]

### C.   Inadequate Protection From Harm

Corrections officials must take reasonable steps to provide "humane conditions" of confinement. Farmer, 511 U.S. at 832. Providing humane conditions requires that a corrections system satisfy inmates' basic needs, such as their need for safety. Additionally, jail officials have a duty to take reasonable steps to protect inmates from physical abuse.

To ensure reasonably safe conditions, officials must take measures to prevent the unnecessary and inappropriate use of force by staff. Officials must also take reasonable steps to protect inmates from violence at the hands of other inmates. In addition, officials must provide adequate systems to investigate incidents of harm, including staff misconduct and alleged physical abuse of inmates. Finally, a jail has an obligation to protect vulnerable inmates from harm, such as those who are at risk of suicide or at risk of harm from other inmates. For the reasons set forth below, ECHC and ECCF fail to meet constitutional standards in all of these regards.

### 1.   Deficient Policies and Procedures

#### a.   Overall Content and Structure of ECHC and ECCF's Policies and Procedures

Policies and procedures are the primary means by which jail management communicate their standards and expectations. Thus, policies and procedures should be current, accessible to all correctional officers and staff, and consistent with relevant legal standards and contemporary correctional practices. Typically, correctional institutions have a uniform policy that governs the Jail Administration. The uniform policy may contain post orders, much like the ECHC Manual contains, that are specific to areas such as intake booking and court hold. Most importantly, however, the uniform policy would provide operational guidance on, inter alia, the use of force, use of restraints, use of chemical agents, suicide prevention, and the grievance process. These uniform policies would be enforced throughout both facilities and all Jail Staff would be trained on one set of operational guidelines. Failure to do so may allow for informal practices to flourish, thus making it difficult to

---

[17]   Id. at 7.

- 15 -

monitor the appropriate application of the institution's governing policies.

ECSO provided us with a copy of the Policies and Procedure Manuals (collectively, the "Manuals") for both ECHC ("ECHC Manual") and ECCF ("ECCF Manual"). The ECHC Manual is dated January 29, 2005, while the ECCF Manual is dated October 7, 2003. A review of the Manuals indicates that many sections are outdated, and many have not been updated in several years. For example, the ECCF use of force policy, Policy 04-09-00 (Physical Force/Corporal Punishment), was last updated in 1991. Similarly outdated are ECCF's suicide prevention screening guidelines, 09-03-01, updated in 1990; restraint policy, 04-09-01, updated in 1997; and grievance policy, 04-11-00, updated in 1999. ECHC policies are similarly dated (i.e., Use of Firearms/Force Report, JMD 04.03.01, updated in 2002; and Contraband Control, JMD 05-03-90, updated in 2003). Notably, in 2004, the ECSO's JMD enacted JMD 02.20.00, requiring the annual review of JMD Policy and Procedures concerning "Classification," "Grievance," and "Suicide Prevention." We are unable to determine, based on the documents that were produced by the County in February 2008 and the County's continued refusal to cooperate with our investigation, whether the County has reviewed or updated these manuals; the date on the materials we received suggests that they have not. Accordingly, we must assume that they have not been updated.

Moreover, the organization of the Manuals is confusing. It is our understanding that the ECSO has custodial responsibilities over both ECHC and ECCF and that the JMD oversees the operation of the facilities. Given this arrangement, it is unclear why there are individual, and dissimilar, manuals for ECHC and ECCF. For example, while the ECCF Manual contains policies on the Use of Force, the ECHC Manual does not,[18] and while Spanish-speaking inmates at ECHC are not provided a translated Inmate Handbook, Spanish-speaking inmates at ECCF are. See infra, Section II.C.9. Similarly, it is unclear why there are different inmate handbooks for each facility.[19] The NYSCC noted this discrepancy in its April 2008 Jail Evaluation, finding deficiencies in the disciplinary sanctions of unsentenced inmates who were housed at ECCF, stating that these inmates who were "transferred to the

---

[18]   The ECHC Manual has a Use of Firearms/Force Report Policy, JMD 04.03.01; however, it is less a policy on appropriate uses of force and more a policy on reporting the use of force.

[19]   ECHC has an Inmate Handbook and ECCF has an Inmate Code of Conduct. See infra, Section II.C.9.

- 16 -

Holding Center for disciplinary reasons were having their disciplinary hearing at the Holding Center,"[20] subject to ECHC's inmate rule book and not the ECCF inmate rule book.  It further found that the two rule books differed in classes of violations and sanctions.[21]  The NYSCC recommended that JMD "consider developing and implementing a single inmate rule book" for both facilities.[22]

### b.    Deficient Use of Force Policies and Procedures

While the use of force is sometimes necessary in a correctional facility, the Constitution forbids excessive physical force against inmates.  A determination of whether force is used appropriately requires an evaluation of the need for the use of force, the relationship between that need and the amount of force used, the seriousness of the threat reasonably believed to exist, and efforts made to temper the severity of a forceful response.  Hudson v. McMillian, 503 U.S. 1, 7 (1992).  Generally accepted correctional practices provide that appropriate uses of force in a given circumstance should include a continuum of interventions, and that the amount of force used should not be disproportionate to the threat posed by the inmate.  Absent exigent circumstances, lesser forms of intervention, such as issuing disciplinary infractions or passive escorts, should be used or considered prior to more serious and forceful interventions.  This guidance is typically found in a use of force policy.  Failure to provide staff with operational guidance on when the use of force is appropriate is a gross departure from generally accepted correctional standards.

The ECHC's Manual fails to provide operational guidance on the use of force.  In contrast with generally accepted corrections practices, ECHC has no operating policy governing the application of force at ECHC, and no system in place to monitor the use of force.  The ECHC Manual makes several vague references to a "Response Team," apparently utilized to quell emergency inmate disturbances; however, there is no policy governing the team's assembly.  ECHC's use of force and its use of the Response Team, without any operating policies and procedures, fails to

---

[20]    New York State Commission of Correction ECHC Phase 2 Evaluation, Apr. 2008, supra, n. 6, at 4.

[21]    Id.

[22]    Id.

- 17 -

provide inmates with sufficient protection from harm and creates
a climate where the unfettered use of force is permissible
because there are no operating guidelines holding anyone
accountable.

While the ECHC Manual makes several vague references to the
"Response Team," the Manual itself does not provide a policy
describing the composition of this team, how it is assembled, its
purpose and specific use, or how members of this team are
trained, if at all.  It is also unclear what the exact purpose of
the Response Team is; however, JMD 04.03.01 provides that a use
of force report must be prepared whenever the Response Team is
"required to control an inmate situation wherein force may be
used to quell the situation."  The policy, however, does not
explain what is meant by "control" and "inmate situation," nor
does it discuss the appropriate or permissible uses of force by
the Response Team.  See JMD 04.03.01.  Moreover, JMD 06.01.02
makes reference to a "secondary response team" that will be
assembled in the event of a riot or hostage situation; again,
limited guidance is given on the composition of this "secondary
response team."  See JMD 06.01.02.  Employing a special
operations team, like the Response Team, that is to be used in
emergency situations without operational guidance as to its
structure and use, is a gross departure from generally accepted
correctional standards.

Our review of the ECHC Manual did not reveal a Use of Force
policy that directs Jail Staff as to when the use of force is
appropriate, and what types of force should be used.  By
contrast, as discussed above, the ECCF manual provides guidance
on the use of force, albeit dated.  See ECCF Manual, Physical
Force/Corporal Punishment, 04.09.00.  While the ECHC Manual does
contain guidance on the planned use of force, Policy JMD
06.01.03, this policy is strictly limited to planned uses of
force initiated by the Quick Entry Team ("QET").  Moreover, this
policy is located in the Emergency Preparedness section of the
ECHC Manual, further limiting its application to situational
necessity.  The ECHC Manual also contains guidance on the
reporting of force; however, this policy fails to provide
operational guidance on when the use of force itself is
appropriate.  See ECSO Use of Firearms/Force Report, JMD
04.03.01.  The ECHC Manual should provide written operational
guidance on what are legally acceptable uses of force, in keeping
with Constitutional, federal, and state guidelines, as well as
generally accepted correctional standards.  However, the ECHC
Manual does not provide any language for when the use of force,
absent an emergency situation, is permissible.

- 18 -

### 2.  Excessive Use of Force

Our investigation revealed that inmates at ECHC and ECCF are regularly subjected to inappropriate, excessive and degrading uses of physical force.  The following are illustrative examples:

- Inmates we interviewed consistently reported that ECSO deputies would take ECHC inmates on "elevator rides," during which deputies would reportedly physically assault inmates.  Inmates consistently described incidents in which deputies would take handcuffed inmates to an isolated elevator (which was not equipped with a security camera) where they would be beaten and had their heads slammed against the elevator walls.

- In August 2008, an ECHC inmate was handcuffed, stripped, and cavity searched by a deputy who then used the same rubber gloves to search other inmates.  When the inmate requested that the deputy change his gloves, which were dirty with blood and fecal matter, the deputy struck the inmate on the head and forcibly performed the search, stating that he "did not have to do a damn thing."

- In 2008, according to inmate interviews, ECSO deputies ordered other inmates to go into the cell of an inmate who refused to shower, pull the inmate out of the cell, strip him and wash him on the floor of the pod common area with rags and a bucket of water.

- In January 2008, ECSO deputies reportedly targeted inmates who were screaming as a result of the New Year. Inmates told us that, in the case of one of the inmates, the deputies punched, kicked, and reportedly tied a sheet around the inmate's neck, threatening to hang him.  The inmate was then shackled and taken to an isolation cell, where the deputies continued to punch and kick him.

- In August 2007, during the booking process, ECHC deputies struck a pregnant inmate in the face, threw her to the ground, and kneed her in the side of her stomach.  When she informed deputies that she was pregnant, the deputies allegedly replied that they thought she was fat, not pregnant.  The inmate lost her two front teeth as a result of the assault.

- 19 -

- An ECCF inmate died of a stroke in March 2007, after suffering a brain injury when ECCF deputies smashed his head against a wall. The inmate requested medical help following the incident, but was ignored despite noticeable signs of injury (dragging his foot when walking and continually dropping things).

- In April 2006, an ECHC inmate (held in the facility for urinating in public) was knocked unconscious and sustained a collapsed lung, fractures to six ribs, and a spleen injury (resulting in removal) as a result of a beating by County deputies. The inmate alleges that the incident arose from his attempt to air out his cell from the odor of other inmates' defecation and vomit.

### 3. Inadequate Reporting of Use of Force

Effective measures to prevent excessive and inappropriate uses of force include the adequate reporting of information to permit the identification of potential problem cases and effective internal investigations. We find that ECHC fails to elicit adequate information about use of force incidents, making management review ineffective. Generally accepted correctional standards require written reports of uses of force. These reports should be submitted to administrative staff for review. Although the County of Erie produced incident reports for ECHC, it did not produce any of the use of force forms that reportedly accompany these reports. The incident reports themselves indicate whether a use of force report was filed under the "Action Taken" section of the Incident Report. While most of the incident reports where force was used indicated that a use of force form was submitted, there were several incidents where force was clearly used, but the submission of a use of force form was not indicated. For example:

- An October 2007 report indicates that two deputies were injured subduing an inmate who attempted to strike a deputy. While the report indicates that the deputies secured the inmate on the floor with handcuffs, there is no indication what type or level of force the deputies used to achieve compliance.

- Similarly, a September 2007 incident report describing an incident in which two deputies were injured subduing an inmate who struck a deputy, indicates only that the deputies took the inmate to the ground and secured him in handcuffs. There is no indication what type or level of force the deputies used to achieve compliance.

- 21 -

assaults, including sexual assaults.  In many of the incidents of
inmate-on-inmate violence, ECSO deputies on duty were not
present, giving inmates ample opportunity to fight.  The
following examples are illustrative:

- On December 1, 2007, an inmate was held down by another
  inmate and punched and kicked by a third inmate.  The
  victimized inmate indicated that he was attacked
  because he was held on sodomy charges.

- On April 12, 2007, an inmate was grabbed by the throat
  and punched in the face by three other inmates,
  suffering a swollen right eye and left cheek as a
  result of the attack.  According to the County's
  records, the deputy on duty was taking a "bathroom
  break" when the assault occurred.

- On March 28, 2007, deputies discovered an inmate, who
  had been in a fight with another inmate, lying on the
  floor, bleeding from a head wound.

- On February 2, 2007, an inmate was stabbed with a
  broken broom handle.  The deputy on duty reported that
  he did not see the assault because he was moving a box
  into the elevator at the time.

- On January 24, 2008, an inmate was sexually harassed
  and assaulted by three inmates who pulled his pants
  down, slapped him on the buttocks, called him "honey,"
  grabbed towards his genitalia in a teasing manner, and
  grabbed his nipples.  There is no indication from this
  incident report whether any of the aggressors were
  disciplined for their actions.

ECSO deputies do not appear to consistently intervene to
stop inmate violence.  There have been several incidents in which
deputies either watched an altercation escalate from a verbal
disagreement to a physical altercation, or allowed other inmates
to break up a fight and detain the inmates until additional
deputies arrived.  For example:

- On November 26, 2007, a deputy witnessed an inmate
  throw a chair across the law library at another inmate
  because he thought the other inmate was a "snitch."

- On November 19, 2007, a deputy witnessed two inmates
  arguing and then fighting.  He also witnessed a third
  inmate join the fight and punch and kick another inmate

- 20 -

- An August 7, 2007 report indicates that an ECHC inmate who struck a deputy was secured by the response team, placed in mechanical restraints, and put into an isolation cell. However, there is no information on the force used to secure the inmate or the length of time he was restrained, nor is there any indication whether medical clearance was secured before the inmate was placed in restraints.

JMD's failure to ensure complete use of force reporting prevents adequate monitoring of the use of force within its facilities. As a result, the ECSO is unable to accurately gauge the amount of force used and whether such force is appropriately used.

### 4. Inadequate and Ineffective Inmate Supervision

#### a. Deputy-Encouraged Violence

ECSO deputies not only fail to protect inmates from harm, but, as our investigation revealed, they affirmatively place inmates in harm's way by pitting inmates against one another in combat. We have received reports of ECSO deputies relying on inmates to discipline other inmates with force. These inmates, sometimes referred to as the deputies' "pet," receive extra privileges, such as extra meals and hygiene products. Alarmingly, we have learned of ECSO deputies harassing inmates charged with a sexual offense. We have received numerous reports of deputies openly announcing the charges of alleged sexual offenders, including describing inmates as "Rape-Os." Deputies would reportedly announce an inmate's charge in the presence of other inmates and then leave the room, allowing the other inmates an opportunity to physically assault the alleged sexual offender.

#### b. Inmate-on-Inmate Violence

Insufficient inmate supervision is a serious problem at ECHC and ECCF. The County is well aware of this issue. Undersheriff Brian D. Doyle has publicly stated that ECHC does not have sufficient "security staff."[23] Indeed, our review of the County's own incident reports confirms this admission. Incident reports revealed that between January 1, 2007 and February 9, 2008, there were over 70 reported incidents of inmate-on-inmate

---

[23]     Gene Warner, <u>Inmate Well-Being Comes Under Scrutiny;</u> <u>Medical Care Limited at County Facilities</u>, Buffalo News, Aug. 5, 2007.

- 22 -

in the head.   There is no indication in the report
whether this deputy attempted to break up the fight or
even intervened during the argument, before it
escalated to a fight.

- On October 30, 2007, a deputy witnessed an inmate
  strike another inmate who had been knocked to the
  ground.   When the attacking inmate refused the deputy's
  order to stop fighting, two other inmates interceded to
  restrain the attacker until additional deputies arrived
  on the scene.

As the incident reports demonstrate, and as our interviews
consistently confirmed, inmates who are not adequately supervised
have opportunities to engage in fights.   The situation in the
County facilities appears so volatile that minor slights appear
to instigate physical altercations.   We noted numerous instances
in which inmates fought one another for inconsequential reasons,
such as:   one inmate denied another inmate access to a newspaper,
an inmate cut ahead of another inmate in the lunch line, and one
inmate told another inmate that he had "smelly feet."   Each of
these exchanges led to fights among inmates.   As the above
examples demonstrate, ECSO and JMD are not meeting constitutional
obligations to provide for the safety and well-being of inmates.

### c.   Unprofessional and Provocative Attitude Towards Inmates

Establishing a professional environment in a correctional
setting is critical to maintaining the safety and security of
inmates and staff.   In addition to reports that deputies have
encouraged inmate violence, we have also learned that deputy
supervisors at ECCF have permitted a culture of unprofessional
and provocative attitude towards inmates to flourish within the
facility.[24]

Notably, in June 2008 the NYSCC cited ECCF Jail staff for
"unprofessional and provocative attitude toward the inmate
population"[25] for posting informational sheets labeled
"Frequently Asked Questions" within the dormitories housing
pre-trial detainees that contained such comments as "Deputies are
here to tell you what to do;" "Deputies decide when you go to

---

[24]   Letter from NYSCC to Sheriff Timothy Howard, dated
June 5, 2008, Cycle 3 Evaluation, at 12.

[25]   <u>Id.</u>

- 23 -

exercise;"[26] and "How do you become a Lima unit porter? Don't ask
we will ask you."[27]   The NYSCC found these sheets to be
unprofessional and that ECSO should view these statements "as an
embarrassment to the corrections profession."[28]   Moreover, the
NYSCC found that the "condescending tone ... perpetuates a
negative work environment,"[29] and the failure of "deputy sheriff
supervisors ... to remove such posting and take further action is
unconscionable."[30]   These "informational sheets," coupled by the
reports of deputy encouraged violence (see Section II.C.4.a,
supra) and sexual misconduct (see Section II.C.6, infra) further
illustrates a culture that undervalues the safety and well-being
of inmates housed within its facility.  Indeed, a condescending
attitude towards an inmate population may lead security staff to
believe that they have an unfettered control over inmates that
allow them to engage in unconstitutional behavior, such as
encouraging inmate violence and engaging in inappropriate sexual
conduct with inmates.

        **d.**    **Inadequate Division of Supervisory
Responsibility**

    ECCF houses both pre- and post-trial inmates.  ECSO employs
two separate work forces to supervise "unsentenced" and
"sentenced" inmates at ECCF.  Specifically, deputies are assigned
to "unsentenced inmates," while correctional officers are
assigned to "sentenced inmates."[31]   The NYSCC found this
arrangement "jeopardizes the safety and security of staff and
inmates at the Correctional Facility."[32]   According to NYSCC,
because the security staff are members of two distinct unions,
based on their work assignment, there is confusion over which
union or security detail has specific control over a particular
inmate.  Indeed, NYSCC's staff "witnessed members of both unions

---

[26]    Id.

[27]    Id.

[28]    Id.

[29]    Id.

[30]    Id.

[31]    Id.

[32]    Letter from NYSCC to Sheriff Timothy Howard, dated
June 5, 2008, Cycle 3 Evaluation, at 11.

- 24 -

openly debating and arguing [over] which union has authority over
an inmate."[33]   The NYSCC further noted that each work force has
different break schedules and different work hours, "affect[ing]
the lock-in time of inmates during the count." Moreover, while
both work forces are "accountable to the Chief and Superintendent
of the Correctional Facility," "each union member is only
accountable to the supervisors in their respective unions."[34]
Accountability and supervisory responsibility was a noted problem
where, for example, "during evening, nights, and weekends" the
highest ranking employee for deputies "is a Sergeant" whereas the
highest ranking corrections officer is "the Tour Commander."[35]
This confusion in supervisory responsibilities amplifies the
deficiencies in inmate supervision.

### 5.   Inadequate Classification

ECHC and ECCF have an inadequate classification system, and
it contributes to unsafe conditions at the facilities.  Generally
accepted correctional standards require separation of problematic
inmates and those who are more vulnerable to violence and abuse
from the general population.  ECHC and ECCF's failure to do so
makes supervision more difficult and increases the risk of harm
to both staff and inmates.

The County's classification system is flawed and fails to
adequately assess critical factors such as an inmate's criminal
history while in custody, escape history, and likelihood of
victimization.  While the County's classification instrument does
*identify* these areas, the JMD fails to provide operational
guidance on *how* to address such issues.  As the NYSCC noted, this
is a major concern because the classification instrument
influences how inmates are classified at ECHC and ECCF; "the
quality of any classification determination and subsequent
housing assignment is suspect" because "classification reviews
and housing assignments are substantially based on outcomes of a
flawed classification system."[36]  While officials at ECHC and
ECCF cannot be expected to prevent all altercations between
inmates, the Constitution requires correctional officers and
County officials to take reasonable steps to protect inmates

---

[33]   Id.

[34]   Id.

[35]   Id.

[36]   NYSCC 2006 Evaluation, supra, n. 6, at 21, 24.

- 25 -

from violence.  Disturbingly, the County was made aware of the inadequacies of its classification through an April 2007 NYSCC report, followed by an August 2007 NYSCC report indicating that the issues remained unaddressed.[37]

As an example of the problems that an inadequate classification system can lead to, we learned of a situation in August 2008 in which a 16 year-old boy was reportedly placed in the "bullpen" at ECHC with adults.  Placed among an adult population, this vulnerable youth was reportedly attacked and sexually assaulted in the middle of the night.

### 6.    Sexual Misconduct

Our review of investigative reports revealed incidents of sexual misconduct at ECHC and ECCF resulting from staff-on-inmate and inmate-on-inmate interaction.  For example:

- On September 16, 2008, a male ECCF deputy resigned after engaging in inappropriate sexual conduct with a female inmate.

- A male ECCF deputy reportedly sexually harassed several inmates in his unit by staring at the male inmates while they were in the shower.  This deputy reportedly engaged in this conduct frequently and regularly.  In at least one instance, the deputy placed his hand on an inmate who attempted to leave the shower.  The deputy reportedly admired the inmate's physique and told him, "we should work out together."

- A male ECCF deputy reportedly engaged in lewd conduct with an inmate, placing his fingers through his uniform pants zipper to simulate fellatio and asking the inmate "do you want to suck it?"

- On September 9, 2007, a female inmate accused a male deputy of rape.  The inmate was sent to the hospital and subsequently moved to a different unit within ECHC. There is no indication of whether an investigation was conducted following the report of rape, nor whether the deputy was, or would be, moved from the women's ward while the charges were being investigated.

---

[37]    NYSCC ECHC Cycle 2 Evaluation Aug. 2007, supra, n. 6, at 5; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, supra, n. 6, at 8.

- 26 -

### 7.    Contraband and Vandalism

Another indicator of inadequate inmate supervision is the amount of dangerous contraband recovered from the housing units and the ease with which inmates can fabricate homemade weapons. Due to the dilapidated condition of scores of cells, shower areas, and various dayroom features, inmates have ample material for fabricating weapons, including floor tiles, metal from light fixtures, metal from the ventilation system, glass from cell light bulbs, electrical wiring, and plumbing fixtures. Inmates have been found with shanks of varying size that are made of broken glass and metal rods. Inmates have also been found with handcuff keys and a syringe, and in March 2007 an inmate handed deputies a 40-caliber hollow point bullet he found under his cellmate's bed. At the time, both inmates were assigned to a cell designated for "constant observation." While it is virtually impossible for any correctional facility to completely deter inmates from obtaining materials for weapons, the problem at ECHC and ECCF is exacerbated by inadequate supervision.

### 8.    Grievance System

An inmate grievance system is a fundamental element of a functional jail system, intended to provide a mechanism for allowing inmates to raise concerns and issues to the administration. If viewed as credible by inmates, it can also serve as a source of intelligence to staff regarding potential security breaches as well as staff excessive force or other misconduct. The grievance system should be readily accessible to all inmates. Inmates should be able to file their grievances in a secure and confidential manner and without the threat of reprisals. Staff responsible for answering inmate grievances should do it in a responsive and prompt manner. We note a number of serious deficiencies with the inmate grievance process at ECHC and ECCF.

The grievance system at ECHC and ECCF is inadequate and open to abuse. NYSCC questioned the integrity of the grievance program, finding the system informal, the policies inadequate, and jail officials unwilling to investigate allegations or quick to categorize grievances as disciplinary and therefore non-grievable, even when they were.[38] We note that the NYSCC has cited the County for such problems in 2007 and 2008. Because the

---

[38]    See generally NYSCC ECHC Cycle 2 Evaluation Aug. 2007, supra, n. 6, at 6; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, supra, n. 6, at 10; NYSCC 2006 Evaluation, supra, n. 6, at 28-33.

- 27 -

County provided us with only a very limited number of grievances for review, it is unclear whether the County has remedied these deficiencies.  Therefore, we must conclude that the NYSCC findings remain unremedied.  In June 2008, the NYSCC found that no grievances had been filed by pre-trial detainees housed at ECCF.[39]  This clearly indicates that the grievance system is not functional, thus depriving the JMD of a valuable source of information concerning questionable constitutional treatment.

One partial explanation for this is the bifurcated grievance system that the JMD employs.  Specifically, inmates are instructed to utilize an informal grievance process that encourages inmates to raise their grievance with Jail Staff and allow Jail Staff an opportunity to informally resolve the grievance, rather than submit a formal grievance that is reviewed by the grievance officer.  Although inmates are told that they may file a formal written grievance at any time, it is impossible for JMD to account for whether a request for a formal grievance is actually met.  Encouraging an inmate to pursue a grievance informally can be problematic in some circumstances, especially in those instances in which unlawful actions have occurred.  Inmates who may have been subjected to unlawful conduct will, most likely, be reluctant to seek resolution from those who may have witnessed or been involved in the very actions that would be the basis for the grievance.  The ECSO's failure to monitor the application of the grievance system makes it deliberately indifferent to serious allegations of force, harassment, and medical care to be ignored.  Numerous inmates reported submitting a grievance, only to have it taken out of the mail slot and destroyed by deputies.

### 9.   Access to Information

Generally accepted correctional standards require that newly admitted inmates receive an opportunity to learn about the facility rules and regulations, services that are available, policies and procedures that affect the inmate, and facility schedules.  Each inmate should receive a facility handbook, containing all the relevant information, and should have an opportunity to have the information explained to him or her if the inmate cannot read.  Typically, facilities have an orientation procedure as a part of the intake processing.

---

[39]    Letter from NYSCC to Sheriff Timothy Howard, dated June 5, 2008, Cycle 3 Evaluation, at 9.

- 28 -

It is our understanding that inmates are provided a copy of either the ECHC Inmate Handbook or the ECCF Code of Conduct upon arrival at the respective facility.  However, these handbooks are not necessarily made available in Spanish.  While ECCF offers a Spanish translation of the ECCF Code of Conduct, the translated version we received in February 2008 was last updated on November 20, 1992; the English version was revised on August 21, 2007. The County of Erie did not produce a Spanish translated version of the ECHC Inmate Handbook in response to our request.  In order for inmates to avail themselves of the programs a facility offers or familiarize themselves with the rules and regulations within a given facility, to which they will be held accountable, inmates must be made aware of facility rules and protocols.  Failure to do so is inconsistent with generally accepted correctional standards.

### D. Inadequate Medical Care

ECHC and ECCF officials are responsible for providing adequate medical care to inmates.  A jail may not deny or intentionally interfere with medical treatment.  A delay in providing medical treatment may be so significant that it amounts to a denial of treatment.  Our investigation revealed that medical care provided at ECHC and ECCF falls below constitutionally required standards of care.

One key deficiency is the lack of on-site health care administrators to manage healthcare services at the facilities. Although a physician is assigned to all Erie County Detention facilities, the physician does not monitor the "appropriateness, timeliness and responsiveness of care and treatment or review[] the recommendations for treatment made by health care providers in the community," and "[t]he physician is not involved in quality improvement reviews, training staff, or reviewing policy and procedures."[40]  This level of oversight is critically important to ensure constitutionally adequate medical care.  For example, adequate oversight and management would identify problems in inmate medical records, provide advice on training, and assist in the development of policies that are consistent with generally accepted correctional healthcare standards. Without this oversight, it is impossible for ECSO and JMD to attest to the adequacy of medical care within their facilities. Indeed, the NCCHC could not adequately determine the quality of

---

[40]    NCCHC 2008 Erie Report, *supra*, n. 5, at 8.

health care for its 2008 review, because the inmate health records were incomplete.[41]

The administration of health care services in ECHC and ECCF is inadequate, as there are no quality improvement programs or monitoring procedures in place to internally assess the quality of heath care at the facilities.[42] Moreover, ECHC and ECCF medical policies and procedures fail to provide staff operational guidance on quality of care.[43] The NYSCC cited both the ECHC and ECCF in 2007 and 2008 for violating state law and employing licensed practical nurses[44] ("LPN") without the direction or supervision of a registered nurse, as required by state law.[45] Specifically, the NYSCC cited the "incompetent assessment" of an LPN for returning inmate John Jackson,[46] who was suffering from congestive heart failure, to his cell -- Mr. Jackson later

---

[41]   Id. at 7.

[42]   Id. at 9.

[43]   Id. at 8. NCCHC noted that the policies were "under revision using the NCCHC *Standards* to revise the manual." (Emphasis in the original).

[44]   LPNs care for people who are sick, injured, convalescent, or disabled under the direction of physicians and registered nurses. LPNs are not to perform "physical assessments of patients" or make "independent clinical decisions [or] patient dispositions without direction from a registered professional nurse or licensed physician." Letter from the NYSCC to Sheriff Timothy Howard, dated Mar. 29, 2007 (regarding the use of LPNs at ECCF, citing Article 139, New York State Education Law, Section 6902).

[45]   Letter from the NYSCC to Sheriff Timothy Howard, dated May 28, 2008 (regarding the use of LPNs at ECHC); Letter from the NYSCC to Sheriff Timothy Howard, dated Mar. 29, 2007 (regarding the use of LPNs at ECCF, citing Article 139, New York State Education Law, Section 6902); Letter from the NYSCC to Anthony J. Billittier III, M.D., Commissioner, Erie County Department of Health, dated Mar. 29, 2007 (regarding the death of inmate [John Jackson]).

[46]   The name "John Jackson" is a pseudonym.

- 30 -

died.[47]   Following an investigation into Mr. Jackson's death, the
NYSCC found that the use of LPNs at ECCF, without the supervision
of a registered nurse, was "commonplace."[48]   The NYSCC also
criticized ECSO's response to their letter notifying the Jail
that the "medical care that Mr. Jackson received was negligent
and inadequate."[49]   The NYSCC's Medical Review Board found that
ECSO's "flagrantly indifferent and dismissive attitude in
response to a critical incident with a fatal outcome and to the
requirements of state law and regulations are in no small part
causative factors in such outcomes."[50]   In May on 2008, a little
over a year after this finding, the NYSCC once again cited ECSO
for similar professional misconduct.   This time, ECHC was cited
for employing LPNs without adequate supervision.[51]

Through our review of incident reports, documents provided
by the County, and recent state oversight reports, we find ECHC
and ECCF document management of inmate medical records poor and
often incomplete.   We note that these problems have persisted for
years, despite the NYSCC placing the County on notice of such
deficiencies since 2005.[52]   As recently as early 2008, the NCCHC
similarly concluded that the County has not addressed this
issue.[53]   In addition to the 2008 NCCHC finding, we draw

---

[47]   Letter from the NYSCC to Sheriff Timothy Howard, dated
Mar. 29, 2007 (finding the ECSO "summarily disregarded the facts
that the medical care that Mr. [Jackson] received was negligent
and inadequate"); Letter from the NYSCC to Anthony J. Billittier
III, M.D., Commissioner, Erie County Department of Health, dated
Mar. 29, 2007.

[48]   Letter from the NYSCC to Anthony J. Billittier III, MD,
Commissioner, Erie County Department of Health, dated Mar. 29,
2007.

[49]   Letter from the NYSCC to Sheriff Timothy Howard, dated
Mar. 29, 2007.

[50]   Id.

[51]   Letter from the NYSCC to Sheriff Timothy Howard, dated
May 28, 2008.

[52]   Letter from the NYSCC to Sheriff Timothy Howard, dated
Sept. 27, 2005 (citing deficiencies in the maintenance of inmate
medical records).

[53]   NCCHC 2008 Erie Report, supra, n. 5, at 7, 24-25.

- 31 -

additional negative inferences from the County's lack of
cooperation with our investigation by failure to provide us with
the requested inmate medical documents and access to the
facilities.

Inmates at ECHC and ECCF suffering from serious medical
conditions require continual observation and consistent treatment
and care in order to protect them from harm.  The following
examples illustrate that inmates at these facilities are not
receiving adequate medical care.

- In December 2007 and January 2008, four inmates
  suffered multiple seizures.  At least two of the
  inmates were told to sleep on the floor, and there is
  no indication that any of the inmates received
  medication after being treated at the hospital.  One of
  the four inmates with a seizure history was transferred
  to the hospital after deputies found him lying
  unresponsive on the floor.  An additional inmate, with
  a seizure history prior to detention, was found shaking
  on the floor of her cell and was not immediately sent
  for a medical evaluation.

- In April 2007, ECCF was cited for providing inadequate
  dental care to an inmate suffering from pain and a
  sensitivity to food and liquids.[54]  The Citizens Policy
  and Complaint Review Council found that ECCF took too
  long to respond to the inmate's request to see a doctor
  regarding his pain, finding 21 days unreasonably
  long.[55]

- In March 2007, an ECHC nurse, while delivering
  prescribed medication to an inmate, discovered that the
  inmate had died due to unknown causes.  Earlier in the
  day, the inmate had refused food and requested that his
  cell window be opened.

    1.  Inadequate Administration of Medication

It appears that ECHC and ECCF nursing staff who store and
administer medication may be untrained in critical areas of
security, accountability, common side effects of medications and

---

[54]    Letter from the NYSCC to Sheriff Timothy Howard, dated
Apr. 24, 2007.

[55]    Id.

- 32 -

documentation of administration of medicines.  Alarmingly, the County was made aware of this deficiency through NYSCC evaluations in 2005 and 2006, as well as the NCCHC 2008 evaluation.[56]  Further, we received consistent reports from ECCF inmates that County deputies withhold inmate medication as a source of intimidation or punishment.  The following examples illustrate the gravity of the situation:

- Despite receiving warnings from State oversight agencies as recently as 2008, nursing staff fail to ensure that inmates swallow their medication and fail to check inmate identification prior to administering medication.  We reviewed incidents from 2007 in which an inmate attempted suicide by ingesting another inmate's psychotropic medication; another inmate hoarded his medication for several weeks before deputies located it on his shelf; and a third inmate admittedly faked a seizure in order to obtain his prescription medication.

- The NYSCC's review found controlled substances "placed in a paper bag and stored in the narcotic cabinet after they have been discontinued or when the inmate has been discharged ... [and that] ... [t]hese controlled substances are not counted each shift," in violation of Federal and State laws.[57]

---

[56]     Letter from the NYSCC to Sheriff Timothy Howard, dated July 17, 2006 ("There is an inadequate system for the management of pharmaceuticals, including controlled substances"); Letter from NYSCC to Sheriff Patrick Gallivan, dated Apr. 18, 2005 (citing ECSO for not screening detainees); see also, Letter from the NYSCC to Sheriff Patrick Gallivan, dated Feb. 22, 2005 and Letter from the NYSCC to Sheriff Timothy Howard, dated Sept. 27, 2005 (both addressing the inadequacy of ECHC's management of pharmaceuticals).

[57]     Letter from the NYSCC to Sheriff Timothy Howard, dated July 17, 2006.  In February 2005 ECSD was cited for leaving "two large boxes of controlled substances unattended in an unsecured area in the medical unit," in violation of Federal and State laws that require the restriction of controlled substances "to a secure area under double lock."  Letter from the NYSCC to Sheriff Patrick Gallivan, dated Feb. 22, 2005.

- 33 -

The above examples indicate that procedures for medication administration at the ECHC and ECCF are not consistent with generally accepted correctional standards.

## 2. Inadequate Infection Control

ECHC and ECCF fail to adequately treat, contain, and manage infectious disease. ECHC and ECCF's management of Tuberculosis ("TB"),[58] Methicillin-resistant Staphylococcus aureus ("MRSA"),[59] and other infectious diseases deviates from generally accepted correctional medical standards. This failure is dangerous and places inmates, staff, and the community at unnecessary risk of serious health problems.

Generally accepted correctional standards for the management of communicable diseases in correctional facilities require the development of a management plan. This plan, at a minimum, should address the screening, diagnosis, and treatment of HIV/AIDS; Sexually Transmitted Diseases; Hepatitis; MRSA; TB; and outbreaks of communicable diseases. ECHC and ECCF, however, have no written exposure control plan approved by the responsible physician.[60] The lack of a written exposure control plan has resulted in deficiencies related to the containment and treatment of TB and MRSA. For example, the nursing staff at ECHC have confirmed that TB PPD testing is not performed on detainees at

---

[58]   TB is a life threatening respiratory ailment commonly found in correctional facilities. TB is prevalent in correctional facilities because of poor circulation or inadequate ventilation, and the close quarters of a transient population.

[59]   MRSA is a potentially dangerous drug-resistant bacteria that can cause serious systemic illness, permanent disfigurement, and death. A MRSA infection is sometimes confused by detainees and medical staff as a spider or insect bite, causing treatment to be delayed while the infection has time to worsen or spread. See http://www.aafp.org/fpr/20041100/10.html. MRSA is resistant to common antibiotics, such as methicillin, oxacillin, penicillin, and amoxicillin. MRSA is almost always spread by direct physical contact. However, spread may also occur through indirect contact by touching objects such as towels, sheets, wound dressings, and clothes. MRSA can be difficult to treat and can progress to life-threatening blood or bone infections. See MedicineNet.com, http://www.medicinenet.com/staph_infection/page2.htm.

[60]   NCCHC 2008 Erie Report, supra, n. 5, at 10.

- 34 -

the Holding Center, in contradiction to generally accepted correctional medical standards.[61] Indeed, we have received numerous reports from inmates housed at ECHC between 2007 and 2008, confirming that they were not tested for TB upon arrival at the facility. Similarly deficient is ECHC's and ECCF's medical staffs' failure to identify symptoms clinically associated with a MRSA infection (e.g., red bumps, rashes, and the "spider bite"). We have received numerous reports from inmates held at these facilities who exhibited commonly known signs associated with MRSA and did not receive treatment.

Moreover, jail medical staff not only fail to screen inmates when they arrive at the facility and provide adequate surveillance of infectious diseases; medical staff also do not provide discharge planning, therefore providing no monitoring for inmates with communicable or infectious diseases, understood to be a basic part of generally accepted correctional practices.[62]

### E. Environmental Health and Safety Deficiencies

ECHC has severe environmental health and safety problems at numerous levels of operation.[63] Despite repeated NYSCC citations for poor sanitation and maintenance, ECSO and JMD have repeatedly failed to correct the problems. In 2007, NYSCC found maintenance and sanitation categorically inadequate throughout ECHC, exposing inmates and staff to unhealthy and unsafe conditions. State regulators cited ECSO and JMD on several occasions for overall poor sanitation, finding sanitation conditions "deplorable," with walls covered in toothpaste and cell bars covered in towels

---

[61]    Letter from NYSCC to Sheriff Timothy Howard, dated Oct. 10, 2007; Letter from NYSCC to Sheriff Patrick Gallivan, dated Apr. 18, 2005.

[62]    NCCHC 2008 Erie Report, supra, n. 5, at 10.

[63]    Given our limited access to inmates held at ECCF, we are unable to assess whether similar sanitation problems exist at ECCF to the degree to which they exist at ECHC. We have received reports, however, that conditions at ECCF are also unsanitary.

- 35 -

and sheets.[64]  NYSCC staff, for example, found a significant accumulation of Styrofoam food trays and other clutter in the cells.  This is a serious problem, as it can attract insects and other vermin, as well as allow for the spread of disease. Maintenance and sanitation are categorically inadequate throughout the facility, exposing inmates and staff to unhealthy and unsafe environments as a result.  We learned of one inmate who indicated he was housed, for at least one month, in an ECHC cell with four inches of standing water due to toilet flooding.

In a correctional setting where inmates and staff are dependent on maintenance staff for their water, heat, lighting, and ventilation, it is expected that these issues would be addressed in a timely manner in order to reduce risks of illness and injury to inmates and staff alike.  That is not the case here.  NYSCC has cited ECSO and JMD for electrical hazards that neither correctional officers nor maintenance staff seemed to be concerned about, despite the potential for harm being readily apparent.  In both April and August 2007, the NYSCC found ECHC supervisors were "not holding staff accountable for the sanitation of their assigned housing areas."[65]  Critical sanitation deficiencies included the failure of jail staff to properly secure sanitation equipment and supplies when not in use.  Inmates have used sanitation equipment, like a broom, as a weapon.  In one case, the handle was broken and used to stab another inmate.

ECSO and JMD were also cited for poor facility maintenance. The NYSCC found the padding and cushion material on chairs in the day room were torn or removed, exposing screws, nuts, and bolts that could be used to cause injury. ██████████████

████████████████████████████████████████████████████████
█ Redacted for Public Posting - Sensitive Security Information █
████████████████████████████████████████████████████████

---

[64]     NYSCC ECHC Cycle 2 Evaluation Aug. 2007, supra, n. 6, at 5; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, supra, n. 6, at 9. The covering of cell bars with towels and sheets results not only in poor sanitation but also in security risks, as correctional officers are unable to see into cells when the bars are covered with towels.

[65]     NYSCC ECHC Cycle 2 Evaluation Apr. 2007, supra, n. 6, at 9; NYSCC ECHC Cycle 2 Evaluation Aug. 2007, supra, n. 6, at 5.

- 36 -

███████████████████████████ This is a serious
security risk that should be corrected immediately.

Laundry services at ECHC and ECCF are similarly inadequate.
As of August 2007, "[i]nmates [were] required to either wash
their facility-issued and/or personally owned undergarment in a
cell sink or arrange for the pick-up and washing of these items
by family or friends."[67] This poses a serious problem, as soiled
and/or improperly washed clothing can retain bacteria and other
contagion that can cause infection or spread disease. Moreover,
inmates are forced to dry their clothes by hanging them in their
cells, thereby obstructing a deputy's view into the cell, thus
compromising security. Lastly, the NYSCC noted that no clothing
exchange was provided to inmates, as required under New York
law.[68]

### III.   RECOMMENDED REMEDIAL MEASURES

In order to rectify the identified deficiencies and protect
the constitutional rights of inmates confined at ECHC and ECCF,
ECSO and JMD should implement, at a minimum, the following
remedial measures:

### A.   Suicide Prevention Measures

    1.    Provide adequate treatment for inmates with
self-injurious behavior.



[67]    NYSCC ECHC Cycle 2 Evaluation Aug. 2007, *supra*, n. 6,
at 4. Again, this inadequacy in sanitation also represents a
security risk.

[68]    NYSCC ECHC Cycle 2 Evaluation Aug. 2007, *supra*, n. 6,
at 4; NYSCC ECHC Cycle 2 Evaluation Apr. 2007, *supra*, n. 6, at 7;
NYSCC 2006 Evaluation, *supra*, n. 6, at 13.

- 37 -

2. Develop policies and procedures to ensure appropriate management of suicidal inmates and the establishment of a suicide prevention program.

3. Ensure that all staff are educated and adequately trained on suicide recognition, intervention, and management, including pre-service and annual in-service suicide prevention training, and that, prior to assuming their duties and on a regular basis thereafter, all staff who work directly with inmates have demonstrated competence in identifying and managing suicide.

4. Ensure that ECHC and ECCF have written suicide prevention policies that include an operational description of the requirements for both pre-service and annual in-service training.

5. Screen all inmates upon intake, including questioning to assess current and past suicide risk.

6. Document inmate suicide attempts at ECHC and ECCF in the inmate's correctional record in the classification system, in order to ensure that intake staff will be aware of past suicide attempts if an inmate with a history of suicide attempts is admitted to ECHC and ECCF again in the future.

7. Ensure that intake staff are sufficiently experienced and qualified to identify inmates who pose a risk for suicide, and that such inmates are promptly referred to the appropriate mental health professionals and provided appropriate housing.

8. Ensure that follow-up evaluations by mental health professionals of all new inmates are conducted within 14 days of intake.

9. Ensure that inmates on suicide precautions receive adequate mental status examinations by a mental health clinician.

10. Ensure that suicidal inmates are housed in an area that is safe for them with appropriate supervision and observation by staff.

- 38 -

11. Ensure that 15- and 30-minute checks of inmates under observation for risk of suicide are timely performed and appropriately documented.

12. Provide different levels of supervision of an inmate based on the presenting risk factors for suicide.

13. Ensure that detainees placed on suicide watch are assessed adequately, monitored appropriately to ensure their health and safety, and released from suicide watch as their clinical condition indicates, according to professional standards of care.

14. Ensure that cut-down tools are readily available to staff in all housing units. Train staff in the use of cut-down tools.

15. Ensure a component of administrative review is implemented following a suicide or a suicide attempt to identify what could have been done to prevent the suicide.

B. **Mental Health Care**

1. Timely and Appropriate Evaluation of Inmates

   a. Ensure ECHC and ECCF properly identify inmates with mental illness through adequate screening, and that such screening is incorporated into each inmate's medical record.

   b. Ensure that inmates with potentially serious chronic mental health illness are referred for prompt mental health evaluations and examinations by a psychiatrist.

   c. Provide adequate mental health assessment and treatment in accordance with generally accepted correctional standards of mental health care.

   d. Ensure that adequate crisis services are available to address the psychiatric emergencies of inmates.

   e. Provide staffing adequate for inmates' serious mental health needs. Provide adequate on-site psychiatry coverage. Ensure that psychiatrists see inmates in a timely manner. Ensure that

- 39 -

psychotropic medication prescriptions are reviewed
by a psychiatrist on a regular, timely basis.

2.    Assessment and Treatment

a.    Ensure that treatment plans adequately address
inmates' serious mental health needs and that the
plans contain interventions specifically tailored
to the inmates' diagnoses and problems, consistent
with generally accepted correctional practices.
Provide therapy services where necessary for
inmates with serious mental health needs.  Provide
adequate opportunities for inmates and staff to
have confidential communications related to mental
health treatment, while maintaining appropriate
security precautions.

b.    Ensure that mental health evaluations done as part
of the disciplinary process include
recommendations based on the inmate's mental
health status.

c.    Ensure that medications are provided to inmates in
a timely manner and that they are properly
monitored.

d.    Provide staffing adequate for inmates with serious
mental health needs.  Ensure that services, such
as distribution of medications, are performed by
nurses or other properly trained staff.

e.    Provide policies and procedures that require the
appropriate assessment of inmates with mental
illness.

f.    Ensure adequate medical documentation and general
procedures as part of the mental health
assessments that account for inmates' psychiatric
histories.

3.    Psychotherapeutic Medication Administration

a.    Ensure timely responses to orders for medication
and laboratory tests, and prompt documentation
thereof in inmates' charts.

b.    Ensure that adequate psychotherapeutic medication
administration is provided in accordance with

- 40 -

        generally accepted correctional mental health care standards.

    c.   Ensure that changes to inmates' psychotropic medications are clinically justified. Screen inmates on psychotropic medications for movement disorders and provide treatment where appropriate.

4.   Other Mental Health Issues

    a.   Ensure that administrative segregation and observation status are not used to punish inmates for symptoms of mental illness and behaviors that are, because of mental illness, beyond their control.

    b.   Ensure that ECHC and ECCF mental health records are centralized, complete, and accurate.

    c.   Ensure that ECHC and ECCF quality assurance system is adequate to identify and correct serious deficiencies with the mental health system.

    d.   Ensure that a psychiatrist or physician conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or as soon thereafter as possible. Seclusion or restraint orders should include sufficient criteria for release.

    e.   Ensure that all staff who directly interact with inmates (including Correctional Officers) receive competency-based training on basic mental health information (e.g., diagnosis, specific problematic behaviors, psychiatric medication, additional areas of concern); recognition of signs and symptoms evidencing a response to trauma; and the appropriate use of force for inmates who suffer from mental illness.

C.  **Protection from Harm**

    1.   Use of Force

        a.   Develop and maintain comprehensive and updated policies and procedures, in accordance with generally accepted correctional standards, regarding permissible use of force.

- 41 -

    b.    Develop and maintain comprehensive policies and procedures, consistent with generally accepted correctional standards, regarding the establishment and deployment of the Response Team and Quick Entry Team, including permissible uses of force, use of force reporting, and necessary training specific for membership on this team.

    c.    Establish effective oversight of the use of force.

    d.    Develop an effective and comprehensive training program in the appropriate use of force.

2.    Safety and Supervision

    a.    Ensure that correctional officer staffing and supervision levels are appropriate to adequately supervise inmates.

    b.    Ensure that inmate common areas are adequately supervised whenever inmates are present.

    c.    Ensure frequent, irregularly timed, and documented security rounds by correctional officers inside each housing unit.

    d.    Ensure that staff adequately and promptly report incidents.

    e.    Develop a process to track all serious incidents that captures all relevant information, including: location, any injuries, if medical care is provided, primary and secondary staff involved, reviewing supervisor, external reviews and results (if applicable), remedy taken (if appropriate), and administrative sign-off.

    f.    Establish a procedure to ensure that inmates do not possess or have access to contraband.  Conduct regular inspections of cells and common areas of the housing units for contraband.

    g.    Conduct regular inspections of cells and common areas of the housing units to identify and prevent rule violations by inmates.

- 42 -

h.   Review, and revise as applicable, all security policies and Standard Operating Procedures on an annual basis.

i.   Provide formal training on division-specific post orders each time a correctional officer is transferred from one division to another.

j.   Develop and implement specialized training for officers assigned to special management units, which include the Special Incarceration Units, disciplinary segregation, and protective custody units. Officers assigned to these units should possess a higher level of experience and be regularly assigned to these units for stability purposes.

k.   Develop and implement appropriate training for corrections staff addressing security administration regarding:

   (1)   Identification, prevention, and intervention in inmate-on-inmate violence; and

   (2)   Professionalism and appropriate interaction between corrections staff and inmates.

l.   Ensure that adequate supervisory staff is in place to prevent staff provocation and staff encouragement of inmate violence.

m.   Develop and implement adequate policies and procedures to ensure appropriate investigation of staff-on-inmate violence and to ensure that appropriate corrective actions are taken.

n.   Ensure the adequate division of supervisory responsibility at ECCF, including, the establishment of clear lines of authority per shift, irrespective of union affiliation.

3.   Classification

a.   Develop and implement policies and procedures for an objective classification system that separates inmates in housing units by classification levels.

- 43 -

    b.   Update facility communication practices to provide officers involved in the classification process with current information as to cell availability on each division.

    c.   Update the classification system to include information on each inmate's history.

4.   Sexual Misconduct

    a.   Ensure that staff is trained and/or retrained on the Prison Rape Elimination Act.

    b.   Establish a zero tolerance standard regarding any form of sexual harassment or sexual misconduct that involves inmates, staff or any other individual that has contact with inmates.

    c.   Prompt written corrective action must follow any deficiency or negative finding that is revealed in either an administrative or criminal investigation surrounding sexual misconduct or sexual harassment.

5.   Inmate Grievance Procedure

    a.   Develop and implement policies and procedures to ensure inmates have access to an adequate grievance process. Such process should ensure that grievances are processed and legitimate grievances addressed and remedied in a timely manner, responses are documented and communicated to inmates, inmates need not confront staff prior to filing grievances about them, and inmates may file grievances confidentially.

    b.   Ensure that grievance forms are available on all units.

    c.   Ensure that inmate grievances are screened for allegations of staff misconduct and, if the incident or allegation meets established criteria, referred for investigation.

- 44 -

6.  Access to Information

    a.  Ensure that newly admitted inmates receive
        information they need to comply with facility
        rules and regulations, report misconduct, access
        medical and mental health care, and seek redress
        of grievances.

    b.  Ensure that inmates who are not literate are
        afforded the opportunity to have information on
        facility rules and services explained to them
        orally.

D.  **Medical Care**

    1.  Intake Screening

        a.  Ensure that adequate intake screening and health
            assessments are provided for inmates in accordance
            with generally accepted correctional standards of
            care.  Develop and implement an appropriate
            medical intake screening instrument that
            identifies observable and non-observable medical
            needs, including infectious diseases, and ensure
            timely access to a physician when presenting
            symptoms require such care.

        b.  Ensure that acute and chronic health needs of
            inmates are identified in order to provide
            adequate medical care.

        c.  Ensure that medical screening information is
            reviewed in a timely manner by trained and
            appropriate medical care providers.

        d.  Ensure that tuberculosis ("TB") screening is
            conducted in a timely manner.  Provide adequate
            treatment and management of communicable diseases
            (e.g., TB and Methicillin-resistant Staphylococcus
            aureus ("MRSA"), HIV, and Hepatitis).

    2.  Acute care

        a.  Provide timely medical appointments and follow-up
            medical treatment.  Ensure that inmates receive
            treatment that adequately addresses their serious
            medical needs.  Ensure that inmates receive acute
            care in a timely and appropriate manner.

- 45 -

    b.    Provide adequate acute care for inmates with serious and life-threatening conditions.

    c.    Ensure that staff are adequately trained and prepared to handle emergency situations in accordance with generally accepted correctional standards.

3.    Chronic care

    a.    Ensure that inmates receive thorough assessments for, and monitoring of, their chronic illness. Develop clinical practice guidelines for inmates with chronic and communicable diseases. Ensure that standard diagnostic tools are employed to administer the appropriate preventative care in a timely manner.

    b.    Adopt and implement appropriate clinical guidelines for chronic diseases such as HIV, hypertension, diabetes, asthma, and elevated blood lipids, and policies and procedures on, among other things, timeliness of access to medical care, continuity of medication, infection control, medicine dispensing, intoxication/detoxification, record-keeping, disease prevention, and special needs.

    c.    Ensure that medical staff are adequately trained to identify inmates in need of immediate or chronic care, and provide timely treatment or referrals for such inmates.

    d.    Ensure that inmates with chronic conditions are routinely seen by a physician to evaluate the status of their health and the effectiveness of the medication administered for their chronic conditions.

    e.    Ensure adequate follow-up treatment and medication administration concerning all inmates with chronic conditions.

- 46 -

4.   Treatment and Management of Communicable Disease

a.   Provide adequate treatment and management of communicable diseases, including TB and Methicillin-resistant Staphylococcus aureus.

b.   Ensure that inmates with communicable diseases are appropriately screened, isolated, and treated.

c.   Ensure that HVAC and negative pressure systems are properly maintained and functioning.

d.   Develop and implement an adequate TB control plan in accordance with generally accepted correctional standards of care. Such should provide guidelines for identification, treatment, and containment to prevent transmission of TB to staff or inmates.

e.   Develop and implement policies that adequately manage contagious skin infections. Develop a skin infection control plan to set expectations and provide a work plan for the prevention of transmission of skin infections, including drug-resistant infections to staff and other inmates.

f.   Develop and implement adequate guidelines to ensure that inmates receive appropriate wound care.

5.   Follow-Up Care

a.   Provide adequate care and maintain appropriate records for inmates following hospitalization. Ensure that inmates who receive specialty or hospital care are evaluated upon their return to the facility and that, at a minimum, discharge instructions are noted and appropriately provided.

6.   Record Keeping

a.   Ensure that medical records are adequate to assist in providing and managing the medical care needs of inmates at ECHC and ECCF.

b.   Ensure that medical records are complete, accurate, readily accessible, and systematically organized. All clinical encounters and reviews of

- 47 -

inmates should be documented in the inmates'
records.

7.   Medication Administration

   a.   Ensure that treatment and administration of
        medication to inmates is implemented in accordance
        with generally accepted correctional standards of
        care.

   b.   Ensure that administration of medication is
        accurate and adequately documented.  Develop
        policies and procedures for the accurate
        distribution of medication and maintenance of
        medication records.  Provide a systematic review
        of the use of medication to ensure that each
        inmate's prescribed regimen continues to be
        appropriate and effective for his condition.

   c.   Ensure that medicine distribution is hygienic and
        appropriate for the needs of inmates.

8.   Staffing, Training, and Supervision

   a.   Provide adequate staffing, training, and
        supervision of medical and correctional staff
        necessary to ensure adequate medical care is
        provided.

   b.   Ensure that medical staffing is adequate for
        inmates' serious medical needs and that physicians
        adequately monitor their patients.

   c.   Provide adequate physician oversight and
        supervision of medical staff, including
        supervision for LPNs.

   d.   Ensure that there is an adequate number of
        correctional officers to escort inmates to medical
        units.

9.   Quality Assurance Review

   a.   Ensure that ECHC and ECCF's quality assurance
        system is adequate to identify and correct serious
        deficiencies with the medical system.

- 48 -

   b.   Ensure that ECHC and ECCF's quality assurance
        system is capable of assisting in managing and
        treating inmate medical needs.  At a minimum, such
        a system should be reliable and capable of
        tracking medically-related incidents.

E.   **Sanitation and Environmental Conditions**

   1.   Sanitation and Maintenance of Facilities

      a.   Develop and implement policies and procedures to
           ensure adequate cleaning and maintenance of the
           facilities with meaningful inspection processes
           and documentation.  Such policies should include
           oversight and supervision, as well as establish
           daily cleaning requirements for toilets, showers,
           and housing units.

      b.   Ensure prompt and proper maintenance of shower,
           toilet, and sink units.

      c.   Ensure proper ventilation and airflow in all cells
           and housing units.

      d.   Ensure adequate lighting in all housing units and
           prompt replacement and repair of malfunctioning
           lighting fixtures, so that officers and inmates
           are not exposed to the security danger that lack
           of visibility presents.

   2.   Environmental Control

      a.   Ensure adequate control and observation of ECHC
           and ECCF cells, particularly with regard to
           razors, fire loading materials, commissary items,
           and cleaning supplies.

      b.   Repair electrical shock hazards; develop and
           implement a system for maintenance and repair of
           electrical outlets, devices, and exposed
           electrical wires.

   3.   Sanitary Laundry Procedures

      a.   Ensure that laundry delivery procedures protect
           inmates from exposure to contagious disease,
           bodily fluids, and pathogens by preventing clean

- 49 -

laundry from coming into contact with dirty laundry or contaminated surfaces.

b. To limit the spread of MRSA and other infectious disease, require inmates to provide all clothing and linens for ECHC and ECCF laundering and prevent inmates from washing and drying laundry outside the formal procedures.

c. To limit the spread of MRSA and other infectious disease, ensure that clothing and linens returned from off-site laundry facility are clean, sanitized, and completely dry.

d. Provide all inmates with properly cleaned and adequate bedding and clothing

* * *

IV. CONCLUSION

Please note that this letter is a public document and will be posted on the Civil Rights Division's website.

We invite the State to discuss with us the remedial recommendations, with the goal of remedying the identified deficiencies without resort to litigation. In the event that we are unable to reach a resolution regarding our concerns, the Attorney General is empowered to institute a lawsuit pursuant to CRIPA to correct deficiencies of the kind identified in this letter, 49 days after appropriate officials have been notified of them. 42 U.S.C. § 1997b(a)(1). If you have any questions regarding this letter, please call Shanetta Y. Cutlar, Chief of the Civil Rights Division's Special Litigation Section, at (202)514-0195.

Sincerely,

*Loretta King*

Loretta King
Acting Assistant Attorney General

cc: Timothy B. Howard
    Erie County Sheriff

- 50 -

Robert Koch
Superintendent
Erie County Sheriff's Department,
Jail Management Division

Cheryl A. Green
County Attorney
Erie County

Kathleen Mehltretter
Acting United States Attorney
Western District of New York