IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERIE COUNTY, NEW YORK, | ) | Civil No. 09-cv-0849 |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

**STIPULATED ORDER OF DISMISSAL**

**I.  <u>GENERAL PROVISIONS</u>**

A.      The Plaintiff in this action is the United States of America ("United States").

B.      The Defendant in this action is Erie County, New York ("the County").  The parties enter into this Stipulated Order of Dismissal to:  (1) Recognize the County's ongoing efforts to enhance the delivery of services at the Facilities; (2) Avoid the cost and burden of continued litigation; and (3) Fully and finally resolve all disputes related to the subject matter of this action.

C.      The Parties enter into this Stipulated Order of Dismissal ("Stipulated Order") and desire to compromise, satisfy and resolve fully and finally all differences or disputes between them in and to avoid the further expense, disruption and uncertainty of litigation, without admitting any liability, on the terms and conditions set forth in this document. The County does not agree or admit that the Eighth or Fourteenth Amendments require any of the specific remedies in this Stipulated Order.

D.      No person or entity is intended to be a third-party beneficiary of the provisions of this Stipulated Order of Dismissal for purposes of any civil, criminal, or administrative action or proceeding. Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class member under this Stipulated Order of Dismissal.  This Stipulated Order of Dismissal is not intended to expand the right of any person or entity

who seeks relief against the County or its officials or employees.  This Stipulated Order of Dismissal may not be used as evidence of liability in any other proceeding.

E.      The County enters into this Stipulated Order of Dismissal because it is committed to providing constitutionally and legally compliant conditions in the Facilities, by effectuating its duties under the Constitution and other applicable laws.

F.      Nothing in this Order shall be construed to alter the legal standards governing the Facilities under New York law or the United States Constitution.

G.      On July 15, 2009, the United States issued a findings letter pursuant to 42 U.S.C. § 1997 alleging that certain conditions at the Erie County Holding Center and the Erie County Correctional Facility (the "Facilities") violate the constitutional rights of individuals confined in the Facilities.  On September 30, 2009, the United States filed a complaint alleging deprivation of constitutional rights.  On June 18, 2010, the parties entered into a Stipulated Settlement and Order to resolve issues of suicide prevention in the Facilities, and now seek to resolve the remaining issues in dispute.

H.      The County has taken steps to address concerns at the Facilities.  At the time of the signing of this Stipulated Order, the County has in place certain policies, practices, and procedures, and has plans to adopt certain other policies, practices, and procedures, with respect to the Facilities.  This Stipulated Order of Dismissal is based on these policies, practices, and procedures, and contemplates that the dispute between the Parties will be resolved by the continued implementation of these measures.  Initiatives undertaken by the County include:  a commitment to reductions in intakes at the jail by accepting male prisoners from the City of Buffalo only after arraignment; the creation of a reception housing unit in the Erie County Holding Center, subject to the approval by the New York State Commission of Corrections ("NYCOC"); undertaking staffing changes where appropriate; the continued promulgation and implementation of new and enhanced policies; and the enhancement of systems to track critical events that will serve as indicators of concerns and that will provide tools to assist leadership in operation of the Facilities.  Use of the phrase "continue to" throughout this Stipulated Order is based on implementation or planned implementation of certain measures included in this Order.

I.      The issue of liability with respect to protection from harm, medical care, mental health care, and environmental health and safety has not been litigated.  The Parties ask the Court to approve this Stipulated Order of Dismissal without a full hearing on the merits, on the basis of the United States' Complaint and this Stipulated Order.

J.      The Parties enter into this Stipulated Order pursuant to Fed. R. Civ. P. 41(a)(2) and desire to resolve fully and finally all differences or disputes between them in connection with the remaining areas of the above captioned litigation: protection from harm, medical care, mental health care, and environmental health and safety, to avoid the further expense, disruption and uncertainty of litigation.

## II. <u>DEFINITIONS</u>

A.    "Access to care" means that, in a timely manner, a patient can (1) be seen by an appropriate clinician; (2) be given a professional clinical judgment; and (3) receive care that is ordered.

B.    "Advanced Level Practitioner" (or "ALP") means a nurse practitioner or a Physician Assistant who is currently licensed by the State of New York and provides medical care and services to prisoners at ECHC and/or ECCF.

C.    A "body cavity search" is a search of an individual's anus or vagina that involves touching or probing with hands or an instrument.

D.    "Corrections staff" means all ECCF/ECHC employees and contractors, irrespective of job title, whose regular duties include the supervision of inmates at ECHC and/or ECCF.

E.    "Custody staff" includes correctional officers as well as correctional administration.

F.    "DOJ" refers to the United States Department of Justice, which represents the United States in this matter.

G.    "ECHC," "ECCF" and "ECMCC" refers to the Erie County Holding Center, the Erie County Correctional Facility, and the Ninth Floor, Zone 2 at the Erie County Medical Center, respectively. "The Facilities" or "the Jail" shall refer to the facilities jointly, as well as any facility that is built, leased, or otherwise used, to replace or supplement either or both ECHC and ECCF.

H.    "Effective date" shall be the date the Stipulated Order of Dismissal is entered by the Court.

I.    "Emergency care" refers to medical, mental health, and dental care for an acute illness or unexpected health need that cannot be deferred until the next scheduled sick call or clinic.

J.    "Generally accepted correctional standards of care" means a decision by a qualified professional that is substantially aligned with contemporary, accepted professional judgment, practice, or standards and demonstrates that the person responsible based the decision on such accepted professional judgment.

K.    "Health care" is the sum of all actions, preventive and therapeutic, taken for the physical and mental well-being of a population. Health care includes medical, dental, mental health, nutrition, and other related services.

L.    "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

M.    "Indecent exposure" by ECHC or ECCF corrections, mental health, or medical staff means the display by a staff member, contractor, or volunteer of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate.

N.    "J-28" means the form submitted by a responding supervisor to report unusual incidents at the Facilities (e.g., uses of force, inmate-on-inmate violent occurrences, attempted suicides, attempted escapes, possession of contraband, and use of the restraint chair). The form includes the following information:  names of inmates involved, addresses, primary charge, age, bail, brief description of the incident, including time and date of the incident, officers involved, actions taken, narrative describing the incident, preliminary investigation findings, medical report if appropriate, signatures of officers involved, signature of supervisor involved, name and statements of witnesses, officers assigned to the area if appropriate, inmate statements, any releases, waivers of liability, pictures taken of the incident showing injuries or the lack thereof, and pictures of damage to property.

O.    "JMD" means the Jail Management Division of the Erie County Sheriff's Office.

P.    "Medical staff" means health professionals who, by virtue of education, credentials, and experience, are permitted by law to evaluate and/or care for patients within the scope of his or her professional practice, including, but not limited to Physicians, Physician Assistants, Nurse Practitioners, Registered Nurses, and Licensed Practical Nurses.

Q.    "Mental health staff" means qualified mental health professionals who have received instruction and supervision in identifying and interacting with individuals in need of mental health services.

R.    "Police Services" shall mean the division of the Erie County Sheriff's Office that provides 24 hour police patrol and investigatory services ensuring enforcement of federal and state, civil and criminal laws.

S.    A "policy" is a facility's official position on a particular issue related to an organization's operations.

T.    "Prisoner" or "prisoners" shall be construed broadly to refer to one or more individuals detained at, or otherwise housed, held, in the custody of, or confined at ECHC, ECCF, and/or the Ninth Floor, Zone 2 at ECMCC.

U.    A "procedure" describes in detail how a policy is to be implemented or carried out.

V.    "PSD" means the Professional Standards Division of the Erie County Sheriff's Office, or any successor organization(s).

W.    "Psychotropic medication" means any substance used in the treatment of mental health problems or mental illness.

X.      "QET" means the Quick Entry Team as defined by current JMD policy, or any team that is formulated to replace or supplement the current QET.

Y.      "Qualified health professional" means a physician, physician assistant, nurse practitioner, a registered nurse, or a practical nurse who is currently licensed by the State of New York and provides medical care and services to prisoners at ECHC and/or ECCF.

Z.      "Qualified mental health professional" means an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, social work or psychiatric nursing, who is currently licensed by the State of New York and provides mental health care and services to prisoners at ECHC and/or ECCF.

AA.     "Qualified Nursing Staff" means registered nurses and licensed practical nurses currently licensed by the State of New York to deliver those health services they have undertaken to provide.

BB.     "Responsible physician" is a designated MD or DO who has the final authority at a given facility regarding clinical issues.

CC.     "RT" means the Response Team as defined by current JMD policy, or any team that is formulated to replace or supplement the current RT.

DD.     "Restraints" means the use of handcuffs, leg irons, security belts or waist chains, and lead chains, other than when used for routine movements, as well as the restraint chair.

EE.     "Serious injury" means any injury that causes (1) physical injury that creates a substantial risk of death; (2) death; (3) serious and protracted disfigurement;  (4) protracted impairment of health; or (5) protracted loss or impairment of the function of any bodily organ.

FF.     "Serious mental illness" refers to "serious and persistent mental illness" as currently defined by the New York State Office of Mental Health (and appended hereto as Attachment A).

GG.     "Serious suicide attempt" means a suicide attempt that  is considered to be either potentially life threatening or that requires hospitalization for medical treatment.

HH.     "Sexual abuse" means (1) Sexual abuse by another inmate, detainee, or resident; and (2) Sexual abuse of an inmate by ECHC or ECCF corrections, mental health, or medical staff.

    1.      Sexual abuse by another inmate, detainee, or resident includes any of the following acts, if the victim does not consent, is coerced into such act by overt or implied threats of violence, or is unable to consent or refuse:

        a.      Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

b.      Contact between the mouth and the penis, vulva, or anus;

c.      Penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument; and

d.      Any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of any person, excluding incidents in which the intent of the sexual contact is solely to harm or debilitate rather than to sexually exploit.

2.      Sexual abuse by ECHC or ECCF corrections, mental health, or medical staff includes:

a.      Sexual touching by staff;

b.      Any attempted, threatened, or requested sexual touching by staff;

c.      Indecent exposure by staff; and

d.      Voyeurism by staff.

II.      "Sexual touching" by ECHC or ECCF corrections, mental health, or medical staff includes any of the following acts, with or without consent and other than for purposes of medical evaluation and/or treatment:

1.      Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;

2.      Contact between the mouth and the penis, vulva, or anus;

3.      Deliberate penetration of the anal or genital opening of another person, however slight, by a hand, finger, object, or other instrument; and

4.      Any other intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or the buttocks of any person, with the intent to abuse, arouse or gratify sexual desire.

JJ.      "Sexual harassment" includes

1.      Repeated and unwelcome sexual advances, requests for sexual favors, or verbal comments, gestures, or actions of a derogatory or offensive sexual nature by one inmate, detainee, or resident directed toward another; and

2.      Repeated verbal comments or gestures of a sexual nature to an inmate, detainee, or resident by ECHC or ECCF corrections, mental health, or medical staff, including demeaning references to gender, sexually suggestive or derogatory comments about body or clothing, or obscene language or gestures.

KK.  "Special Management Units" mean those housing units of the Facilities designated for prisoners in administrative or disciplinary segregation, in protective custody, or on suicide precautions.

LL.  "Special Needs Units" mean those housing units of the Facilities designated for prisoners requiring a residential or crisis level of mental health care.

MM.  "Specialty care" means specialist-provided health care (e.g., nephrology, surgery, dermatology, and orthopedics).

NN.  "Stipulated Suicide Prevention Settlement" refers to the Stipulated Settlement Agreement and Order concerning Suicide Prevention and Related Mental Health Issues (Dkt. 89-2).

OO.  "Strip search" means a search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia.

PP.  "Suicide Precautions" means any level of watch, observation, or measures to prevent self-harm, including where an inmate self-reports suicidal ideations or suicide risk or is identified by correctional officers, a qualified health professional or a qualified mental health professional.

QQ.  "Suspected mental illness" refers to bizarre, unusual, or uncharacteristic behavior by an individual that may indicate mental illness. Specific behavioral and emotional signs and symptoms that may constitute bizarre, unusual or uncharacteristic behavior include: disorganized speech; catatonic; hallucinatory; delusions; unable to care for self; suicidal and/or self-injurious; smearing feces; vulnerable; aggression or belligerent; manic speech; invincible; grandiose; sleep disturbance; slowing; apathy; loss of appetite; fatigue; depressed; withdrawal; lack of concentration; loss of memory; restless; and mood swings. Further explanation of these signs and symptoms will be listed in the document to be approved by the Technical Compliance Consultant ("TCC").

RR.  "TCC" means Technical Compliance Consultant, which is discussed further in Section VI below.

SS.   "Timely" means the provisions of medical or mental health care consistent with generally accepted correctional standards of care, depending on the nature of the situation, such as emergency, urgent, or routine.

TT.  "Train" means to instruct in the skills addressed to a level that the trainee has the demonstrated proficiency to implement those skills. "Trained" means to have achieved such proficiency.

UU.  "Unified Health Record" means the records of all health care provided to the inmate while in the County's custody.

VV.   "Use of force" means the application of physical, mechanical, or chemical measures to compel compliance by an unwilling subject. "Use of force" will not include un-resisted

handcuffing or un-resisted shackling of prisoners during movement if no other force is used.

WW.   "Voyeurism" by ECHC or ECCF corrections, mental health, or medical staff means an invasion of an inmate's privacy by staff for reasons unrelated to official duties, such as peering at an inmate who is using a toilet in his or her cell to perform bodily functions; requiring an inmate to expose his or her buttocks, genitals or breasts; or taking images of all or part of an inmate's naked body or of an inmate performing bodily functions, and distributing or publishing them.

### III. <u>SUBSTANTIVE PROVISIONS</u>

Defendant agrees to continue taking all actions necessary to implement the substantive provisions of this Stipulated Order listed below.

A.      **PROTECTION FROM HARM**

Defendant agrees to continue to develop and implement policies and procedures to provide prisoners with a safe and secure environment and continue to take all reasonable steps to protect them from harm.

1.  Classification

    i.   The County agrees to continue using its existing classification tool that it developed in concert with the New York State Commission of Corrections, as edited by the Parties.

    ii.  The County plans to stop receiving pre-arraigned male prisoners from the City of Buffalo on or about October 2011, and that it will continue to receive pre-arraigned female prisoners from the City of Buffalo only on an interim basis. The County will continue its current plan to develop and implement policies and procedures to create a reception housing unit in ECHC, subject to the approval by the New York State Commission of Corrections, consisting of a dorm unit, linear units with enhanced 15 minute supervision, and a medical/mental health screening area.  The reception center policies and procedures shall address the housing of unclassified prisoners in accordance with risk assessment.

    iii. The County will develop and implement a policy to address the housing of unclassified prisoners in accordance with risk assessment.

2.  Security Staffing:  The County agrees to create a written staffing plan for the Facilities to assist administration in operating the Facilities. This plan will memorialize staffing efforts already underway by the County.

3. Safety and Supervision

   a. Correctional officers will continue to conduct security rounds at least once every half hour, at irregular intervals, which view the inmate inside of each cell, including pre-classification and linear units. These rounds will continue to be documented in an activity log or other written or electronic form. Video surveillance may be used to supplement, but must not be used to replace, rounds by correctional officers.

   b. The County agrees to continue using video cameras to film all uses of force where the QET is deployed. The County will maintain a log of all video footage of uses of force.

   c. The County will continue to monitor video surveillance cameras in the following areas: intake processing/activity areas at ECHC, administrative or disciplinary segregation (i.e., Gulf East), constant observation units, and ECHC elevators. Video footage will be preserved for a period of ninety (90) days. In the event that the County receives notice of or identifies allegations of misconduct and/or force resulting in serious injury to staff or inmates, such footage will be preserved for three (3) years.

   d. Correctional officers assigned to special needs units on a consistent basis will participate in the treatment planning process set forth in section C(4)(c)(ii).

   e. The County will continue to make all reasonable efforts to maintain consistency in the assignment of corrections staff to special needs units and will conduct periodic reviews of the appropriateness of the assignments.

4. Access to Information

   a. The County will ensure that all newly admitted prisoners receive information, through an inmate handbook and, at the discretion of the County, an orientation video, regarding the following:  facility rules and regulations, how to report misconduct, how to report sexual abuse or assault, the process for accessing medical and mental health care, emergency procedures, rules for sending and receiving mail, the visitation process, the disciplinary process, and how to access the grievance process.

   b. The County will develop a language access policy that includes: a language access coordinator on each shift, use of interpreters or a working language line, and a roster of bilingual employees. The language access policy will also include:

      i. Policies and procedures for ensuring appropriate signs through the Facilities in English and Spanish, and that interpreters are reasonably proficient;

      ii. Translation of materials on facility rules and services, including any orientation video, if any, into Spanish;

9

iii.     Policies to assist other limited and non-English speakers and prisoners with low literacy on understanding the Facilities rules and policies.

c.    The County will continue to ensure that grievance forms are available on all units. If a prisoner complaint is resolved informally prior to the filing of a grievance, this informal resolution will be documented.  The County will assist prisoners who are limited or non-English speakers, prisoners with low literacy, and prisoners who have physical or cognitive disabilities in accessing the grievance system.

5.   Sexual Abuse

a.    The County will develop and implement a policy on prevention, detection, reporting, and investigation of sexual abuse, including prisoner-on-prisoner and staff-on-prisoner sexual abuse. This written policy will include all of the elements set forth in Section A(5), as well as clearly delineated steps that JMD and PSD staff must take to investigate reports of sexual abuse.

b.    The County will designate a senior-level staff person to be sexual abuse prevention coordinator.  The coordinator will oversee the County's development and implementation of policies on sexual abuse at the Facilities.

c.    The County will continue to prohibit cross-gender strip searches or cross-gender visual body cavity searches of the vagina or anus except in case of emergency within the Facilities. Body cavity searches will only be performed, if at all, by a qualified physician or ALP in a clinical setting. All cross-gender strip searches and cross gender visual body cavity searches will be documented and any violation of these policies must be documented in a written report.

d.    The County will continue to prevent porters or trustees from having access to physical locations where there are opposite-sex prisoners unless they are within sight and sound of corrections staff at all times. Inmate porters and trustees will never access opposite-sex housing units or holding areas.

e.    The County will continue to offer all victims of sexual abuse alleged to have occurred in the Facilities access to forensic medical exams performed by Medical staff, whether onsite or at an outside facility, without financial cost. Informed acceptance or refusal of a forensic medical exam must be documented in writing.

f.    The County will ensure appropriate counseling services are made available to victims of sexual abuse, provided by a qualified staff member or a victim advocate from a community-based organization that provides services to sexual abuse victims.

g.    The County will continue to require all Facility employees to report immediately: (1) any knowledge or information regarding an incident or alleged incident of

sexual abuse that occurred in the Facilities, transport vehicles, and off-site lock-ups under the immediate control and supervision of ECSO and JMD staff; (2) retaliation against prisoners or staff who reported abuse.

h. The County will provide prisoners and staff with multiple ways for privately reporting possible abuse and/or retaliation, including sexual abuse and/or harassment, and retaliation by other prisoners or staff for reporting sexual abuse and sexual harassment. This includes accepting reports made verbally, in writing, confidentially, or anonymously, and from third parties including other prisoners, Facility employees, contractors, volunteers, and the prisoner's family or legal representation.

i. All reports of sexual abuse shall be forwarded immediately to the sexual abuse prevention coordinator and PSD.  PSD and Police services will investigate, as appropriate, and document any resulting investigations.

j. The County will ensure prompt corrective action following any finding or recommendation resulting from either an administrative or criminal investigation surrounding sexual abuse or sexual harassment. This will include, but not be limited to:

    i. Documented sanctions commensurate with the nature and circumstances of the acts committed, the staff member's disciplinary history, and the sanctions imposed for comparable offenses by other staff with similar histories;

    ii. Removal from post where sexual abuse or harassment occurred; and

    iii. Documented review of County practices following verified occurrence of sexual abuse or sexual harassment and changes to policy and/or practice, if warranted.

k. The County will train all employees who have contact with prisoners, including medical and mental health care staff, and those contractors who provide medical and mental health care services to inmates in the ECHC and ECCF, on:

    i. The County's policies and procedures for the prevention, detection, reporting, and investigation of sexual abuse and sexual harassment;
    ii. Anti-retaliation protection for prisoners and staff who report sexual abuse and sexual harassment;
    iii. Dynamics of sexual abuse in confinement;
    iv. Common reactions of sexual abuse victims;
    v. How to detect and respond to signs of threatened and actual sexual abuse;
    vi. Duty to report sexual abuse and sexual harassment;
    vii. How to avoid inappropriate relationships with prisoners;
    viii. How to communicate effectively and professionally with prisoners.

l.   The County will ensure that all full- and part-time qualified health and qualified mental health professionals who work regularly in ECHC and ECCF and have contact with prisoners have been trained in:

   i.     How to detect and assess signs of sexual abuse;
   ii.    How to preserve physical evidence of sexual abuse;
   iii.   How to respond effectively and professionally to victims of sexual abuse;
   iv.    How and to whom to report allegations or suspicions of sexual abuse.

m.   The County will ensure that PSD and other staff assigned to investigate allegations of sexual abuse or harassment occurring within the Facilities receive training, in addition to the training outlined in K. (i)-(iv), on conducting sexual abuse investigations in confinement settings. This training will include:

   i.     Techniques for interviewing sexual abuse victims;
   ii.    Proper use of *Miranda* and *Garrity* warnings;
   iii.   Sexual abuse evidence collection in confinement settings; and
   iv.    The criteria and evidence required to substantiate a case for administrative action or prosecution referral.

6.  Use of Force

   a.   The County will continue to review its policies and amend them where appropriate to ensure that they include comprehensive use of force policies, procedures, and annual training to ensure that prisoners are not subjected to excessive use of force. These policies and procedures will:

      i.     define permissible and impermissible uses of force;
      ii.    require a detailed statement from each officer involved in or a witness to each use of force describing the type and level of force used;
      iii.    include the use of de-escalation tactics in order to prevent unnecessary uses of force; and
      iv.    require a medical examination following uses of force where appropriate; and
      v.     govern the use of the RT.

   b.   The County will continue to require that an ECHC or ECCF lieutenant, captain, chief, first deputy superintendent, or superintendent conducts a documented review of all J-28 reports within 72 hours of each incident for completeness and appropriateness of the use of force. Any possible use of excessive force identified by the reviewer will be referred to PSD for investigation.

   c.   The County will continue to maintain policies and procedures on the appropriate use of chemical spray on prisoners, and will continue to train correctional officers on this policy and procedure.

12

7.  Review of Incidents

    a.  The County will develop a written policy to reflect its current practice of tracking of trends in use of force and prisoner-on-prisoner assault incidents, including location of incident, prisoners and/or staff involved in the incident, brief description of incident, and whether prisoner(s) involved have an identified or suspected mental illness. The policy will include a Chief of Operations or higher level JMD administrative personnel and, if appropriate, the Director of Intensive Adult Mental Health Services, or his designee, will be involved in reviewing trends and developing and implementing corrective action recommendations as appropriate.

    b.  Review of trends and formulation of corrective action will include review of staff personnel files, prisoner grievances, J-28 reports, use of force reports, and any previous PSD investigations, and prisoner and staff disciplinary reports as appropriate.

B.  **MEDICAL CARE**

1.  Policies and Procedures:  The County will continue to review its policies and amend them as appropriate to ensure that they reflect current practice and address all substantive provisions of this Stipulated Order pertaining to Medical Care. The County will ensure that each policy and procedure is reviewed at least annually, and revised as necessary under the direction of the responsible physician. Each policy and procedure will bear the date of the most recent review or revision and the signature of the responsible physician, verifying approval of each review or revision.

2.  Medical Autonomy:  The County will continue to ensure that clinical decisions and actions regarding health care provided to inmates are the sole responsibility of qualified health professionals, and that, subject to legitimate security concerns, custody staff do not interfere with an inmate's access to care as determined by the clinical decisions of Medical staff.

3.  The County will continue to ensure prisoners' medical privacy and confidentiality through the following:

    a.  The County will implement a revised version of Policy JMD-M 5.00.00, to prohibit any non-medical staff from receiving a patient's refusal of medication, and to provide that such notice of refusal is given only to qualified health professionals, except as may be required by NYCOC.

    b.  The County will continue to ensure that discussion of patient information and clinical encounters are conducted with reasonable privacy, subject to legitimate security concerns and emergency situations, and in a manner that does not discourage the patient's subsequent use of health services. The County will ensure that custody staff is present in the room during clinical encounters only if

13

the patient poses a probable risk to the safety of the health care professionals or others.

   c.  The County will continue to ensure that custody staff and interpreters who observe or hear clinical encounters receive documented training on how to maintain patient confidentiality.

   d.  The County will continue to ensure that (1) health records are maintained under secure conditions separate from correctional records; and (2) health records are transported in such a fashion to prevent review of records by non-health staff.

4.  Training of Custody Staff:  The County will continue to ensure that all custody staff receive training on recognizing and responding to medical urgencies and emergencies; identification, timely referral, and proper supervision of inmates with serious medical needs; and identifying the signs and symptoms of drug and alcohol withdrawal. The County will continue to document and track training and attendance by required staff. Prior training in these areas is sufficient to satisfy this provision for management-level staff.

5.  Management of Health Records:  The County will continue to ensure that one unified health record is maintained for each prisoner that includes complete records for both physical and mental health and a complete list of medications the prisoner is taking. The County will also ensure that such unified health records are available to all Medical staff who are necessary to facilitate continuity of care, early and correct diagnosis based on review of prior symptoms and findings, and coordination of treatment by multiple clinicians.

   a.  The County will ensure that the unified health records are available at the time of treatment (except during intake medical and/or mental health screenings) to clinical staff at the Facilities where a prisoner receives treatment, and that clinical notes and documentation are placed in the unified health record by staff within 72 hours of creation by facility medical staff or receipt from outside providers.

   b.  Transfer of Health Records/Information:

      i.  Whenever a prisoner is transferred to an off-site facility for care, Medical staff at the sending facility will ensure that all relevant medical information is provided to that facility as permitted by law. Upon return, the County will take all reasonable steps to obtain documentation or records of prisoner care received off-site within 72 hours of intake and will follow up as appropriate.

     ii.  Whenever a prisoner is transferred between ECHC and ECCF, medical and/or mental health staff at the sending facility will continue to ensure that all relevant information is provided to the other facility. Medical

and/or Mental Health staff at the receiving institution will review the health record of incoming prisoners within twenty-four (24) hours of their arrival. Medical and/or Mental Health staff will also take whatever steps are necessary to reestablish the prisoner on medications and treatment programs and to ensure that the prisoner keeps any health care appointments, rescheduling as necessary.

c.  The County will continue to develop and implement a policy and procedure to notify the responsible physician or his/her designee in writing whenever a prisoner is scheduled to be transferred from the County's custody to another facility as soon as such information is available prior to the prisoner's transfer. Upon such notification, the responsible physician will prepare and send with the prisoner a transfer summary listing the prisoner's major health problems and current medications and dosages.

d.  The County will continue to develop and implement a policy and procedure to provide prisoners written instructions, including a fax number, where future medical providers can request a summary of the prisoner's medical treatment, including a listing the prisoner's major health problems and current medications and dosages.

6.  Medication Administration:  The County will develop and implement policies and procedures to ensure that all medications are appropriately prescribed, stored, controlled, dispensed, and administered in accordance with all applicable laws and through the following:

a.  The County will continue to ensure that all Medical staff who administer medications to prisoners are permitted to do so by state law and in accordance with the scope of his or her license.

b.  The County will continue to ensure that initial doses of prescribed medications are delivered to the patient within 48 hours of the prescription, unless it is clinically required to deliver the medication sooner.

c.  The County will continue to ensure that prisoners entering the Facilities continue to receive previously prescribed medications or acceptable alternate medications, within 48 hours of entry, unless the facility physician makes an alternative clinical judgment.

d.  The County will continue to ensure that Medical staff who administer medications to prisoners document in the prisoner's Medical Administration Record (1) each date and time medication is administered, and (2) the date and time for any refusal of medication, and will ensure that the prisoner's unified health record is updated within one (1) week of the end of each month to include a copy of the prisoner's Medical Administration Record for that month. All documentation will include the name and dosage of each dispensed

15

medication. The County will develop a policy and procedure regarding medication non-compliance.

e.  The County will continue to supply sufficient medication for the period of transit for prisoners who are being transferred to another correctional facility or other institution. If the prisoner's reported medication is discontinued or changed, a qualified health professional must document the reason for the change in the health record.

f.  Upon request, the County will provide discharged prisoners who have been in the County's custody for thirty (30) consecutive days with access to a seven-day supply of prescription medications, unless a different amount is clinically appropriate, to serve as a bridge until prisoners can arrange for continuity of care in the community. Every prisoner will receive a written notice of how to request medication.

7.  Access to Care:  The County will ensure that all prisoners have access to care to meet their serious medical needs through the following:

a.  The County will continue to ensure that the medical, dental, and mental health request ("sick call request") process for prisoners provides prisoners with access to care. The sick call request process will include:

   i.  written or electronic medical/mental health care request (i.e., "sick call slips") are available in English and Spanish;
   ii.  a confidential collection method in which the request slips are collected by Medical staff seven (7) days per week;
   iii.  the opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and
   iv.  the opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

b.  Sick call requests will continue to be screened by an RN or Advanced Level Practitioner within twenty-four (24) hours of daily collection, and qualified health professionals will respond to the sick call request within 48 hours, or sooner if clinically indicated. Prisoners will be scheduled to be seen, if clinically indicated, by a qualified health professional consistent with the degree of urgency indicated by the sick call request. Qualified health professionals will completely and clearly respond to each complaint in a sick call request in a professional manner. Evaluation and treatment of prisoners in response to a sick call request will continue to occur in a clinically appropriate setting.

c.  The County will continue to develop and enhance its system for documenting and tracking sick call requests. Medical staff will document the date collected and a brief summary of each sick call request, the date that the prisoner was seen in response to the request, the disposition of the medical visit (e.g., referral;

whether inmate scheduled for acute care visit), and, if follow-up care is necessary, the date and time of the prisoner's next appointment. The County will continue to document the reason for and disposition of the medical or mental health care request in the prisoner's unified health record.

8. Emergency Care: The County will continue to ensure that all prisoners with emergency medical needs receive timely and clinically appropriate care, including prompt referrals and transports for outside care when medically necessary.

9. Follow-Up Care:

   a. Prisoners who receive an emergency department visit or who are admitted to a hospital will be evaluated upon their return to the Facilities by a qualified health professional. A Qualified Health Professional will review the records of Prisoners who receive any other offsite health care and follow up as appropriate. The Facilities will make reasonable efforts to obtain the off-site provider's discharge instructions or other documentation. A Qualified Health Professional will review and include the off-site provider's documentation in the prisoner's unified health record, upon receipt by the Facility, and will document the follow-up care provided.

   b. The County will continue to ensure that prisoners who have been referred for additional off-site specialty care are scheduled for timely off-site care appointments and transported to their appointments. Prisoners awaiting off-site care will be seen by a Qualified Health Professional as medically necessary, to evaluate the current urgency of the problem and respond as medically appropriate.

10. Chronic Disease Care: The County will ensure that prisoners with identified chronic diseases are enrolled in a chronic disease program to decrease the frequency and severity of the symptoms, prevent disease progression and complication, and foster improved function. The chronic disease program will include the following:

    a. The Responsible Physician will adopt and implement appropriate written clinical practice guidelines for chronic and communicable diseases, such as HIV, hypertension, diabetes, asthma, and elevated blood lipids, which are consistent with generally accepted guidelines.

    b. The Responsible Physician will maintain a current registry of prisoners with chronic illnesses to ensure that these prisoners receive necessary diagnosis, monitoring, and treatment.

11. Dental Care: The County will ensure that each prisoner receives medically necessary dental care for a serious medical need under the direction and supervision of a dentist licensed in New York State, including care and follow-up to address pain and interference with normal activities, rather than extractions only. Access to care will be

ensured by incorporating access to dental care into the sick call request process set forth required by Section 7, *supra*.

12. Care for Pregnant Prisoners:  The County will continue to ensure that pregnant prisoners receive timely and clinically appropriate prenatal care, specialized obstetrical services when clinically indicated, and postpartum care through the following:

    a.  providing pregnant prisoners with regularly scheduled medical examinations for which custodial staff make reasonable accommodations in security procedures to permit pregnant prisoners' attendance;

    b.  providing laboratory and diagnostic tests, including HIV testing and prophylaxis when clinically indicated;

    c.  compliance with NY Correction Law § 611, including the restraint provisions of § 611.

    d.  maintaining an agreement with an outside health care facility for delivery;

    e.  documenting in the prisoner's unified health record all postpartum care; and

    f.  coordinating with, and providing referrals, if necessary, to mental health staff in the treatment of postpartum depression.

13. Dietary Allowances and Food Service:

    a.  Medical Diets:  The County will continue to ensure that clinically necessary medical diets are provided to prisoners with health conditions that require such diets.

        i.  Orders for medical diets will include the type of diet, the duration for which it is to be provided, and any special instructions.

        ii.  Head cooks responsible for preparing medical diets will receive documented training on preparing medical diets, including appropriate substitutions and portions.

    b.  The County will continue to ensure that all pregnant prisoners receive a clinically appropriate pregnancy diet and vitamin supplements.

    c.  When requested by a prisoner, the County will ensure that special diets are provided when prisoners' religious beliefs require adherence to religious dietary laws.

14. Health Screening of Food Service Workers:  The County will continue to ensure that all prisoners involved in the preparation of the food service receive are cleared by a

physician or ALP, prior to initial assignment, or after any illness, to ensure freedom from diarrhea, skin infections, and other illnesses transmissible by food or utensils.

15. Treatment and Management of Communicable Disease:  The County will further develop and implement an infectious disease control program, including testing, monitoring, and treatment programs for management of communicable diseases, including: all inmates will be screened upon arrival for TB; all inmates will be cultured for symptomatic diseases as clinically indicated; and all culture results will be screened for epidemiologically linked outbreaks. The County will adequately maintain statistical information necessary to treat and control communicable diseases.

16. Sexual Abuse**:**  The County will continue to ensure that any prisoner who is victimized by sexual abuse receives immediate medical care, including evaluation for injury, sexually-transmitted infection or adverse emotional response, and gathering/preservation of potential evidence.

17. Quality Management:  The County will enhance existing Quality Improvement activities to ensure that the provisions of this Stipulated Order are adequately implemented and reviewed for quality assurance and improvement.

    a. Medical Review Committee:  The Facilities will have a Health Review Committee, for which there will be a Medical Review Sub-Committee, comprised of at least the Responsible Physician and Head Nurse for each Facility, which will:

        i. oversee the implementation of medical policies and procedures as set forth by this Stipulated Order;
        ii. perform quarterly quality management reviews of the access to care/sick call process
        iii. review and analyze individual and aggregate medical data, including data on prisoners who have diabetes, have had seizures, have been taken to the hospital for urgent or emergent care, pregnant prisoners, prisoners who have had an adverse reaction to medications, and prisoners with complaints of denial of access to care; and
        iv. track performance and implement remedies for identified deficiencies.

    b. Review of Clinical Care by the Responsible Physician:  The Responsible Physician of each Facility or his/her designee will conduct documented quarterly audits of a sampling of prisoners' unified health records and other medical documentation to ensure that Medical staff are providing appropriate clinical care and maintaining health record documentation in accordance with the provisions of this Stipulated Order.

## C.    MENTAL HEALTH CARE

The County will provide mental health care in accordance with the following provisions:

19

1.  Incorporation of Stipulated Settlement Agreement and Order Concerning Suicide Prevention and Related Mental Health Issues

    a.  Except as modified by any terms set forth below, the Stipulated Suicide Prevention Settlement (Dkt. 89-2) is incorporated into and made part of this Stipulated Order.

    b.  To the extent that any provisions of this Stipulated Order and the Stipulated Suicide Prevention Settlement are in conflict, this Stipulated Order will govern.

2.  Screening and Assessment

    a.  The County will continue to utilize the New York State Commission on Corrections ("NYSCOC") screening form, as modified, consistent with the Stipulated Suicide Prevention Settlement, section III(A)(1)(a).

    b.  The County will continue to administer the screening and identification process in a manner consistent with the parties' Stipulated Suicide Prevention Settlement, sections III(A)(1)(b)-(f), as modified by the provisions below.

    c.  The County will continue to develop and implement its plan to provide Qualified Mental Health Professional coverage in the reception center seven (7) days a week during peak hours ("peak coverage"), and will designate an on-call psychiatrist for the reception center at all times.  During times when there is no in-person QMHP coverage in the reception center ("off-peak coverage"), the County will designate an on-call QMHP.

    d.  If the initial mental health screening is "positive," meaning that mental health care concerns are identified as will be determined by policy, then:

        i.   During peak hour coverage, the individual will be seen by a QMHP for mental health assessment within four (4) hours, or sooner, if clinically indicated.

        ii.  During off-peak coverage, the nurse will notify the on-call QMHP, who will do one of the following, based on clinical determination: (a) come in and perform an in-person assessment within four (4) hours; (b) place the individual on constant observation, and an in-person assessment by a QMHP will be completed no later than the beginning of the next shift of peak coverage; (c) make a non-emergent referral to the Forensic Mental Health Service ("FMHS"); or (d) refer to ECMCC for assessment. Emergent Referrals made through options (a) and (b) in this provision will include a phone consultation with a psychiatrist, doctoral level mental health clinician, until the Qualified Mental Health Professional is not required to consult with these clinicians as determined by the process described in section 3(c)(i),

*infra*, and consistent with the crisis care admission procedures set forth in Section 4(d)(iii)(3), *infra*.

e.  The County will ensure:

   i.  That all mental health staff performing mental health assessments  receive comprehensive training concerning the policies, procedures, and practices for the mental health screening, assessment and referral processes. This training policy will include an assessment of each attendee's comprehension of the policies, procedures, and practices for the mental health screening, assessment and referral processes.  A record will be kept of each person's attendance at the training, and passage of the assessment.
   ii.  That all nurses performing health screenings receive comprehensive training concerning the policies, procedures, and practices for the mental health screening and referral process.  This training policy will include an assessment of each attendee's comprehension of the policies, procedures, and practices for the mental health screening and referral process.  A record will be kept of each person's attendance at the training, and passages of the assessment.

f.  The County will ensure that all prisoners housed in the Facilities receive a mental health screening as part of the medical intake screening within 3 days of admission. The County agrees to augment its screening form to include appropriate questions to identify mental health concerns and/or needs, in consultation with the TCC, and to conduct training on administering these questions for the practitioners performing the medical intake screening. If appropriate, the prisoner will be referred to the FMHS by the practitioner performing the screening. The screening will be documented in each prisoner's unified health record.

3.  Referral Process and Access to Care

a.  The County will continue to develop and implement written policies and procedures governing referrals to FMHS, including but not limited to procedures for referral, levels of referral based on acuteness of need and medication management, and timelines within which a prisoner referred to the FMHS must be seen by a Qualified Mental Health Professional, psychiatrist, psychologist or psychiatric nurse practitioner, as set forth below.

   i.  Levels of referral based on acuteness of need must include, at minimum, "Emergent Referral," "Urgent Referral," and "Routine Referral."
   ii.  "Emergent Referral" will include prisoners who present an increased risk of harming themselves or others, as well as prisoners determined to be severely decompensated, or at imminent risk of severe decompensation.

b. Referrals to the FMHS may be made at the time of initial screening, medical intake screening, or at any time by prisoner self-referral, or by staff referral (including custody staff, mental health staff, and medical staff). Response times for all referrals will meet the timelines outlined in this section.

c. Qualified Mental Health Professionals, excluding psychiatrists and doctoral level licensed mental health clinicians, will participate in a credentialing process for referrals and crisis care admissions. The credentialing process will include completion of all of the following over a time period of at least three months: 30 satisfactory reviews by a credentialing psychiatrist of assessment forms completed by a QMHP; 10 satisfactory case presentations by a QMHP to a credentialing psychiatrist; and satisfactory concurrent review by a credentialing psychiatrist of at least 15 non-Emergent Referrals.

    i. Until a QMHP is credentialed through this process, the QMHP will consult with a psychiatrist or a doctoral level licensed mental health clinician on Emergent and Urgent Referrals, and will not be designated as on-call for off-peak coverage unless a psychiatrist indicates in writing that such consultations are no longer necessary.

d. Prisoners designated "Emergent Referral" to the FMHS will be seen by a Qualified Mental Health Professional within 4 hours.  If clinically indicated, the prisoner will be seen by a psychiatrist within 24 hours (or the next business day), or sooner, if clinically indicated. Emergent Referrals must be placed on constant observation at least until seen by a Qualified Mental Health Professional.

e. Prisoners designated "Urgent Referral" to the FMHS will be seen by a Qualified Mental Health Professional within 24 hours, and a psychiatrist, when clinically indicated.

f. Prisoners designated "Routine Referral" to the FMHS will be seen by a Qualified Mental Health Professional within 5 business days, and a psychiatrist, when clinically indicated (e.g., for medication and/or diagnosis assessment). The written policies and procedures governing referrals will include criteria for determining if a referral is not subject to this timeline requirement (e.g., a face to face contact is not clinically indicated).

4. Provision of Mental Health Treatment

a. The County will continue to develop and implement policies and procedures that ensure adequate access to mental health treatment for prisoners housed at ECHC and ECCF.

b. Each prisoner on the forensic mental health caseload will receive a written initial treatment plan at the time of evaluation. The treatment plan will be kept in the prisoner's unified health record.

c. Each prisoner on the forensic mental health caseload who remains in the facility for 10 days following evaluation will receive a written comprehensive treatment plan. The treatment plan will be kept in the prisoner's health record.

    i. A written comprehensive treatment plan for prisoners at the outpatient level of care will be completed within 30 days of completion of the initial treatment plan. It will target medication management and discharge planning, and will include determination of the need for frequency of QMHP interaction. The treatment planning process for the outpatient level of care will include at least a forensic mental health counselor and psychiatrist or doctoral level licensed mental health clinician, and will be reviewed annually, or sooner, if clinically indicated.

    ii. The comprehensive treatment plan for prisoners at the residential level of care or higher will be completed within 14 days of admission to the residential treatment program. It will be developed by the interdisciplinary treatment team, which will include the forensic mental health counselor, the treating psychiatrist, and custody staff. The prisoner will be encouraged to participate in the treatment planning process. Nursing staff will be encouraged to participate when clinically appropriate.

    iii. The interdisciplinary treatment team for residential or higher level of care will meet to discuss and review the prisoner's treatment no less than once every 30 days for the first three months of care, and once every 90 days thereafter.

    iv. Whenever there is a change to a prisoner's level of care, the treatment plan will be reviewed by the appropriate treatment team.

d. Prisoners diagnosed with mental illness will be classified according to the level of mental health care required to appropriately treat them.  Level of care classifications will include outpatient care; residential care; crisis care; crisis-stabilization care; and inpatient care.

    i. Prisoners classified as requiring outpatient level of care will receive access to:

        1. Psychotropic medication, as clinically appropriate;

        2. Individual counseling and behavioral therapy with a forensic mental health counselor with a frequency as determined in the treatment plan; and

        3. Evaluation and assessment by a psychiatrist, when clinically indicated, at a frequency of no less than once every 30 days if prescribed psychotropic medication, until stabilized on medication, and every 90 days thereafter.

    ii. Prisoners classified as requiring residential level of care will receive access to:

        1. Psychotropic medication, as clinically appropriate;

2. Individual counseling and behavioral therapy with a forensic mental health counselor at a frequency of no less than once per week;

3. Evaluation and assessment by a psychiatrist at a frequency of no less than once every thirty days;

4. Access to at least one group therapy session per week.

iii. Prisoners classified as requiring crisis level of care will:

1. Be placed on immediate constant observation or suicide precautions;

2. During peak hours, a prisoner placed at the crisis level of care will be seen by a Qualified Mental Health Professional within 4 hours, and a psychiatrist the same day.

3. During non- peak hours, a prisoner placed at the crisis level of care will be admitted by a QMHP, credentialed pursuant to the process described in Section 3(c), *supra*, and the QMHP will facilitate a phone consultation with a psychiatrist within 4 hours of admission.  If the psychiatrist determines that the prisoner requires acute medication management, the psychiatrist will either come into the Facility to see the prisoner in person, or the prisoner will be sent to ECMCC for assessment.  If an in-person assessment by a QMHP is not completed at the time of admission, it will be completed no later than the beginning of the next period of on-site coverage.

4. After admission, all prisoners at the crisis level of care will be seen by a Qualified Mental Health Professional daily, 7 days per week, and by a psychiatrist or psychiatric nurse practitioner daily during the 5 days of the week for which there is psychiatric coverage.

5. Treatment plans for prisoners discharged from crisis level of care will be developed and reviewed by the interdisciplinary treatment team.

6. Prisoners discharged from the crisis level of care will receive a follow-up assessment and, at minimum, clinical contact with a Qualified Mental Health Professional on a weekly basis for two weeks. Subsequent mental health treatment (including a description of planned clinical contacts and basis for frequency) shall be documented in the treatment plan and via progress notes.

7. Receive other care in a manner consistent with the Stipulated Suicide Prevention Settlement.

iv. The County agrees to continue its arrangement with Erie County Medical Center Corporation ("ECMCC") to provide a crisis-stabilization level of care to prisoners, and agrees to increase the number of crisis stabilization beds at ECMCC to at least 4 beds, exclusive of the beds used for CPEP

24

(Comprehensive Psychiatric Emergency Program), subject to any required approvals by New York Office of Mental Health and New York Department of Corrections. Prisoners classified as requiring crisis-stabilization care will be transferred within 72 hours to the custodial unit at ECMCC.

1. Constant observation and/or suicide precautions may be temporarily used while waiting to transfer a prisoner to an inpatient bed at ECMCC, but for no longer than 72 hours.
2. No prisoner will be released from ECMCC back to ECHC or ECCF who continues to need a crisis-stabilization level of care.
3. The County will maintain a waiting list of prisoners referred to a crisis-stabilization level of care if no beds are available, and will track wait times and lengths of stay for crisis-stabilization beds.
4. The County will review its utilization of crisis-stabilization beds at ECMCC on an annual basis, and complete a written assessment of whether additional beds are needed. If additional beds are needed, the County will make good faith efforts to arrange for additional beds at ECMCC, or elsewhere, sufficient to meet the above requirements.
5. Prisoners discharged from the custodial unit at ECMCC and transferred back to ECHC or ECCF will be seen by a Qualified Mental Health Professional within the same day. The current treatment plan will be reviewed and modified as clinically appropriate at that time.

v. The Technical Compliance Coordinator will work with the County to assess the need for inpatient beds, and develop a plan within six months of the Effective Date for the delivery of services to prisoners in need of inpatient mental health care.

vi. Qualified Mental Health Professionals will complete rounds of all administrative or disciplinary segregation units outside the Delta unit, or other units where prisoners are locked down, on a weekly basis. These rounds will be logged.

5. Staffing

a. The County agrees to increase its psychiatric staff to 2.75 Full-Time Equivalents ("FTEs"), with significantly decreased court-ordered evaluation caseload.  The County recently increased its licensed QMHPs by 5 FTEs; it agrees to maintain this level of service.

b. No later than July 1, 2012, the County, with the assistance of the TCC, will complete an analysis of current and necessary staffing levels for mental health staff. The County agrees to make good faith efforts to add additional staff, if necessary, to meet the staffing need identified by the assessment.

    c.   The County's mental health staffing will include a Board certified, licensed supervising or lead psychiatrist, whose work includes supervision of other treating psychiatrists.

    d.   The County will continue to ensure that all persons providing mental health treatment meet applicable state licensure and/or certification requirements, and practice only within the scope of their training and licensure.

    e.   The County will continue to develop and implement written training protocols for mental health staff, including an introductory training provided to new hires and an annual refresher training on relevant topics, which will include policies and procedures for assessment and referrals of prisoners with mental illness, identification and care of prisoners with mental illness, role in approval and review of disciplinary procedures and uses of restraints or force, and suicide prevention. The County will document and track training and attendance by staff, who must attend the initial and annual training provided for in this provision in order to continue their employment.

    f.   The County will continue to develop and implement written training protocols in the area of mental health for custody staff, including an introductory training provided to new hires and an annual refresher training on relevant topics, which will include training on basic mental health information (e.g., recognizing mental illness, specific problematic behaviors, additional areas of concern); identification, timely referral, and proper supervision of prisoners with serious mental health needs; appropriate responses to behavior symptomatic of mental illness; and suicide prevention.  The training will be conducted by a qualified mental health professional. The County will document and track training and attendance by staff, who must attend the training provided for in this provision in order to continue their employment.

    g.   The County will draft written policies and procedures that reflect its practice of appropriate and regular communication between mental health staff and custody staff regarding prisoners with mental illness, including communication about concerning behavior and signs of distress. The County agrees to continue its current practice of meetings at least twice per day between mental health and custody staff.

6.  Confidentiality

    a.   The County will develop and implement written policies and procedures regarding confidentiality of mental health information. These policies should recognize that sharing of information between mental health staff and custody staff is crucial for effectively treating and managing inmates with mental illness, and address the responsibility of both mental health staff and custody staff to keep patient information confidential.

b.  The County will ensure that custody staff understand policies and procedures regarding confidentiality of mental health information.  Custody officers assigned to the residential and crisis care mental health units will participate in interdisciplinary treatment team meetings, and the County will make reasonable efforts to ensure that assignments to these posts will be at least six months in duration.

7.  Documentation and Record-keeping

The County will ensure that unified health records are adequate to assist in providing and managing the medical and mental health needs of prisoners at the County Facilities, as set forth in the Medical Care Section of this Agreement.

8.  Medication Management

a.  The County will further develop and implement policies and procedures to ensure the accurate administration of medication and maintenance of medication records, as set forth in the Medical Care Section of this Agreement.

b.  The County will continue to develop and implement a medication continuity system so that incoming prisoners receive psychotropic medications for serious mental health needs in a timely manner, as medically appropriate.

  i.  The County will develop a written policy and procedure for medication continuity that includes a list of critical psychotropic medications, and a psychotropic medication verification process;

  ii.  Upon entry to the Facilities, if a prisoner's reported medication is verified, a prescribing clinician should be contacted to determine whether a bridge order is indicated. If such a medication is ordered, the prisoner will receive the first dose of medication within 24 hours of medication verification, in the case of a critical psychotropic medication, or 48 hours, in the case of a non-critical medication. If a bridge order is not ordered, the reason for such a decision will be documented in a prisoner's unified health record;

  iii.  If a prisoner reports currently receiving a critical psychotropic medication, that prisoner will be designated an Emergent/Urgent (depending on the prisoner's clinical presentation) Referral to the FMHS.

  iv.  If the incoming prisoner's reported non-critical medication is not verified within 24 hours, that prisoner will be referred to the FMHS at the referral level corresponding to the reported psychotropic medication and reported and/or observed symptoms, as identified in the County's referral policy and procedure. Bridge psychotropic medication orders may be issued in consultation with mental health staff.

c.  Whenever a psychotropic medication is discontinued, added, or changed (excluding dosage changes), the County will ensure that the psychiatrist or other

27

prescriber making such changes documents the reason for such change in the prisoner's unified health record.

d.   The County will amend its psychotropic medication review form to require that the prescribing psychiatrist document informed assent by prisoners. Whenever a psychotropic medication is discontinued, added, or changed (excluding dosage changes and bridging medications prescribed upon admission to the ECHC), the psychiatrist or other prescriber must explain to the prisoner the reason for such change, effects (including potential side-effects) of such psychotropic medication, document that this explanation has been provided, and attempt to obtain the prisoner's signature as evidence that the prisoner has received this information.

e.   The County will create a Pharmacy and Therapeutics Committee, to assist in creating and implementing guidelines for the prescription of certain types of psychotropic medications. The Committee will meet at least quarterly.

f.   The County will continue to develop and implement a policy and procedure regarding psychotropic medication non-compliance that meets the standard of care.

9.   Review of Disciplinary Measures

a.   The County will continue to develop and implement written policies regarding the use of disciplinary measures with regard to prisoners with serious mental illness or suspected mental illness. These policies will include written procedures to ensure review of proposed disciplinary measures to be taken against prisoners with identified or suspected mental illness by a Qualified Mental Health Professional (other than the treating clinician), and input by the QMHP regarding the extent to which the prisoner's mental illness and/or the provision of mental health treatment should be a mitigating factor with respect to any discipline.

b.   Supervisory custody staff who review incident reports and disciplinary reports will be trained on the policies and procedures regarding the referral of prisoners with suspected mental illness to the FMHS, and the policies regarding the use of disciplinary measures with regard to prisoners with mental illness or suspected mental illness.

c.   The hearing officer will be trained on the policies regarding the use of disciplinary measures with regard to prisoners with mental illness or suspected mental illness and will document consideration of the QMHP's recommendations, including treatment alternatives considered in the disciplinary process.

d.  Disciplinary measures taken against prisoners with identified or suspected mental illness will be reviewed by the Mental Health Review Committee, as set forth in Section 12, *infra*.

10. Use of Restraints on Prisoners with Mental Illness

a.  The County will develop and implement written policies and procedures for the use of restraints on prisoners with serious mental illness or suspected mental illness.

b.  These policies and procedures will conform with New York state law regarding use of the restraint chair, and will conform with APA guidelines regarding the use of other restraints for mental health purposes.

11. Use of Chemical Spray or Other Force on Prisoners with Mental Illness

a.  Chemical spray will not be used on prisoners known to the corrections officer to have serious mental illness, or displaying symptoms of suspected mental illness, except in circumstances where the failure to use chemical spray could result in imminent physical injury or death.

b.  Good faith efforts not to use chemical spray on prisoners described in (a) will be made and documented.  All uses of chemical spray or other force on prisoners under this section will be reviewed by the Mental Health Review Committee.

12. Quality Management

a.  The County agrees to expand the Quality Improvement Program instituted as part of the Stipulated Suicide Prevention Settlement to the entire mental health treatment program. This expansion includes the establishment of a Health Review Committee, which will include a Mental Health Review Sub-Committee (in addition to the Suicide Prevention Sub-Committee established under the Stipulated Suicide Prevention Settlement).

b.  The Mental Health Review Sub-Committee will include, at minimum, the Director of Intensive Adult Mental Health Services, supervising or lead psychiatrist, senior level forensic mental health specialist, and a senior level custody representative, or the designees of the above individuals. The attending psychiatrist of the forensic inpatient program at ECMCC, or his designee will be encouraged to attend.  When appropriate, representatives from nursing, pharmacy, and medical staff will also participate.

c.  The Mental Health Review Sub-Committee will:

i.  Provide oversight of the implementation of mental health policies and procedures as set forth by this Stipulated Order;

    ii.  Review and analyze individual and aggregate mental health data and identify trends that present risk of harm, including referrals and admissions from general population or outpatient level of care to crisis level of care, lengths of stay in crisis and crisis-stabilization levels of care, and wait times for crisis-stabilization levels of care;

    iii.  Perform a periodic quality management review of the screening and assessment process and document corrective action or training for any staff performing screening and assessment contrary to the provisions of this Stipulated Order and generally accepted correctional health care standards. ;

    iv.  Perform a periodic quality management review of the referral process and document corrective action or training for any staff performing contrary to the provisions of this Stipulated Order and generally accepted correctional health care standards;

    v.  Perform a periodic quality management review of disciplinary measures and uses of force taken against prisoners with identified or suspected mental illness. A representative from custody will always be present during review in these areas;

    vi.  Review or direct review of the use of psychotropic medication to ensure appropriate and effective use of medications in the provision of mental health treatment;

    vii.  Amend or provide additional written policies and training as necessary to effectuate the provisions of this Stipulated Order;

    viii.  Direct participation of the mental health staff in periodic modified peer review activities;

    ix.  Prepare written annual performance assessments regarding the timely and appropriate access to mental health care by prisoners; and

    x.  Maintain a comprehensive record of all activity.

d.  The appropriate frequency of the quality management activities listed above will be determined in consultation with the Technical Compliance Coordinator.

e.  Minutes of the Mental Health Review Sub-Committee and all subcommittees thereof will be maintained, including a record of attendance, a summary of the matters discussed, a record of any decisions made, and identification of any documents reviewed or persons consulted. Minutes of the Mental Health Review Sub-Committee will be provided to the United States upon request.

f.  Supervisors of forensic mental health counselors and psychiatrists will review mental health charts on a periodic basis to be determined by the TCC for the purpose of providing feedback to mental health staff.

g.  The Director of Intensive Adult Mental Health Services and the supervising psychiatrist or their designees will attend meetings of the Health Review Committee.

**D.      ENVIRONMENTAL HEALTH AND SAFETY**

1.  The County will continue its policies and procedures of providing prisoners who are indigent or are otherwise unable to procure such a supply with access to an adequate supply of underwear.

2.  The County will continue to implement policies and procedures to inspect and disinfect mattresses prior to each assignment to a new inmate. Mattresses that are worn or torn such that repair and disinfection is not possible or practical will be replaced and not used for prisoner housing. Mattresses will also be inspected for contraband.

3.  Each kitchen will continue to be inspected by the Erie County Department of Health Food Sanitation Program, on a basis consistent with the State Sanitation Code (New York Codes, Rules and Regulations Title 10, Part 14, Subpart 14-1), and the County will ensure that dishes and utensils, food preparation and storage areas, and vehicles and containers used to transport food are appropriately cleaned and sanitized.

## IV.  COMPLIANCE

A.  The County agrees to provide copies of any documents provided to the TCC to the United States.

B.  Within 120 days of the Effective Date of this Stipulated Order, Defendant will provide to the TCC and the United States all policies, procedures, and protocols that are contemplated by this Stipulated Order. The United States will provide any comments to the TCC within 90 days thereafter, and the TCC will review the policies, procedures, and protocols for approval. The TCC will approve all policies before they are implemented.

C.  Defendant will revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Stipulated Order, and will send all such materials to the TCC and the United States as they are promulgated. All policies will be reviewed at least annually. The United States will provide any comments to the TCC within 30 days thereafter, and the TCC will review the materials for approval.  The TCC will approve all materials before they are implemented.  Changes to policies and procedures will be submitted for review and approval on an ongoing basis in accordance with this process until this Order is terminated.

D.  Upon approval from the TCC, Defendant will implement policies, procedures, and protocols within 14 days.

E.  Within 90 days after the approval of all policies, procedures, and protocols contemplated by this Stipulated Order, Defendant will submit to the TCC for review and approval all proposed curricula for training contemplated by this Stipulated Order.

31

F.  Within 180 days of the TCC's approval of Defendant's training curricula set forth in Section V.C., *supra*, Defendant will provide this training to all staff required to be trained.  Defendant will maintain records of each person's attendance at training.

## V.  REPORTING REQUIREMENTS AND RIGHT OF ACCESS

A.  Defendant will submit semiannual compliance reports to the United States and the TCC, the first of which will be filed within six (6) months of the Effective Date of this Stipulated Order. Thereafter, the semiannual reports will be filed 15 days after the termination of each six-month period until the Stipulated Order is terminated.

B.  Each compliance report will describe the actions Defendant has taken during the reporting period to implement this Stipulated Order and will make specific reference to the Stipulated Order provisions being implemented. Such reports shall not be subject to disclosure nor admissible in any other proceeding other than a proceeding related to the enforcement of this Stipulated Order.

C.  Defendant will promptly (within 48 hours) notify the TCC and the United States upon the death of any prisoner or any serious suicide attempt. Defendant will forward to the TCC and the United States any completed incident reports related to deaths, autopsies, and/or death summaries of prisoners as well as all final reports that involve prisoners, including, but not limited to PSD reports.

D.  Defendant will maintain sufficient records to document that the provisions of this Stipulated Order are being properly implemented and will make good faith efforts to provide such records to the United States within five (5) business days of the United States' request for inspection and copying (at Plaintiff's cost). For example, Defendant will maintain all records or other documents that demonstrate that the County has taken such actions as described in its compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, and incident reports).

E.  The United States and its attorneys, consultants, and agents will have reasonable access to the Facilities, prisoners, staff, and documents once each six (6) month reporting period, or under exceptional circumstances as agreed by the parties or determined by the Court.

G.  Within 30 days of receipt of reasonable written questions from the United States concerning Defendant's implementation of this Stipulated Order, Defendant will provide the United States with written answers.

H.  Any document provided to a TCC or the DOJ by the County (and any information contained therein) shall not be re-disclosed to any third party unless required by law or authorized by the Court.  To the extent that the United States discloses any such document in response to a FOIA request, it will give the County Attorney reasonable written notice of such disclosure.  The TCC and the DOJ shall protect confidential or personal privacy information, including but not limited to, protected health

information, and shall adhere to all federal, state and local laws, rules or regulations precluding the disclosure of such information.

## VI.   TECHNICAL COMPLIANCE CONSULTANT

A.      The Parties agree that two (2) Technical Compliance Consultants ("TCCs") will serve under this Stipulated Order.  The Parties agree that the TCC for the mental health provisions of this Stipulated Order is Jeffrey Metzner, MD, and that the TCC for the medical provisions of this Stipulated Order is Ronald Shansky, MD. The Parties agree that Dr. Metzner will also assume all responsibilities previously assigned to the Joint Compliance Officer under the Stipulated Suicide Prevention Settlement.

B.      In the event that a TCC is unable to or unwilling to continue in such role, the parties must consent to a replacement.  Absent such agreement, the replacement will be selected by the Honorable William M. Skretny, or a neutral to be agreed upon by the parties.

C.      Neither Party, nor any employee or agent of either Party, will have any supervisory authority over the TCC's activities, reports, findings, or recommendations. The reasonable cost for the TCC's staff, fees, and expenses will be borne by Defendant in an amount to be mutually agreed upon by and between the TCCs and County. The selection of the TCC will be conducted solely pursuant to the procedures set forth in this Stipulated Order and will not be governed by any formal or legal procurement requirements. The TCC may be terminated only for good cause, unrelated to the TCC's findings or recommendations, and only with prior notice to, and approval of, both Parties, or by Court order.

D.      Immediately after the Effective Date of this Stipulated Order, the TCC may conduct on-site inspections to evaluate implementation of the provisions of this Stipulated Order. The TCC will have full and complete access to the Facilities, all Facility records, prisoner records, staff, and inmates upon notice to Defendant's Stipulated Order Coordinator or his/her designee.  Defendant will direct all employees to cooperate fully with the TCC in their evaluation activities.  The United States will have the right to be present during TCC on-site inspections of the Facilities, and Defendant will also provide to the United States any documents provided to the TCC.

E.      Subject to the County's approval, the TCC may hire or consult with such additional qualified staff as necessary to fulfill the duties required by the Stipulated Order ("TCC Teams").  Approval will not be unreasonably withheld.  Such qualified staff will have relevant experience and education or training in the field of corrections, mental health care, and/or medical care. The TCC is ultimately responsible for the findings regarding compliance. The TCC Teams will be subject to all of the same access rights and confidentiality limitations, listed below, as the TCC. The Parties reserve the right to object for good cause to members of the TCC Teams, at which point the Parties will meet and confer regarding the objections.  If the Parties are unable to resolve the objections, each will propose an alternative candidate, and the TCC will choose from among those proposed candidates after consultation with the Parties.

F.     The TCC and his/her team members will be permitted to initiate and receive ex parte communications with all Parties.

G.     Except as required or authorized by the terms of this Stipulated Order or the Parties acting together, the TCC will not:  (1) make any public statements (at a conference or otherwise); or (2) issue findings with regard to any alleged act, error, or omission of Defendant or its agents, representatives or employees; or (3) disclose nonpublic information provided to the TCC pursuant to this Stipulated Order. Any press statement made by the TCC regarding his or her employment herein must first be approved in writing by all Parties. Unless such conflict is waived by the Parties, the TCC will not accept employment or provide consulting services that could present a conflict of interest with the TCC's responsibilities under this Stipulated Order. The TCC is not a State/County or local agency or an agent thereof, and accordingly the records maintained by the TCC will not be deemed public records subject to public inspection. Neither the TCC nor any person or entity hired or otherwise retained by the TCC to assist in furthering any provision of this Stipulated Order will be liable for any claim, lawsuit, or demand arising out of the TCC's performance pursuant to this Stipulated Order. This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for compliance evaluation of this Stipulated Order.

H.     The TCCs shall not testify in any other proceeding with regard to any alleged act, error or omission of the County or any of its agents, representatives, or employees.  Nor may the TCCs testify in any other proceeding regarding anything that the TCCs may have discovered as a result of his or her performance under this Stipulated Order.  No report issued pursuant to this Stipulated Order shall be subject to disclosure nor admissible in any proceeding other than a proceeding related to the enforcement of this Stipulated Order.

I.     The TCCs will file with the Court and provide the Parties with reports describing the steps taken by Defendant to implement this Stipulated Order and evaluate the extent to which Defendant has successfully implemented each substantive provision of the Stipulated Order.

    1.     The TCC will issue such reports every six (6) months, unless both Parties otherwise agree in writing.

    2.     The reports will be provided to the Parties in draft form at least two (2) weeks prior to final issuance. The Parties may provide written comments, if necessary, copying the opposing Party. These reports will be written with due regard for the privacy interests of individual inmates and staff.

    3.     In each report, the TCC will evaluate the status of compliance for each provision of the Stipulated Order using the following standards:

        a.     substantial compliance;
        b.     partial compliance; and

34

        c.      non-compliance.

4.      In order to assess compliance, the TCC will:  review a sufficient number of relevant documents to accurately assess current conditions; interview all relevant staff; and interview a sufficient number of inmates to accurately assess current conditions.

5.      The TCC will be responsible for independently verifying representations from Defendant regarding progress toward compliance and for examining supporting documentation.

6.      Each TCC report will describe the steps taken to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the TCC's findings.

J.      The TCC will provide the County with a reasonable budget to be agreed upon by and between the County and TCC.

K.      The TCC will provide Defendant with technical assistance as requested by Defendant. Technical assistance should be reasonable and should not interfere with the TCC's ability to assess implementation.

L.      Defendant and its agents agree that they will not retaliate against any person because that person has or may file a complaint, has or may provide information or assistance, or has or may participate in any other manner in an investigation or proceeding relating to this Stipulated Order.

M.      Defendant will not assert physician/patient or psychotherapist/patient privileges with respect to the monitoring of this Stipulated Order by the United States and the TCC. The Parties and the TCC will treat all personally identifiable information obtained pursuant to this Stipulated Order as confidential.

## VII. ENFORCEMENT

A.      The United States District Court for the Western District of New York will retain jurisdiction over this matter for the purposes of enforcing this Stipulated Order.

B.      During the period that this Stipulated Order is in force, prior to initiating any enforcement proceedings in Court for an alleged failure to fulfill an obligation under this Stipulated Order in Court, the aggrieved party will notify the other party in writing of the facts supporting the aggrieved party's belief that the other party is not in compliance. The responding party will investigate the allegations and respond in writing within 30 days. If the aggrieved party is not satisfied with the other party's response, the parties will conduct negotiations to resolve the issue(s). If the Parties are unable to resolve the issue(s) satisfactorily within 30 days of the other party's written response, the aggrieved party may move the Court for any relief permitted by law or equity.

## VIII. <u>CONSTRUCTION, IMPLEMENTATION, AND TERMINATION</u>

A.    Upon entry of this Stipulated Order by the Court, the parties will take all reasonable steps to begin and/or continue implementing the provisions of this Order.

B.    This Stipulated Order shall not terminate for at least one year after the establishment of the reception center nor before Defendant has achieved substantial compliance with each provision of the Stipulated Order and has maintained substantial compliance with the Stipulated Order for a period of three consecutive six (6) month monitoring periods. With respect to the Protection From Harm and Environmental Health and Safety provisions of this Stipulated Order, this Order will terminate earlier  if the parties agree that the Defendant has been in substantial compliance for three consecutive six (6) month self-reporting periods. The burden will be on Defendant to demonstrate that it has maintained substantial compliance with each of the provisions of the Stipulated Order. Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance. At the same time, temporary compliance during a period of sustained noncompliance will not constitute substantial compliance.

C.    Failure by any Party to enforce this entire Stipulated Order or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver of its right to enforce other deadlines or provisions of this Stipulated Order.

D.    If any unforeseen circumstance occurs that causes a failure to timely carry out any of the provisions of this Stipulated Order, Defendant will notify the United States in writing within 20 calendar days after Defendant becomes aware of the unforeseen circumstance and its impact on Defendant's ability to perform under the Stipulated Order. The notice will describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. Defendant will implement all reasonable measures to avoid or minimize any such failure.

E.    This Stipulated Order and any attachments or exhibits appended hereto will constitute the entire integrated Stipulated Order of the Parties. No prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein, in litigation, or in any other proceeding, with the exception of the Stipulated Settlement Agreement and Order concerning Suicide Prevention and Related Mental Health Issues (Dkt. 89-2).

F.    The Stipulated Order will be applicable to, and binding upon, all Parties, their officers, agents, employees, assigns, and their successors in office. Defendant will ensure that all current and future relevant County employees, agents, assigns, and their successors in office, are trained on the terms of the Stipulated Order (to the extent necessary to carry out their job duties and responsibilities) and implement the terms of the Stipulated Order.

G.    Each Party will bear the cost of its fees and expenses incurred in connection with this cause.

H.    If any provision of this Stipulated Order is declared invalid for any reason by a court of competent jurisdiction, said finding will not affect the remaining provisions of this Stipulated Order.

## IX.    STIPULATION PURSUANT TO THE PRISON LITIGATION REFORM ACT, 18 U.S.C. § 3626

A.    The Parties agree that this Stipulated Order of Dismissal complies in all respects with the requirements for prospective relief under the Prison Litigation Reform Act, 18 U.S.C. § 3626 (a).

B.    The Parties stipulate and agree that all of the prospective relief in this Stipulated Order is narrowly drawn and extends no further than would be necessary to correct any violation of federal rights.

FOR THE UNITED STATES:


_S/William J. Hochul, Jr._      _S/Thomas E. Perez_
WILLIAM J. HOCHUL, JR.      THOMAS E. PEREZ
United States Attorney       Assistant Attorney General
Western District of New York     Civil Rights Division



_S/Mary E. Fleming_       _S/Jonathan Smith_
MARY E. FLEMING        JONATHAN SMITH
Assistant United States Attorney    Chief, Special Litigation Section
Civil Chief, Western District of New York Civil Rights Division


             _S/Laura L. Coon_
             LAURA L. COON
             Special Counsel, Special Litigation Section
             Civil Rights Division


             _S/Zazy I. Lopez_
             ZAZY I. LÓPEZ
             ALYSSA C. LAREAU
             MARLYSHA MYRTHIL
             LORI RIFKIN
             Trial Attorneys, Special Litigation Section
             Civil Rights Division


DATED: August 17, 2011

FOR ERIE COUNTY:


*S/Jeremy A. Colby*
JEREMY A. COLBY
Erie County Attorney


DATED: 8/17/11

SO ORDERED this _____ day of _____, 2011

_____

THE HONORABLE WILLIAM M. SKRETNY
UNITED STATES DISTRICT JUDGE
Western District of New York