UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

        v.                                               **DECISION AND ORDER**
                                                          09-CV-849S

ERIE COUNTY, NEW YORK,

                              Defendant.

## I.  INTRODUCTION

        This action was initially commenced by the United States against the Defendant

County and several County officials pursuant to the Civil Rights of Institutionalized Persons

Act of 1980 ("CRIPA"), 42 U.S.C. § 1997 *et seq.,* following a two year investigation into

conditions at the Erie County Holding Center ("ECHC") and the Erie County Correctional

Facility ("ECCF").

        Presently before the Court is the motion of New York Civil Liberties Union

("NYCLU") for an order (1) granting NYCLU leave to intervene in this case; (2) unsealing

compliance reports previously filed with this Court; and (3) vacating the standing order

permitting future compliance reports to also be filed under seal.

## II. BACKGROUND

        In September 2009, the United States Department of Justice ("DOJ") commenced

the instant action alleging that confinement conditions at ECHC and ECCF violated the

federal constitutional rights of inmates incarcerated there.  The complaint and the attached

"findings" letter detail Defendant's alleged failures in the areas of protection from harm,

environmental safety, medical care, mental health care, and suicide prevention.  The DOJ

sought declaratory and injunctive relief against the Defendant County and the individually named Defendants in their official capacities.

The parties engaged in extensive mediation efforts, which came to partial fruition in June 2010, when the DOJ moved for entry of a partial stipulated settlement agreement which resolved the suicide prevention and related mental health care claims (the "Suicide Prevention Agreement").  (Docket No. 89.)  As part of this stipulation, the parties agreed to select a "Joint Compliance Officer," or "JCO," with relevant experience in the field of corrections, mental health care, suicide prevention, or medical care, to "file with the Court and provide the Parties with reports describing the steps taken by the Defendants to implement this Stipulated Settlement and evaluate the extent to which the Defendants are in compliance with each substantive provision of the Stipulated Settlement." (Suicide Prevention Agreement § IV(A-F).)  These reports were to be issued every four months, after a two week comment period afforded to the parties.  (Id. § IV(F).) The Court approved this stipulated partial settlement on June 22, 2010, finding that it satisfied the requirements for prospective relief pursuant to 18 U.S.C. § 3626(a)(1)(A). (Docket No. 91.)  The parties subsequently stipulated to the selection of Robert L. Trestman, Ph.D., M.D., as the JCO for the Suicide Prevention Agreement. (Docket No. 112.)

Defendants' first motion to dismiss the Complaint was denied on July 9, 2010. (Docket No. 94.) This Court held that CRIPA was not unconstitutional as applied to Defendants.  It was further found, however, that despite technical compliance, the original complaint violated the spirit underlying Rules 8 and 10 of the Federal Rules of Civil Procedure and ordered Plaintiff to file an amended complaint within 14 days.  Plaintiff complied. (Docket No. 97.)  The  amended complaint asserted allegations in the following

2

areas of concern: protection from harm (excessive force under the Eighth and Fourteenth Amendments); medical and mental health care (medical indifference under the Eighth Amendment); and environmental health and safety issues (conditions of confinement under the Eighth and Fourteenth Amendments). (Docket No. 97.)

In November 2010, Defendant served subpoenas on the Erie County Prisoners' Rights Coalition, the Partnership for the Public Good, Inc., and the League of Women Voters of Buffalo/Niagara, Inc., seeking, among other things, correspondence between these entities and the DOJ. (Docket 214 Exs. A-C.) The present proposed intervenor, NYCLU, represented these parties by bringing a third-party motion to quash these subpoenas in July 2011. (Docket No. 214.) This motion was initially held in abeyance to allow for resolution of pending discovery issues. (Docket No. 219.)

On August 5, 2011, Defendants filed a motion to dismiss the amended complaint as against the individually named Defendants on the ground that claims against these individuals in their official capacities were redundant of claims against the Defendant County. (Docket No. 218.) Prior to resolution of this motion, however, the claims were voluntarily dismissed with prejudice as against the individual defendants pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure on August 18, 2011.[1] (Docket Nos. 223-224.) On this same date, the parties jointly moved for entry of a second Stipulated Order of Dismissal ("Stipulated Order") resolving the remaining protection from harm, provision of medical and mental health treatment, and environmental health and safety

---

[1] The stipulation dismissing the action as against the individual defendants is separate and distinct from the Stipulated Order between the DOJ and the Defendant County at issue here. Defendant is therefore correct that NYLCU erroneously included the individual Defendants in the original caption to its motion (Def's Mem of Law in Opp'n at 21). This error was acknowledged and rectified in NYCLU's reply memorandum. (NYCLU Reply Mem of Law at 11, Docket No. 249.)

claims as against the Defendant County. (Docket No. 225).  This stipulation recognized that, without any admission of liability on its part, the County, now the only remaining Defendant, would continue developing and implementing policies, practices, and procedures to address concerns at ECHS and ECCF. (Stipulated Order at § I.)

The Stipulated Order states general goals with respect to each of the areas of concern raised, as well as more specific actions for achieving these goals, such as procedure development, additional training and staffing, and enhanced record keeping. For example, with respect to protection from harm, the Stipulated Order provides that "Defendant agrees to continue to develop and implement policies and procedures to provide prisoners with a safe and secure environment and continue to take all reasonable steps to protect them from harm."  (Stipulated Order, § III(A).)  More specific actions in support of this general goal include "film[ing] all uses of force where the [Quick Entry Team] is deployed" and "maintain[ing] a log of all video footage of uses of force." (Id. §III(A)(3)(b).)

In order to monitor compliance, the parties agreed upon two Technical Compliance Consultants ("TCCs") to independently verify representations by Defendant regarding progress toward compliance with the stipulated goals. (Stipulated Order § VI(A),(I)(5).) The parties chose Jeffrey Metzner, M.D., as TCC for the mental health provisions of the current order as well as all responsibilities previously assigned the JCO for the Suicide Prevention Agreement.    (Id. § VI(A).)   To that end, the Suicide Prevention agreement was incorporated into the 2011 Stipulated Order, except to the extent the former was modified by the latter. (Id. § III(C)(1).)  The parties further agreed on Ronald Shansky, M.D., as TCC for the medical provisions of the Stipulated Order.  (Id.) The Stipulated Order requires the TCCS to "file with the Court and provide the Parties with reports describing the steps taken

by Defendant to implement this Stipulated Order and evaluate the extent to which Defendant has successfully implemented each substantive provision of the Stipulated Order" every six months, unless otherwise agreed to by the parties in writing. (Stipulated Order § (VI)(I)(1).) These reports are required to be submitted to the parties at least two weeks prior to final issuance in order to allow for written comments to be made by either party, with a copy provided to the other. (Stipulated Order § VI(I)(2).)

The Stipulated Order requires that the TCC reports "will be written with due regard for the privacy interests of individual inmates and staff." (Stipulated Order § VI(I)(2).) Further, although Defendant is not permitted to "assert physician/patient or psychotherapist/patient privileges with respect to the monitoring of the Stipulated Order by the United States and the TCC," the parties agreed to "treat all personally identifiable information obtained pursuant to this Stipulated Order as confidential." (Stipulated Order § VI(M).)  This stipulation further provides that "[t]he TCC is not a State/County or local agency or an agent thereof, and accordingly the records maintained by the TCC will not be deemed public records subject to public inspection." (Stipulated Order § VI(G).) Additionally, "[n]o report issued pursuant to this Stipulated Order shall be subject to disclosure nor admissible in any proceeding other than the proceeding related to the enforcement of this Stipulated Order." (Stipulated Order § VI(H).)

In addition to the TCC's compliance reports, Defendant is also required to:

submit semiannual compliance reports to the United States and the TCC, the first of which will be filed within six (6) months of the Effective Date of this Stipulated Order.  Thereafter, the semiannual reports will be filed 15 days after the termination of each six-month period until the Stipulated Order is terminated.

[] Each compliance report will describe the actions Defendant has taken

5

during the reporting period to implement this Stipulated Order and will make specific reference to the Stipulated Order provisions being implemented. Such reports shall not be subject to disclosure nor admissible in any other proceeding other than a proceeding related to the enforcement of this Stipulated Order.

(Stipulated Order § V(A-B).)   Defendant also agreed to "maintain sufficient records to document that the provisions of this Stipulated Order are being properly implemented" and timely provide copies of the same to the DOJ. (Id. § V(D).)   "For example, Defendant will maintain all records or other documents that demonstrate that the County has taken such actions as described in its compliance reports (e.g., census summaries, policies, procedures, protocols, training materials, investigations, and incident reports)." (Id.)   The parties agreed that:

> Any document provided to a TCC or [Plaintiff] by the County (and any information contained therein) shall not be re-disclosed to any third party unless required by law or authorized by the Court.  To the extent that the United States discloses any such document in response to a FOIA request, it will give the County Attorney reasonable written notice of such disclosure. The TCC and the DOJ shall protect confidential or personal privacy information, including but not limited to, protected health information, and shall adhere to all federal, state and local laws, rules or regulations precluding the disclosure of such information.

(Stipulated Order § V(H).)

In an order entered August 26, 2011, this Court determined that the Stipulated Order satisfied the requirements for prospective relief under the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A), inasmuch as it "is narrowly drawn, and extends no further than is necessary and is the least intrusive means necessary to correct the violations of the federal rights at issue." (Docket No. 227.)  The Court ordered that the case be dismissed and closed, although jurisdiction over the matter would be retained until the substance of the terms of the Stipulated Order of Dismissal was fulfilled, "and either party may move to

reopen this case at any time should issues requiring this Court's intervention arise." (Id.; see Stipulated Order § VII(A-B) (agreeing on this Court's continued jurisdiction for enforcement purposes).)

At the conclusion of the first six-month period in February 2012, Defendant moved to file the first reports of the TCCs, as well as the previously unfiled Joint Compliance Reports resulting from the initial Suicide Prevention Agreement and any future TCC reports, under seal. (Docket No. 231.)  Defendant relied on the provisions in both the Suicide Prevention Agreement and the Stipulated Order stating that neither a TCC nor a JCO was "a State/County or local agency or an agent thereof, and accordingly the records maintained by the TCC will not be deemed public records subject to public inspection." (Docket No. 232 ¶¶ 16-17, 23-25.)  The DOJ affirmatively stated that it was not opposing the motion to seal, following which this Court granted the motion.  (Docket Nos. 234, 235.) In March 2012, Defendant moved this Court to "expand" the prior order to also allow the filing of Defendant's semiannual compliance reports  to the TCCs and the DOJ under seal. (Docket No. 237.)  The DOJ again assented, and the Court granted the motion on March 29, 2012. (Docket Nos. 239, 240.)

In June 2012, proposed intervenor NYCLU filed the present motion to unseal the previously filed compliance reports and vacate the standing order permitting future sealed filings.

### III. DISCUSSION

**A.      Intervention**

Before reaching the merits of the motion to unseal, the Court must first determine

whether NYCLU is permitted to intervene, either as of right or with this Court's permission, pursuant to Rule 24 of the Federal Rules of Civil Procedure. Defendant opposes intervention, arguing that NYCLU's motion inadequately identifies the basis for intervention, fails to establish that new interests will be represented by NYCLU if granted, and is untimely. (Def's Mem of Law in Opp'n at 11-13, Docket No. 248.)

The common law right of public access to judicial documents is well established; indeed, it is said to predate the Constitution. Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir.2006); United States v. Amodeo ("Amodeo I"), 44 F.3d 141, 145 (2d Cir. 1995). It is similarly well settled that "the public and the press have a qualified First Amendment right to attend judicial proceedings and to access certain judicial documents." Lugosch, 435 F.3d at 120 (internal quotation marks omitted); Gambale v. Deutsche Bank AG, 377 F.3d 133, 140 n. 4 (2d Cir. 2004).  In order to allow for meaningful assertion of either right, however, "representatives of the press and general public 'must be given an opportunity to be heard on the question of their exclusion.'" Globe Newspaper Co. v. Superior Court for Norfolk County, 457 U.S. 596, 609 n. 25, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982) (quoting Gannett Co. v. DePasquale, 443 U.S. 368, 401, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979)(Powell, J., concurring)); Application of The Hearld Co., 734 F.2d 93, 102 (2d Cir. 1984).  Thus, courts have recognized that intervention pursuant to Rule 24 is the proper procedure for a third party to assert the public's right of access to judicial documents.  Diversified Group, Inc. v. Daugerdas, 217 F.R.D. 152, 157 (S.D.N.Y. 2003); see United States v. Aref, 533 F.3d 72,  81 (2d Cir. 2008); Martindell v. Inter'l Tel. & Tel. Corp., 594 F.2d 291, 292 (2d Cir. 1979); Katzman v. Victoria's Secret Catalogue, 923 F.Supp. 580, 583 (S.D.N.Y. 1996).

8

Defendant does not dispute this, but argues that NYCLU failed to identify the basis on which it is asserting standing under Rule 24, and that NYCLU's motion contains no assertions that would support intervention either as of right or with the permission of the Court. (Def's Mem of Law in Opp'n at 12.)

Rule 24(a) allows intervention as of right where the proposed intervenor has an "interest relating to the property or transaction which is the subject of the action." Fed. R. Civ. P. 24(a)(2). Alternatively, under Rule 24(b), a court may permit intervention where the proposed intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(2).  As recognized by the Seventh Circuit, intervention for the purpose of asserting the public's interest in public access "does not fit neatly within the literal language of either section." Jessup v. Luther, 227 F.3d 993, 997 (7th Cir. 2000).

Nonetheless, permissive intervention pursuant to Rule 24(b)(2) has generally been found to be most appropriate for a non-party to intervene in order to assert the right to public access.  See Dorsett v. County of Nassau, 289 F.R.D. 54, 71 (E.D.N.Y. 2012); Diversified Group, Inc., 217 F.R.D. at 158; In Re Application of Akron Beacon Journal, No. 94 Civ 1402 (CSH), 1995 WL 234710, *3-4 (S.D.N.Y. Apr. 20, 1995) (citing Martindell, 594 F.2d at 292); see Jessup, 227 F.3d at 998-99;  Beckman Industries, Inc. v. International Ins. Co., 966 F.2d 470, 473 (9th Cir. 1992), cert. denied sub nom., International Ins. Co. v. Bridgestone/Firestone, Inc., 506 U.S. 868 (1992).  This is because:

> [W]hen a district court enters a closure order, the public's interest in open access is at issue and that interest serves as the necessary legal predicate for intervention. Similarly, from the [original p]arties' perspective, their interest in the nondisclosure of the settlement agreement is a central aspect of this litigation. Although the [p]arties take a very different view of the matter of

9

confidentiality, nevertheless, that confidentiality is – in the language of Rule 24(b)(2) – a "question of law ... in common" between the [p]arties and the [proposed intervenor].

Jessup, 227 F.3d at 998-99.  Because an intervenor asserting the right of public access is not becoming a party to the underlying merits of a case, further specificity is not required. Beckman Industries, Inc., 966 F.2d at 473-74.

This Court's approval of the confidentiality provisions in the Stipulated Order and the subsequent orders to seal therefore provide the basis for intervention pursuant to Rule 24(b).  The subject matter of the present litigation, conditions in the County's correctional facilities, is a significant matter of public interest.  In light of the organization's stated mission of promoting transparency in public institutions, the Court finds that NYCLU is an appropriate representative of the press and general public in the instant case. (See Aff. of Corey Stoughton, Esq., ¶ 2, Docket No. 244.) Further, both parties agreed to the confidentiality provisions in the stipulated agreements and the DOJ acquiesced to Defendant's subsequent motions to seal. Thus, contrary to Defendant's further contention, NYCLU's proffered concerns are not "merely coextensive to that of the DOJ." (Def's Mem of Law in Opp'n at 12-13.)

Defendant's final argument in opposition to intervention is that the motion is untimely.  See Fed. R. Civ. P. 24(b) (permitting intervention "on a timely motion").  A determination of the timeliness of a motion to intervene is committed to the sound discretion of the court after consideration of the totality of the circumstances. Dorsett, 289 F.R.D. at 72.  Relevant factors for a court to consider include: "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and

(4) any unusual circumstances militating for or against a finding of timeliness." United States v. Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir. 1994).

Defendant highlights NYCLU's previous appearance before this Court in the present litigation as a representative of third-party movants at the time the Stipulated Order was entered, (Def's Mem of Law in Opp'n at 7; see Docket No. 214), which was approximately a year prior to the filing of the present motion for intervention. (Docket No. 244.) Defendant argues that, despite being on notice of the parties' agreement regarding the confidentiality of the compliance reports, the NYCLU waited until six months after Defendant moved the Court to seal these reports to bring the present motion.  Defendant asserts that this delay prejudiced it by foreclosing the opportunity to either withdraw from the Stipulated Order or amend the agreements with the DOJ to eliminate the need to file the reports with the Court.

NYCLU responds that it could not have moved to intervene prior to the parties' filing of the Stipulated Order containing the confidentiality provisions, and that it acted promptly after pursuing Freedom of Information Law ("FOIL") requests[2] made to, and subsequently denied by, the County. (Stoughton Affirm. ¶¶ 3, 11-13, Exs. G-I.) The present motion to intervene was filed approximately a month after the County denied NYCLU's administrative FOIL appeal. (Stoughton Affirm. Ex. I (May 18, 2012 denial on administrative appeal); NYCLU's June 21, 2012 Motion to Intervene and Unseal, Docket No. 244.)  The Court gives little weight to any delay caused by NYCLU's pursuit of a FOIL request.  There is no exhaustion requirement prior to asserting the right of public access.  Further, it does not

---

[2]FOIL is the New York State statutory mechanism by which the public is able to gain access to government records and increase public accountability.  See N.Y. Public Officers Law § 84 et seq.; County of Suffolk, N.Y. v. First American Real Estate Solutions, 261 F.3d 179, 185 (2d Cir. 2001).

appear that NYCLU completed the state process by pursuing a New York C.P.L.R. Article 78 proceeding in state court regarding the purportedly improper denial. <u>See</u> N.Y. Public Officers Law § 89(4)(b); <u>Schuloff v. Fields</u>, 950 F. Supp. 66, 67-68 (E.D.N.Y. 1997). That proceeding is the proper forum for NYCLU's FOIL arguments.

Ultimately, however, the Court finds that, under the circumstances of this case, the motion to intervene was timely filed.  " 'Rule 24(b)'s timeliness requirement is to prevent prejudice in the adjudication of the rights of the existing parties, a concern not present when the existing parties have settled their dispute and intervention is for a collateral purpose.' " <u>Diversified Group, Inc.</u>, 217 F.R.D. at 158 n. 4 (quoting <u>United Nuclear Corp. v. Cranford Ins. Co.</u>, 905 F.2d 1424, 1427 (10th Cir. 1990), *cert denied sub nom* <u>American Special Risk Ins. Co. v. Rohm & Haas Co.</u>, 498 U.S. 1073 (1991)).  Thus, "ordinary principles applicable to intervention do not necessarily apply to intervention for the limited purpose of modifying a protective order to gain access to documents." <u>In Re Application of Akron Beacon Journal</u>, No. 94 Civ 1402 (CSH), 1995 WL 234710, *6; <u>see</u> <u>Public Citizen v. Liggett Group, Inc.</u>, 858 F.2d 775,  786-87 (1st Cir. 1988), *cert denied*, 488 U.S. 1030 (1989).  Further, although post judgment intervention is generally disfavored under normal circumstances, <u>Farmland Dairies v. Com'r of N.Y. Dep't of Agr.</u>, 847 F.2d 1038, 1044 (2d Cir. 1988), intervention for the purpose of challenging confidentiality orders is permissible even years after a case has been closed. <u>Diversified Group, Inc.</u>, 217 F.R.D. at 157-58 (intervention permitted two years after closure);  <u>see</u> <u>E.E.O.C. v. Nat'l Children's Ctr., Inc.</u>, 146 F.3d 1042, 1047 (D.C. Cir. 1998) (intervention permitted two years after closure); <u>United Nuclear Corp.</u>, 905 F.2d at 1427 (intervention permitted three years after closure); <u>see generally</u> <u>Gambale</u>, 377 F.3d at 140-41 (every court retains the supervisory power over

12

its own files and the authority to modify or lift protective orders that it has entered, even after closure of a case).

This is not to say that no weight should be given to the fact that Defendant has already relied on the confidentiality provisions in the Stipulated Order and this Court's sealing orders by filing the designated documents, only that this is more appropriately considered in connection with NYCLU's motion to vacate the sealing orders.  NYCLU's motion to intervene is therefore granted pursuant to Rule 24(b)(1)(B) for the limited purpose of considering the motion to unseal.

## B.    Motion to Unseal Compliance Reports

NYCLU requests that this Court unseal those prior compliance reports[3] already filed and vacate the standing order permitting future sealed filings.  It argues that these reports are judicial documents to which there exists a presumption of public access under the both common law and the First Amendment. (NYCLU's Mem of Law at 7-8.)  Further, "the public's significant interest in understanding these judicial proceedings surrounding an issue of intense public concern far outweighs any conceivable reason for suppressing the TCC Reports." (Id.)  In opposing the motion, Defendant contends that the reports at issue

---

[3]Although NYCLU consistently refers to the documents requested as "TCC Reports," the docket numbers referenced in its memorandum are for JCO reports, TCC reports, and Defendant's own compliance reports. (See NYCLU Mem of Law at 5; Docket Nos. 228, 238, 241-243.)  Because the JCO for the Suicide Prevention Agreement  performed the same function as the mental health TCC for the Stipulated Order, the Court will jointly refer to these documents as the TCC reports.  Further, Docket No. 103, also referenced by NYCLU, is not a compliance report, but instead is an attorney declaration in support of a DOJ motion to file documents containing sensitive details related to a suicide at the ECHC under seal. (See Docket No. 100.)

It should also be noted that a single report relating to the initial Suicide Prevention Agreement was filed by the JCC in February 2011, over a year prior to Defendant's first motion to seal and apparently without the assistance of either counsel. (Docket No. 174.)  NYCLU does not argue that this weighs in favor of unsealing, and this Court concludes that it has no effect on the conclusions reached with respect to the sealing of the subsequently filed reports.

are not judicial documents subject to public access, but are instead an extension of settlement negotiations that should not be made subject to disclosure. (Def's Mem of Law in Opp'n at 13-21.)

       1.    Common Law and First Amendment Qualified Right of Public Access

As noted above, the public has a qualified right of access, under both the common law and the First Amendment, to judicial proceedings and documents. United States v. Sattar, 471 F. Supp. 2d 380, 384 (S.D.N.Y. 2006); Lougsch, 435 F.3d at 119; Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 90 (2d Cir. 2004). "The presumption of access under the common law is based on the need for federal courts, although independent – indeed, particularly because they are independent – to have a measure of accountability and for the public to have confidence in the administration of justice." United States v. Amodeo ("Amodeo II"), 71 F.3d 1044, 1048 (2d Cir. 1995). "[P]rofessional and public monitoring is an essential feature of democratic control. Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior. Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings." Id.

"Although there is a presumption favoring access to judicial records, the fact that a document is a judicial record does not mean that access to it cannot be restricted." Amodeo I, 44 F.3d at 146 (citing Nixon v. Warner Comm'ns, 435 U.S. 589, 602, 98 S. Ct. 1306, 55 L.Ed.2d 570 (1978)). Indeed, the Second Circuit has recognized that an abundance of documents generated during litigation have no bearing on the exercise of judicial power, and "[u]nlimited access to every item turned up in the course of litigation would be unthinkable." Amodeo II, 71 F.3d at 1048.

"In addition to the common law right of access, it is well established that the public and the press have a 'qualified First Amendment right to attend judicial proceedings and to access certain judicial documents.'" Lugosch, 435 F.3d at 120 (quoting Hartford Courant Co., 380 F.3d at 91).   This right of access extends to "written documents submitted in connection with judicial proceedings that themselves implicate the right of access" Hartford Courant Co., 380 F.3d at 93 (quoting Matter of New York Times, 828 F.2d 110, 114 (2d Cir. 1987)).   It is generally understood to be a stronger right of access than that found in the common law.   Lugosch, 435 F.3d at 120 (citing Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th Cir. 1988)); United States v. Strevell, No. 05-CR-477 (GLS), 2009 WL 577910, *4 (N.D.N.Y. Mar. 4, 2009); see Standard Inv. Chartered, Inc. v. Financial Indus. Reg. Auth., Ind., 347 Fed. App'x. 615, 616-617 (2d Cir. 2009).   Where found to apply, a court may seal a document "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Lugosch, 435 F.3d at 124 (internal quotation marks omitted) (quoting In re New York Time Co., 828 F.2d 110, 116 (2d Cir. 1987)); see Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 13-14, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986).

2.      Judicial Documents

The presumption of access in civil cases, as noted, applies only to "so-called 'judicial documents.' " Securities and Exchange Comm'n v. TheStreet.Com, 273 F.3d 222, 231 (2d Cir. 2001) (quoting Amodeo I, 44 F.3d at 145); Diversified Group, Inc., 217 F.R.D. at 158. Thus, "[b]efore any such common law right can attach, . . . a court must first conclude that any documents at issue are indeed 'judicial documents.'" Lougsch, 435 F.3d at 119. "[T]he mere filing of a paper or document with the court is insufficient to render that

paper a judicial document subject to the right of public access." Amodeo I, 44 F.3d at 145. Instead, "the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document." Id.

At issue on the instant motion are two types of reports required by the agreements to be kept confidential by the parties and subsequently ordered to remain under seal when filed with this Court.  The first consists of the reports of the TCCs, which document the steps taken by Defendant to implement the agreements in the Stipulated Order and are required to be "file[d] with the Court and provide[d to] the Parties" every six months. (Stipulated Order § VI(I)(1); see Suicide Prevention Agreement § IV(F).)  The second type is the semiannual compliance reports that Defendant itself is required to submit to the DOJ and the TCCs, but not, pursuant to the plain language of the Stipulated Order, to the Court. (Stipulated Order  § V(A).)

Not surprisingly, NYCLU and Defendant[4] disagree over whether these reports are 'judicial documents' subject to any presumption of access.  NYCLU argues that the facts of the instant case are nearly identical to Amodeo I. (NYCLU Mem of Law at 8-11.) There, the Second Circuit found that reports filed by an appointed court officer, charged with investigating union-related corruption and taking appropriate remedial action thereon as part of a consent decree issued in a RICO case, constituted judicial documents. Amodeo I, 44 F.3d at 142, 146. The Court noted that, although the officer was not required to keep the district court informed of her investigation, she chose nonetheless to do so.  Id. at 146. Further, the officer was vested with the powers of a Receiver, see Fed. R. Civ. P. 66, the

---

[4]The DOJ does not object to either NYCLU's intervention or the unsealing of the reports, "except to require that confidential information be redacted." (Docket No. 247.)

discharge of whom is a matter within the discretion of the district court. Amodeo I, 44 F.3d at 146.  Because the filed reports were part of the record that the district court would be required to review in considering either whether to exercise that discretion or to rule on an enforcement motion brought by a party to the consent decree, the Second Circuit did not "hesitate to classify [the officer's reports], including the exhibits filed under seal, as judicial documents subject to the common law presumption of public access." Id.

NYCLU argues that "[t]his Court's role in the judicial process of enforcing and monitoring the settlement of this litigation is as robust as, if not more robust than, the court's role in Amodeo I." (NYCLU's Mem of Law at 8.)  Specifically, NYCLU argues that the reports must be judicial documents because this Court relies on them to discharge its duty to "evaluat[e] the parties' compliance with the settlement terms, adjudicat[e] enforcement proceedings if necessary, and terminat[e] the Stipulated Order once the parties achieve compliance." (Id. at 8.)

Defendant correctly argues that NYCLU overstates the role ascribed to the Court by the Stipulated Order. (Def's Mem of Law in Opp'n at 5, 15-16.) For example, this Court does not have the exclusive authority to appoint, oversee, and if necessary dismiss the TCCs monitoring Defendant's progress under the agreements. (See NYCLU Reply Mem of Law at 6 (asserting that this is an "exclusive" function of the Court.) Instead, these consultants were chosen by mutual agreement of the parties, and any replacement similarly requires that both parties consent.  (Stipulated Order § VI(A-C).)  The Court intervenes only upon notice that the parties cannot reach agreement. (Id. § VI(B-C).) Similarly, it is the TCCs that are tasked with monitoring Defendant's progress toward attaining the goals set forth in the Stipulated Order, and intervention by the Court is not

17

warranted absent notice from the parties.   (Id. § VI(1), VII.)  Notably, no enforcement motion is permitted under the Stipulated Order unless the allegedly aggrieved party has first given the offending party notice in writing and an opportunity to cure any deficiency. (Id. § VII(B).)

Defendant asserts that the filing of the compliance reports in this case "is a ministerial function that provides a means for the parties to develop a record" in the event that either party is required to bring an enforcement action. (Def's Mem of Law in Opp'n at 16.)  Thus, because the reports are irrelevant to the current performance of any judicial function, Defendant argues that this case is more akin to United States v. Glens Falls Newspapers, Inc., 160 F.3d 853 (2d Cir. 1998).  There, the Second Circuit affirmed the district court's denial of an intervention motion by a newspaper seeking draft settlement agreements and judicial settlement conference documents involving, among other things, remediation of a landfill site under the Comprehensive Environmental Response, Compensation, & Liability Act. Id. at 858.

In doing so, however, the Second Circuit considered both the weight of the presumption of public access and the countervailing factors to be balanced against that weight.  Id. at 857-58.  As such, the Court implicitly found that the items at issue were judicial documents requiring further analysis. See Lugosch, 435 F.3d at 119-20 (only after it is determined that judicial documents are at issue does a court consider the weight of the presumption of access and any competing considerations).  Further, although the compliance reports have not yet been considered by this Court for the purpose of ruling on an enforcement motion, the Second Circuit in Amodeo I specifically gave weight to the fact that the court officer's report would become part of the relevant record if an

18

enforcement motion was brought.  44 F.3d at 146.  Thus, the *possibility* that a document in a court's possession will be useful to the performance of the judicial function is relevant in determining if the common law presumption of access attaches.

This case nonetheless presents a close question because the documents at issue are part of a negotiated settlement agreement between the parties. The terms of settlement agreements, and any related supporting exhibits, are generally not deemed judicial records because they document confidential negotiations not subject to judicial approval.  See Gambale, 377 F.3d at 143 (citing Pansy v. Borough of Stroudsburg, 23 F.3d 772, 781 (3d Cir. 1994); Janus Films, Inc. v. Miller, 801 F.2d 578, 582 (2d Cir. 1986); Glens Falls Newspapers, Inc., 160 F.3d at 857; Chapman-Green v. Icahn House West LLC, No. 11 Civ. 1190 (MHD), 2013 WL 474352, *2 (S.D.N.Y. Jan. 24, 2013); Geltzer v. Andersen Worldwide, S.C., No. 05 Civ 3339(GEL), 2007 WL 273526, *1 (S.D.N.Y. Jan. 30, 2007). This general rule, however, does not apply to all settlement agreements:

> Written applications for a court ruling that a proposed settlement is fair and appropriate—including the settlement document, which must be submitted for the court to assess such an application—come within the rubric of adjudicative documents, thus triggering an obligation by the litigants to satisfy the demanding standards to overcome the presumption of public access.

Chapman-Green, 2013 WL 474352 at *1; see Janus Films, Inc., 801 F.2d at 582; Hens v. Clientlogic Operating Corp., No. 05-CV-381S, 2010 WL 4340919, *2 (W.D.N.Y. Nov. 2, 2010)(Skretny, J.); see also Jessup, 277 F.3d at 929.

Here, the compliance reports are requirements of settlement agreements that were required to be, and were in fact, reviewed and approved by this Court pursuant to the Prison Litigation Reform Act, 18 U.S.C. § 3626. Nonetheless, these reports did not yet exist at that time, therefore the contents thereof cannot be said to have been relevant to the

19

Court's performance of this assessment.  Determinative under these circumstances is the fact that the compliance reports are part of the relevant record on any *potential* enforcement action,  as in Amodeo I. The Court finds that the compliance reports that were or will be filed with this Court under seal are judicial documents entitled to the common law presumption of public access.

3.       First Amendment Presumption of Access

The conclusion that the compliance reports are judicial documents does not necessarily mean that they also fall within the subset of "*certain* judicial documents" entitled to the heightened constitutional presumption of access. Lugosch, 435 F.3d at 120 (emphasis added). The Second Circuit has "articulated two different approaches for determining whether 'the public and the press should receive First Amendment protection in their attempts to access certain judicial documents.'" Lugosch, 435 F.3d at 120 (quoting Hartford Courant Co., 380 F.3d at 92)).  Relevant here[5] is the "experience and logic" test, whereby a court considers "both whether the documents 'have historically been open to the press and general public' and whether 'public access plays a significant positive role in the functioning of the particular process in question.'" Lugosch, 435 F.3d at 120 (quoting Hartford Courant Co., 380 F.3d  at 92).

As discussed above, settlement agreements have not been historically open to the press and the general public where judicial review and approval is not required.

_____

[5]"The second approach considers the extent to which the judicial documents are 'derived from or [are] a necessary corollary of the capacity to attend the relevant proceedings,'" Lugosch, 435 F.3d at 120 (quoting Hartford Courant Co., 380 F.3d  at 93).  For example, an oral argument transcript is a necessary corollary to one's ability to attend the argument in person.  Hartford Courant Co., 380 F.3d at 93.  As discussed, the compliance reports are not derived from or a necessary corollary to a judicial proceeding. Indeed, if no enforcement motion is brought by a party, the reports may never be reviewed for the purpose of making an adjudication on the merits.  Accordingly, only the experience and logic test is applicable.

Nonetheless, because the instant civil case involved a dispute over prison conditions, here the Court was required to ensure that the prospective relief provided for in the stipulation of dismissal was narrowly drawn, extended no further than was necessary, and was the least intrusive means necessary to correct the alleged violations of the federal rights at issue.  See 18 U.S.C. § 3626(a)(1).  This Court also retained jurisdiction over the matter "until the substance of the terms of the Stipulated Order of Dismissal are fulfilled," with both parties retaining the right to "move to reopen this case at any time should issues requiring this Court's intervention arise." (Order entering Stipulated Order of Dismissal, Docket No. 227.)

However, neither the Suicide Prevention Agreement nor the Stipulated Order were filed under seal; instead both are readily available to the public. Under seal are the assessments of the TCCs and Defendant regarding Defendant's progress toward the goals stated in the Stipulated Order. The purpose of these compliance reports is to assess Defendant's progress from two different perspectives: the Defendant's own reported compliance and the assessment of the neutral TCCs.  The reports of the TCCs are provided to both parties two weeks prior to finalization to allow for comment by the DOJ and Defendant. (Stipulated Order §VI(I)(2).)  This comment period therefore provides a mechanism to facilitate the parties' continued discussion regarding prison conditions in the areas specified, which in turn will permit the parties – not this Court – to determine when Defendant has substantially complied with the terms of the Stipulated Order such that termination is warranted. Termination of the Stipulated Order is a matter for the Court only if the parties request intervention.

This Court therefore concludes that the compliance reports are more akin to

settlement negotiation documents which have not been traditionally open to the public or the press. Lugosch, 435 F.3d at 120. Although these reports were not created until after the Stipulated Order was entered, they serve the same function as settlement negotiation documents: they allow for frank discussion between the parties, with the benefit of a neutral intermediary, about the proper policies needed to remediate the areas of concern, as well as Defendant's steps toward compliance with those policies.

With respect to the second prong of the experience and logic test, public access to these documents does not "play a significant positive role in the functioning" of this settlement process. Id. The compliance reports did not exist at the time the Court reviewed the stipulated agreements, and therefore it cannot be said that the substance of these reports had any bearing on the exercise of this Court's Article III power. See Amodeo II, 71 F.3d at 1048.  In fact, Defendant's six-month self assessment reports, unlike the TCC reports, are not even required by the Stipulated Order to be filed with the Court. (See § V(A).)  Further, "access to settlement discussions and documents has no value to those monitoring the exercise of Article III judicial power by the federal courts.  The judge cannot act upon these discussions or documents until they are final, and the judge may not be privy to all of them." Glens Falls Newspapers, Inc., 160 F.3d at 857.  Indeed, "[f]ew cases would ever be settled if the press or public were in attendance at a settlement conference or privy to settlement proposals." Id. at 858.  Promising participants confidentiality in settlement negotiations and other alternative dispute resolution processes " 'promotes the free flow of information that may result in settlement of a disputed.' " In re Teligent, Inc., 640 F.3d 53, 57-58 (2d Cir. 2011) (quoting In re Grand Jury Subpoena Dated Dec. 17, 1996, 148 F.3d 487, 492 (5th Cir. 1998)); see Fields-D'Arpino v. Restaurant Assocs, Inc..

39 F. Supp. 2d 412, 417 (S.D.N.Y. 1999) (because of the importance of the existence and perception of mutual fairness, confidentiality in mediation and settlement negotiations is critical).

This Court therefore concludes that the compliance reports, although falling within the broader category of judicial documents, are not part of the subset of documents to which the heightened First Amendment presumption of access attaches.

4.    Weight of the Presumption of Access

Despite having determined that only the common law presumption of access is applicable to the compliance reports at issue, it is still necessary to determine the weight to be afforded to this presumption by comparing "the interests advanced by the parties in light of the public interest and the duty of the courts." Amodeo I, 44 F.3d at 146 (internal quotation marks and citation omitted); Lugosch, 435 F.3d at 119.

> [T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.

Amodeo II, 71 F.3d at 1048.

Where, as here, the documents at issue fall within the middle of this continuum, the determination of what weight should be afforded is similar to the experience and logic test under the qualified First Amendment right of access. Id. at 1049-50.  Specifically, a court is required to consider whether "such documents are usually filed with the court and are generally available" to the public. Amodeo II, 71 F.3d at 1050; see Lugosch, 435 F.3d at 120.  As concluded above, despite being the result of, as opposed to a precursor to, the

Stipulated Order, the compliance reports are akin to settlement negotiations and documents that are afforded a "negligible to nonexistent presumption of access." Glens Falls Newspapers, Inc., 160 F.3d at 858.

"Once the weight of the presumption is determined, a court must balance competing considerations against it." Amodeo II, 71 F.3d at 1050. One such countervailing factor is the possibility that release of the sealed materials will likely "impair in a material way the performance of Article III functions," which includes fostering the settlement of any case or controversy. Glens Falls Newspapers, Inc., 160 F.3d at 857-58. In the instant case, the matters to be resolved by the parties involve numerous areas of prison condition reform, including policies related to sexual abuse prevention, medical care and autonomy, and the provision of appropriate mental health treatment. As with the extensive environmental clean-up at issue in Glens Falls Newspapers, "litigation to the ultimate end [in the instant case] is a blunt instrument for the resolution of the complex problems presented." 160 F.3d at 856. Frank discussions with staff members regarding past or continuing inadequacies are necessary in order to maintain continued improvement toward the goals outlined in the stipulated order. To that end, the Court credits the declarations of the Director of the Intensive Adult Mental Health Service of the Erie County Department of Mental Health, the Commissioner of the Erie County Department of Mental Health, the Chief Medical Officer for the Erie County Department of Health's Division of Correctional Health, and the Commissioner of the Erie County Department of Health that confidentiality has allowed personnel to readily communicate perceived inadequacies to the TCCs.[6] This,

---

[6]NYCLU correctly notes that these declarations rely on almost identical language, however, more specific statements would necessitate disclosure of the very information sought to be sealed.

in turn, has allowed the reporting, compliance and improvement process to be as productive as possible, and unsealing would have a chilling effect on progress.  (Ranney Decl. ¶¶ 4-9; Endress Decl. ¶¶ 4-9; Heidelberger Decl. ¶¶ 4-9; Burstein Decl. ¶¶ 4-9.)

The issues in this case also evoke the issue of government accountability, and the Court is cognizant that "[t]he public's interest is particularly legitimate and important where, as in this case, at least one of the parties to the action is a public entity or official." Pansy, 23 F.3d at 786.  "In a perfect world, the public would be kept abreast of all developments in the settlement discussions of lawsuits of public interest.  In our world, such disclosure would . . . result in no settlement discussions and no settlements." Glens Falls Newspapers, Inc., 160 F.3d at 856 (internal quotation marks and citation omitted). In this case, the Court gives significant weight to the fact that the detailed stipulated orders are not themselves under seal.  Indeed, although Defendant admits no liability, both orders clearly delineate the prison conditions that the parties agree require remediation, and specifies the policies and procedures to be enacted to alleviate the concerns regarding these conditions.  The public is therefore aware of the areas of concern, of the proposed means to alleviate those concerns, and, by virtue of the fact that the parties have not terminated the Stipulated Order, that substantial compliance has not yet been sufficiently maintained with respect to one or more agreed-upon terms.  (See Stipulated Order § VIII(B) (prohibiting the parties from terminating the order for at least one year after the creation of a reception housing unit in the ECHC and until Defendant has maintained substantial compliance with the remaining terms for a period of three consecutive six-month monitoring periods).

Public debate over these issues is therefore not unduly hampered by this settlement

process.   Indeed, although the compliance reports themselves are confidential, the Stipulated Order requires the Defendant to "maintain sufficient records to document that the provisions of this Stipulated Order are being properly implemented," including "all records or other documents that demonstrate that the County has taken such actions as described in its compliance reports (e.g. census summaries, policies, procedures, protocols, training materials, investigations, and incident reports)." (Stipulated Order § V(D).)  Members of the public are not precluded from seeking access to these documents to the extent that they fall within the purview of FOIL or its federal counterpart, the Freedom of Information Act ("FOIA").   As NYCLU itself points out, the Stipulated Order anticipates such requests and specifies only that the DOJ provide Defendant reasonable notice prior to disclosure under FOIA of any document provided by Defendant to a TCC or the DOJ. (Stipulated Order § V(H).)   Thus, the sealing of the compliance reports, which would not exist but for the stipulated agreements, neither limits "non-party rights that would otherwise prevail" nor constitutes an overly broad application of confidentiality. United States v. Bleznak, 153 F.3d 16, 19 (2d Cir. 1998) (affirming district court order holding that intervenors had no right to audio tapes where, among other things, those tapes would not have existed but for a consent decree); see Schoeps v. Museum of Modern Art, 603 F. Supp. 2d 673, 676 (S.D.N.Y. 2009) (noting that "the broad brush of confidentiality should be applied in a more nuanced way than is typically the case") (citing Pansy, 23 F.3d at 785-86).

Finally, Defendant relied on the Stipulated Order's confidentiality provisions that were approved by this Court, as well as the subsequent sealing orders, in filing the compliance reports.   Although this reliance would have little weight if those orders were

improvidently granted, this Court has determined otherwise; therefore they should not be disturbed absent extraordinary circumstances. <u>See</u> <u>Palmieri v. State of N.Y.</u>, 779 F.2d 861, 864-65 (2d Cir. 1985) (citing <u>Fed. Deposit Ins. Corp. v. Ernst & Ernst</u>, 677 F.2d 230, 232 (2d Cir. 1982); <u>see</u> <u>TheStreet.com</u>, 273 F.3d at 230 (noting that if protective orders were easily modified, parties would be less willing to settle their disputes).

## IV. CONCLUSION

In light of the public interest in access at stake, the Court grants NYLCU's motion to the extent it seeks intervention pursuant to Rule 24(b).  For the reasons discussed above, the further request that this Court unseal the previously filed compliance reports (Docket Nos. 229, 238, 241-43) and vacate the standing order permitting future compliance reports to also be filed under seal is denied.

## V. ORDERS

IT HEREBY IS ORDERED, that NYCLU's motion to intervene and unseal records (Docket No. 244) is GRANTED in part and DENIED in part;

FURTHER, because the limited matter for which intervention was granted has been decided, NYLCU is terminated from the case.

SO ORDERED.

Dated:   August 30, 2013
         Buffalo, New York

   /s/William M. Skretny
   WILLIAM M. SKRETNY
   Chief Judge
   United States District Court